UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE FIRE AND CASUALTY INSURANCE COMPANY; ALLSTATE PROPERTY AND CASUALTY INSURANCE COMPANY; ESURANCE INSURANCE COMPANY; and ESURANCE PROPERTY AND CASUALTY INSURANCE COMPANY, | C.A. No. _____ |
| Plaintiffs, | |
| v. | **Demand for Jury Trial** |
| AFFILIATED DIAGNOSTIC OF OAKLAND, LLC; CLEARPATH DIAGNOSTICS, LLC; VITAL COMMUNITY CARE, P.C.; SELECT SPECIALISTS LLC; MULTICARE HEALTH CENTER LLC; OPTIM CARE CENTER LLC; VCC SERVICES PLLC; GROESBECK RX LLC; DYNAMIC MEDICAL SUPPLY, LLC; UNITED LAB RX, LLC; GET WELL MEDICAL TRANSPORT CO.; TRANSPORTATION R US LLC; AMALE BAZZI; YOUSSEF BAKRI; NAMIR ZUKKOOR, M.D.; JASON BITKOWSKI, D.O.; and HALA MOUSSA, | |
| Defendants. | |

## <u>COMPLAINT</u>

Plaintiffs Allstate Insurance Company, Allstate Fire and Casualty Insurance

Company, Allstate Property and Casualty Insurance Company, Esurance Insurance

Company, and Esurance Property and Casualty Insurance Company (hereinafter collectively referred to as "Allstate" and/or "plaintiffs"), by their attorneys SMITH & BRINK, hereby allege as follows.

## I.   **<u>INTRODUCTION</u>**

1.     This is a case about medical clinics, a magnetic resonance imaging ("MRI") facility, a computed tomography scanning ("CT scan") facility, a durable medical equipment ("DME") issuer, a drug testing laboratory, transportation companies, pharmacies, and the owners, managers, agents, and representatives of the same who abused the medical benefits available under the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., by engaging in a scheme to defraud Allstate by submitting and causing to be submitted false and fraudulent medical records, bills, and invoices through interstate wires and the U.S. Mail seeking payment under the No-Fault Act for treatment and services that were not actually rendered, were medically unnecessary, were fraudulently billed, and were not lawfully rendered.

2.     Defendants Affiliated Diagnostic of Oakland, LLC ("Affiliated"), Clearpath Diagnostics, LLC ("Clearpath"), Vital Community Care, P.C. ("Vital"), Select Specialists LLC ("Select"), Multicare Health Center LLC ("Multicare"), Optim Care Center LLC ("Optim"), VCC Services PLLC ("VCC Services"), Groesbeck Rx LLC ("Groesbeck Rx"), Dynamic Medical Supply, LLC

("Dynamic"), United Lab Rx, LLC ("United Lab"), Get Well Medical Transport Co. ("Get Well"), Transportation R Us LLC ("TRU"), Amale Bazzi ("Bazzi"), Youssef Bakri ("Bakri"), Namir Zukkoor M.D. ("Zukkoor"), Jason Bitkowski, D.O. ("Bitkowski"), and Hala Moussa ("Moussa") (collectively, the "defendants") each conspired to, and did in fact, defraud Allstate by perpetuating an insurance fraud scheme in violation of federal and state law.

3.     The insurance fraud scheme perpetrated by the defendants was designed to, and did in fact, result in payments from Allstate to and on behalf of the defendants.

4.     All of the acts and omissions of the defendants, described throughout this Complaint, were undertaken intentionally.

5.     By this Complaint, and as detailed in each count set out below, Allstate brings this action for: (1) violations of the federal Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1962(c) and (d); (2) common law fraud; (3) civil conspiracy; (4) payment under mistake of fact; and (5) unjust enrichment. Allstate also seeks declaratory relief that no previously-denied and pending claims submitted to it by the defendants are compensable.

6.     As a result of the defendants' fraudulent acts, Allstate has paid in excess of $3,381,011 to them since September 21, 2017 related to the patients at issue in this Complaint.

## II.   <u>THE PARTIES</u>

### A.   <u>PLAINTIFFS</u>

7.     Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Illinois.

8.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company are each companies duly organized and existing under the laws of the State of Wisconsin.

9.     Allstate Insurance Company, Allstate Property and Casualty Insurance Company, and Allstate Fire and Casualty Insurance Company have their respective principal places of business in Northbrook, Illinois.

10.     Esurance Insurance Company and Esurance Property and Casualty Insurance Company have their respective principal places of business in San Francisco, California.

11.     At all times relevant to the allegations contained in this Complaint, the plaintiffs were authorized to conduct business in the State of Michigan.

### B.   <u>DEFENDANTS</u>

#### 1.     <u>Affiliated Diagnostic of Oakland, LLC</u>

12.     Affiliated Diagnostic of Oakland, LLC is organized under the laws of the State of Michigan.

4

13.     Affiliated's principal place of business is in Southfield, Michigan.

14.     Affiliated's members are Warren Ringold, M.D. ("Ringold") and Nesreen Bazzi ("N. Bazzi"), both of whom are citizens of the State of Michigan.

15.     At all relevant times, Affiliated was operated and controlled by Vital, Select, Multicare, Optim, TRU, Bazzi, Bakri, Zukkoor, and Bitkowski.

16.     Affiliated billed Allstate for services not rendered, that were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 1.

### 2.     Clearpath Diagnostics, LLC

17.     Clearpath Diagnostics, LLC is organized under the laws of the State of Michigan.

18.     Clearpath's principal place of business is in Southfield, Michigan.

19.     Clearpath's member is Ringold, who is a citizen of the State of Michigan.

20.     At all relevant times, Clearpath was operated and controlled by Vital, Select, Multicare, Optim, Get Well, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa.

21.     Clearpath billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 2.

### 3.      **Vital Community Care, P.C.**

22.     Vital Community Care, P.C. is incorporated under the laws of the State of Michigan.

23.     Vital's principal place of business is in Southfield, Michigan.

24.     At all relevant times, Vital was operated and controlled by Affiliated, Clearpath, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa.

25.     Vital billed Allstate for services that were not rendered, were medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 3.

### 4.      **Select Specialists LLC**

26.     Select Specialists LLC is organized under the laws of the State of Michigan.

27.     Select's principal place of business is in Southfield, Michigan.

28.     Select's member is Bitkowski, who is a citizen of the State of Michigan.

29.     At all relevant times, Select was operated and controlled by Affiliated, Clearpath, Vital, Multicare, Optim, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa.

30.     Select billed Allstate for services that were not rendered, medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 4.

###     5.     Multicare Health Center LLC

31.     Multicare Health Center LLC is organized under the laws of the State of Michigan.

32.     Multicare's principal place of business is in Warren, Michigan.

33.     Multicare's member is Jeffery Cook, D.C., who is a citizen of the State of Michigan.

34.     At all relevant times, Multicare was operated and controlled by Affiliated, Clearpath, Vital, Select, Optim, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa.

35.     Multicare billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 5.

###     6.     Optim Care Center LLC

36.     Optim Care Center LLC is organized under the laws of the State of Michigan.

37.     Optim's principal place of business is in Saint Clair Shores, Michigan.

38.     Optim's member is Saman Afroz, who is a citizen of the State of Michigan.

39.     At all relevant times, Optim was operated and controlled by Affiliated, Clearpath, Vital, Select, Multicare, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa.

40.     Optim billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 6.

### 7.     VCC Services PLLC

41.     VCC Services PLLC is organized under the laws of the State of Michigan.

42.     VCC Services's principal place of business is in Southfield, Michigan.

43.     VCC Services's member is Zukkoor, who is a citizen of the State of Michigan.

44.     At all relevant times, VCC Services was operated and controlled by Vital, Bazzi, Bakri, and Zukkoor.

45.     VCC Services billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 7.

### 8.    Groesbeck Rx LLC

46.    Groesbeck Rx LLC is organized under the laws of the State of Michigan.

47.    Groesbeck Rx's principal place of business is in Mt. Clemens, Michigan.

48.    Groesbeck Rx's member is Ali Saad, who is a citizen of the State of Michigan.

49.    At all relevant times, Groesbeck Rx was operated and controlled by Vital, Select, Multicare, Optim, Bazzi, Bakri, Zukkoor, and Bitkowski.

50.    Groesbeck Rx billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 8.

### 9.    Dynamic Medical Supply, LLC

51.    Dynamic Medical Supply, LLC is organized under the laws of the State of Michigan.

52.    Dynamic's principal place of business is in Southfield, Michigan.

53.    Dynamic's member is Souad Jomaa, who is a citizen of the State of Michigan.

54.    At all relevant times, Dynamic was operated and controlled by Vital, Select, Multicare, Optim, Bazzi, Bakri, Zukkoor, and Bitkowski.

55.     Dynamic billed Allstate for DME and medical supplies that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 9.

### 10.     United Lab Rx, LLC

56.      United Lab Rx, LLC is organized under the laws of the State of Michigan.

57.     United Lab's principal place of business is in Southfield, Michigan.

58.     United Lab's members are Abbas Khalil and Fadl el Hage Ali, who are both citizens of the State of Michigan.

59.     At all relevant times, United Lab was operated and controlled by Vital, Select, Multicare, Optim, Bazzi, Bakri, Zukkoor, and Bitkowski.

60.     United Lab billed Allstate for services that were not rendered, medically unnecessary (to the extent they were rendered at all), and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 10.

### 11.     Get Well Medical Transport Co.

61.      Get Well Medical Transport Co. is incorporated under the laws of the State of Michigan.

62.     Get Well's principal place of business is in Southfield, Michigan.

63.     At all relevant times, Get Well was operated and controlled by Clearpath, Vital, Select, Multicare, Optim, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa.

64.     Get Well billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 11.

## 12.     **Transportation R Us LLC**

65.     Transportation R Us LLC is organized under the laws of the State of Michigan.

66.     TRU's principal place of business is in Dearborn Heights, Michigan.

67.     TRU's member is Mohamad Abdulkarim, who is a citizen of the State of Michigan.

68.     At all relevant times, TRU was operated and controlled by Affiliated, Vital, Select, Multicare, Optim, Bazzi, Bakri, Zukkoor, and Bitkowski.

69.     TRU billed Allstate for services that were medically unnecessary (to the extent they were rendered at all) and were unlawful in relation to several Allstate insureds, including the patients identified in Exhibit 12.

## 13.     **Amale Bazzi**

70.     Amale Bazzi a/k/a Amanda Bazzi, Amale Makki, and Amanda Makki is a resident and citizen of the State of Michigan.

11

71.    At all relevant times, Bazzi operated and controlled Affiliated, Clearpath, Vital, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, and TRU.

### 14.    Youssef Bakri

72.    Youssef Bakri a/k/a Joe Bakki is a resident and citizen of the State of Michigan.

73.    At all relevant times, Bakri operated and controlled Affiliated, Clearpath, Vital, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, and TRU.

### 15.    Namir Zukkoor, M.D.

74.    Zukkoor is a resident and citizen of the State of Michigan.

75.    At all relevant times, Zukkoor operated and controlled Affiliated, Clearpath, Vital, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, and TRU.

### 16.    Jason Bitkowski, D.O.

76.    Bitkowski is a resident and citizen of the State of Michigan.

77.    At all relevant times, Bitkowski operated and controlled Affiliated, Clearpath, Vital, Select, Multicare, Optim, Groesbeck Rx, Dynamic, United Lab, Get Well, and TRU.

      17.   **Hala Moussa**

78.    Hala Moussa a/k/a Hala Makki is a resident and citizen of the State of Michigan.

79.    At all relevant times, Moussa operated and controlled Clearpath, Vital, Select, Multicare, Optim, and Get Well.

## III.   JURISDICTION AND VENUE

80.    Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this action on the basis of the claims brought by the plaintiffs under 18 U.S.C. § 1961, *et seq*. because they arise under the laws of the United States.

81.    Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this action because the amount in controversy, exclusive of interest and costs, exceeds $75,000 against each defendant and because it is between citizens of different states (as detailed in the foregoing section).

82.    Supplemental jurisdiction over the plaintiffs' state law claims is proper pursuant to 28 U.S.C. § 1367.

83.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the vast majority of the acts at issue in this Complaint were carried out within the Eastern District of Michigan.

## IV.   BACKGROUND ON THE DEFENDANTS AND THEIR SCHEME

84.     The defendants used the defendant clinics/RICO enterprises identified herein to submit exorbitant charges to Allstate for purported medical services, procedures, equipment, and medications that were not actually provided, were not medically necessary, and were fraudulently billed.

85.     The fraudulent scheme described herein was driven by defendant Bazzi and her son-in-law Bakri, and their businesses, clinics, and associates.

86.     Bazzi and Bakri oversaw and coordinated a network of solicitors and medical providers who worked in concert to identify individuals who claimed to have been involved in motor vehicle accidents, and to unlawfully and improperly induce such individuals to present to defendants Vital, Select, Multicare, and Optim (collectively, the "defendant clinics") for purported treatment that they did not actually need and that was not actually or lawfully performed to generate bills to Allstate.

87.     After patients were unlawfully and improperly induced to the defendant clinics for services that they did not actually need and that they did not seek of their own volition, the defendant clinics billed for excessive, unnecessary, and predetermined courses of treatment, if treatment was actually performed at all, and referred the patients to the other defendant entities, including Affiliated, Clearpath, United Lab, VCC Services, Groesbeck Rx, Dynamic, Get Well, and TRU, who in

14

turn billed for extensive, unnecessary, and unlawful predetermined treatments and services.

88.     Bazzi and Bakri's role in the fraudulent scheme derives from their ownership and control of Affiliated and the defendant clinics.

89.     While N. Bazzi, the daughter of Bazzi and the wife of Bakri, is the purported owner of an 87.5% interest in Affiliated, Bazzi has testified that due to medical issues, N. Bazzi is unable to work and that Bazzi and Bakri operate and control her businesses.

90.     Individuals associated with other medical providers have reported that Bazzi, Bakri, and Affiliated pay kickbacks to physicians and clinics for referring patients to Affiliated for medically unnecessary MRIs.

91.     Bazzi and Bakri also own, manage, operate, and control the other entity defendants.

92.     Upon information and belief, Bazzi, Bakri, and their associates provided capital and resources used to establish or continue operations of the entity defendants, which investments Bazzi and Bakri used to manage and control those defendants in order to implement their fraudulent scheme.

93.     The relationship between each of the defendant clinics, on the one hand, and Affiliated, Bazzi, and Bakri, on the other hand, is evidenced by the defendant clinics' practice of directing patients to Affiliated for excessive MRIs.

94.    For example, in 2019, Zukkoor (the ostensible owner of and physician at defendant Vital), ordered MRIs for patients on 133 occasions, 132 of which were allegedly performed at Affiliated, representing a 99% correlation.

95.    Casey Darrah, M.D. ("Darrah") of Vital ordered MRIs on 181 occasions in 2019, 175 of which were allegedly performed at Affiliated, representing a 96.6% correlation.

96.    Bitkowski of Select ordered MRIs on 445 occasions in 2019, 382 of which were allegedly performed at Affiliated, representing an 85.84% correlation.

97.    Allan Schwartz, D.O. ("Schwartz") of Multicare ordered MRIs on 165 occasions in 2019, 146 of which were allegedly performed at Affiliated, representing a 88.48% correlation.

98.    Nidal Jboor, M.D. ("Jboor") of Multicare ordered MRIs on 115 occasions in 2019, 102 of which were allegedly performed at Affiliated, an 88.7% correlation.

99.    Referrals of patients for medically unnecessary and excessive MRIs to Affiliated was only one part of the defendants' fraudulent scheme.

100.    After patients were unlawfully and improperly induced to the defendant clinics for services that they did not actually need and that they did not seek of their own volition, the defendant clinics' treatment of these patients consisted of an initial cursory examination and "re-examinations," at which the defendant clinics

automatically diagnosed multiple generalized sprains, strains, and "pain" of the back, neck, and extremities, and which they used to implement a predetermined treatment protocol that was designed to maximize the amount of billing for each patient and to generate a series of referrals to the other defendants as part of the defendants' fraudulent network.

101. The defendant clinics' predetermined treatment protocol included disability findings made to justify orders for transportation billed by defendants Get Well or TRU; orders for multiple, unnecessary tests, procedures, and screenings, including unnecessary x-rays, psychological testing, neurological testing, and electrodiagnostic testing billed for by the defendant clinics; unnecessary urine drug tests billed for by defendant United Lab; unnecessary CT Scans billed for by defendant Clearpath; unnecessary MRIs billed for by defendant Affiliated; unnecessary DME billed by defendant Dynamic; unnecessary prescriptions and compounded medications billed by defendants VCC Services and Groesbeck Rx; and unnecessary referrals for physical therapy, chiropractic treatment, and "pain management" injections to the other defendant clinics.

102. The defendants are all interrelated, and rely on a system of referrals and orders for medical services from the defendant clinics, who either arrange for the provision of the unnecessary testing, treatment, and supplies directly with the other defendants or direct their patients to the other defendants for those services.

103.   The interrelationship and existence of referral agreements between each of the defendants is proven by substantial evidence, including the significant overlap in patients between the defendants.

104.   For example, between January 1, 2019 and February 8, 2021, United Labs billed Allstate for purported urine drug testing relative to 252 different patients, 223 of whom were patients of the defendant clinics, representing a 88.5% correlation.  *See* Exhibits 3-6, 10.

105.   Between September 21, 2017 and February 11, 2021, VCC Services billed Allstate for allegedly dispensing medications to 185 different patients, 178 of whom were patients of Vital, a 96.2% correlation.  *See* Exhibits 3 and 7.

106.   Between September 21, 2017 and February 25, 2021, Get Well billed Allstate for alleged non-emergency medical transportation services for 250 different patients, 224 of whom were patients of Vital, Select, Multicare, and Optim, an 89.6% correlation.  *See* Exhibits 3-6, 11.

107.   Between December 2018 and December 14, 2020, TRU billed Allstate for alleged non-emergency medical transportation services for 74 different patients, 58 of whom were patients of Vital, Select, Multicare, and Optim, a 78.4% correlation.  *See* Exhibits 3-6, 12.

108.   Between September 21, 2017 and February 7, 2021, Dynamic billed Allstate for purportedly issuing DME to 425 different patients, 372 of whom were

18

patients of Vital, Select, Multicare, and Optim, an 87.5% correlation.  *See* Exhibits 3-6, 9.

109.   Between September 21, 2017 and February 22, 2021, Clearpath billed Allstate for purported CT scans of 61 different patients, 53 of whom were patients of Vital, Select, Multicare, and Optim, an 86.9% correlation.  *See* Exhibits 2, 3-6.

110.   Between May 2019 and January 18, 2021, Groesbeck Rx billed Allstate for allegedly dispensing medications to 173 different patients, 147 of whom were patients of Vital, Select, Multicare, and Optim, an 85% correlation.  *See* Exhibits 3-6, 8.

111.   The referral of patients between the defendants also is confirmed by patient testimony.

112.   Numerous patients have reported that the individuals or entities who illegally solicited them to seek treatment with the defendant clinics also arranged for transportation from Get Well or TRU.

113.   For example, patient J.M. (Claim No. 0525207767)[1] was allegedly involved in a motor vehicle accident on November 11, 2018 and defendants Vital and Get Well each began billing Allstate just three (3) days later, on November 14, 2018.

---

[1] To protect the confidentiality of the patients at issue herein, Allstate refers to them by initials and claim number.

114.   J.M. testified that he was solicited by an individual named "Nicole" who was associated with Vital and that this person arranged for his transportation to Vital that was billed by Get Well.

115.   Similarly, patient D.H. (Claim No. 0575041157) testified that Select arranged transportation for him to get to his initial appointment, which was billed to Allstate by Get Well and which purportedly occurred just one day after his alleged motor vehicle accident on December 18, 2019.

116.   Patients of the defendant clinics have also testified that they were directed to Affiliated for MRIs and to Clearpath for CT scans by the defendant clinics, including by the defendant clinics scheduling their appointments with Affiliated and Clearpath and arranging transportation with Get Well and TRU to get to and from Affiliated and Clearpath.

117.   For example, patient M.F. (Claim No. TXA-0248024) testified that Select set up an appointment at Affiliated for him, and Affiliated billed for the alleged performance of three (3) MRIs just five (5) days after M.F.'s alleged motor vehicle accident on January 6, 2020.

118.   Patient D.G. (Claim No. 0579113374) testified that Select referred her to Affiliated for MRIs and that someone then called her to let her know the time of her appointment that had been scheduled for her.

119.   There also is substantial overlap in the employees and operations of the defendant entities, further confirming their actions and agreements as part of an overarching scheme.

120.   During the period from October 1, 2017 to the present (the "relevant period"), Allstate has been billed for services purportedly rendered by Benson Selitsky, D.O. and Mark J. Brennan, M.D. at both Vital and Multicare.

121.   During the relevant period, Allstate has also been billed for services purportedly rendered by nurse practitioner Lashawnda Brown at both Select and Optim.

122.   Prior to forming Select, defendant Bitkowski worked out of Vital's office.

123.   Select and Clearpath share an office location.

124.   Invoices submitted by Dynamic to Allstate for DME it allegedly provided to patients are from an entity called "Biomedical Wholesale" whose resident agent, Hussein Nasser, uses an address that is also the address for Vital.

125.   The substantial overlap in patients, employees, treatment protocols, and offices between each of the defendants individually and collectively demonstrate the shared ownership, control, and coordination used to facilitate the defendants' fraudulent scheme.

126.   The defendants also have a history of participating in fraudulent schemes, and engaging physicians with disciplinary histories, which further confirms their disregard for appropriate standards of care and treatment protocols.

127.   On June 1, 2018, defendant Zukkoor entered into a consent order with the Michigan Board of Medicine admitting to violations of the Public Health Code, Mich. Comp. Laws 333.1101, *et seq.* constituting professional negligence.

128.   The charges against Zukkoor arose out of conduct involving efforts by Zukkoor to acquire medications through foreign and unapproved channels.

129.   On August 7, 2015, the Disciplinary Subcommittee of the Michigan Board of Health of Osteopathic Medicine and Surgery executed a Consent Order and Stipulation that limited the osteopathic medicine and surgery license of Bitkowski for a minimum of one year and placed him on probation for a minimum of three years.

130.   In March 2018, the Michigan Department of Licensing and Regulatory Affair, Bureau of Professional Licensing, filed an Administrative Complaint against Bitkowski alleging, *inter alia*, negligence in the practice of the health profession in violation of Mich. Comp. Laws 333.16221(a), failing to conform to minimal standards of acceptable, prevailing practice for the health profession in violation of Mich. Comp. Laws 333.16221(b)(i), and conduct that constitutes selling,

prescribing, giving away, or administering drugs for other than lawful diagnostic or therapeutic purposes, in violation of Mich. Comp. Laws 333.16221(c)(iv).

131.   According to the March 2018 Administrative Complaint against Bitkowski, in 2016 Bitkowski ranked among the highest Michigan prescribers of the commonly abused and diverted controlled substances Oxymorphone and Oxycodone.

132.   According to the March 2018 Administrative Complaint, between January and August 2016, Bitkowski averaged 134 controlled substance prescriptions a month. In September 2016, this went up to 804 and then averaged out to 700 a month for the rest of the year. On September 27, 2016 alone, Bitkowski wrote 129 controlled substance prescriptions to 93 individuals.

133.   According to the March 2018 Administrative Complaint, an expert review of medical files produced by Bitkowski revealed a number of deficiencies, including: (a) failure to obtain a comprehensive medical history; (b) failure to provide an evaluation for the possibility of addiction, diversion, and drug misuse, even in instances where there was clear evidence of these behaviors; (c) failure to document individualized analysis of risks and benefits of controlled substances prescribed; (d) failure to develop treatment plans and set up functional goals for patients, and (e) failure to assess how patients responded to medications.

134.   According to the March 2018 Administrative Complaint, an expert review of individual medical files produced by Bitkowski also revealed numerous additional failures, including: (a) failure to document a chief complaint, history of present illness, past medical history, family or social history, or any kind of physical exam; (b) failure to document any kind of diagnosis or plan for treatment; (c) failure to note positive tests for illegal or not-prescribed drugs; and (d) multiple prescriptions for oxymorphone and oxycodone well above the Centers for Disease Control and Prevention (CDC) maximum recommended dose without any discussion or explanation for why Bitkowski departed so far from the CDC guidelines.

135.   The March 2018 Administrative Complaint against Bitkowski was pending for nearly all of the period at issue in this Complaint and remains open at this time.

## V.    **BILLING FOR SERVICES NOT RENDERED**

136.   The defendants regularly submitted bills to Allstate seeking payment for treatment and services that were never rendered.

137.   All of the bills submitted by the defendants to Allstate through interstate wires and the U.S. Mail seeking payment for treatment that never occurred are fraudulent.

138.   Allstate is not required to pay the defendants for services that were never provided to patients at issue in this Complaint and is entitled to recover any payments tendered to the defendants in reliance on their fraudulent billing for services not rendered.

### A.   AFFILIATED BILLED FOR SERVICES NOT RENDERED

139.   Defendants Affiliated, Select, and Bitkowski conspired to bill for unnecessary arthrograms that were ordered as a matter of predetermined protocol by the defendant clinics.

140.   Each time these defendants billed for alleged arthrograms, they collectively submitted a series of bills totaling $9,350 for alleged performance of an MR arthrogram, a radiographic arthrogram, injection of contrast material, fluoroscopy to guide injection of contrast material, and supply of contrast material.

141.   However, at most the defendants performed an MR arthrogram and submitted additional bills for services not rendered in relation to the alleged radiographic arthrograms.

142.   For example, a physician at defendant Optim ordered an MR arthrogram of patient C.B.'s (Claim No. 0571268069) shoulder.

143.   On February 20, 2020, C.B. was allegedly injected with contrast material by Bitkowski at Select and then somehow transported to Affiliated's separate location for an MRI.

144.    Select billed for the alleged injection of dye, fluoroscopic guidance, and for supply of the dye.

145.    Affiliated billed for the alleged performed of the MRI, plus an additional $2,000 for a radiographic arthrogram that did not actually occur.

146.    Affiliated submitted similar improper charges for separate radiographic arthrograms that did not occur at least thirty-three (33) times relative to at least twenty-three (23) separate patients.  *See* Exhibit 1.

### B.    UNITED LAB BILLED FOR SERVICES NOT RENDERED

147.    United Lab billed Allstate for drug testing that it never actually performed.

148.    For example, United Lab billed $2,000 for alleged comprehensive definitive urine drug testing performed on a urine specimen collected at defendant Vital from patient R.K. (Claim No. 0560219693) on September 20, 2019.

149.    However, R.K. testified that she never provided a urine specimen at Vital, and therefore it is not possible that United Lab actually performed any urine drug testing services.

150.    United Lab also routinely billed for conducting drug testing that was not ordered by medical providers and for which it provided no testing results or other evidence that such testing actually was performed.

26

151.   The presumptive drug testing billed by United Lab frequently was billed on the same date of service as presumptive drug testing also billed by the defendant clinics.

152.   For example, United Lab billed Allstate using CPT Code[2] 80305 ("drug test(s), presumptive, any number of drug classes, any number of devices or procedures; capable of being read by direct optical observation only (e.g., utilizing immunoassay [e.g., dipsticks, cups, cards, or cartridges]), includes sample validation when performed") for presumptive drug testing with respect to patient O.M. (Claim No. 0566566963) on the same date that Select billed for conducting presumptive drug testing using the same CPT Code.

153.   There was no reason for Select to order presumptive drug testing by United Lab that Select had already performed, and the laboratory requisition order form submitted by Select to United Lab for patient O.M. included no indication that presumptive drug testing was ordered by Select.

154.   While United Lab submitted billing for presumptive drug testing to Allstate, United Lab's testing report included no results or evidence that presumptive drug testing was actually performed.

---

[2] Current Procedural Terminology (CPT) Codes are published by the American Medical Association ("AMA") to facilitate the efficient processing of healthcare charges by insurance carriers and other private and governmental healthcare payors.

155.   As another example, on May 19, 2020, United Lab billed Allstate using CPT Code 80305 for presumptive drug testing with respect patient C.K. (Claim No. 0582961132) despite the fact that the laboratory requisition order form submitted by Vital to United Lab for patient C.K. was for definitive drug testing and included no indication that presumptive drug testing was done, and even though United Lab's report include no evidence that such testing was actually performed or the results of such testing.

156.   United Lab has billed Allstate using CPT Code 80305 on at least 313 occasions despite not producing documentation with any indication that such testing occurred at all.  *See* Exhibit 10.

157.   The billing for presumptive drug testing by United Lab not ordered by medical providers and not actually performed by United Lab constitutes billing for services that were not actually rendered.

158.   United Lab also frequently billed Allstate for specimen validity testing using CPT codes 82570 and 83986, which require a specific order from a medical provider.

159.   United Lab routinely billed for specimen validity testing even though such testing was not ordered by the medical provider and despite the fact that its reports included no specimen validity testing results.

160.   Examples of United Lab's billing for services not rendered using CPT codes 82570 and 83986 include:

- Patient S.A. (Claim No. 0570685586): United Labs billed Allstate for specimen validity testing using CPT Codes 82570 and 83986 that was not specifically ordered by the medical provider and for which its records included no specimen validity testing results.

- Patient A.C. (Claim No. 0570039651): United Labs billed Allstate for specimen validity testing using CPT Codes 82570 and 83986 that was not specifically ordered by the medical provider and for which its records included no specimen validity testing results.

161.   United Lab's billing for specimen validity testing that was not ordered by a medical provider, for which it provided no results, and which it did not perform constitutes billing for services not rendered.

## C.   SELECT BILLED FOR SERVICES NOT RENDERED

162.   Select routinely billed for alleged psychological testing of patients using CPT Code 96103 (psychological testing; deleted code as of January 1, 2019) and CPT Code 96138 (Psychological or neuropsychological test administration and scoring by technician), which requires a minimum timed component of thirty (30) minutes.

163.   The billing submitted to Allstate by Select did not document the time spent on the alleged psychological testing and did not satisfy the timed component of this service.

164. For example, Select submitted billing for Patient O.M. (Claim No. 0566566963) using CPT code 96138 that did not document or support the timed component of the code and that was improperly unbundled from the evaluation and management code also billed by Select.

165. The billing submitted by Select using CPT Code 96103 and 96138 constitutes billing for services that were not actually rendered to patients.

### D. VITAL BILLED FOR SERVICES NOT RENDERED

166. Vital routinely billed for x-rays of the lumbar spine using CPT Code 72100 ("radiological examination, spine, lumbrosacral; 2 or 3 views").

167. Since September 21, 2017, Vital has billed Allstate more than $39,550 using CPT Code 72100.

168. In order to bill using CPT Code 72100, a medical provider is required to obtain two or three views of the lumbar spine.

169. The documentation submitted by Vital to support this billing routinely failed to identify what views were taken or the number of views taken, indicating that only a single view was taken.

170. Billing using CPT Code 72100 without obtaining and documenting multiple views constitutes billing for services that were not actually rendered.

171.   As detailed below, Vital and its co-defendants routinely pressured patients to undergo unnecessary invasive procedures, including surgeries, and when they did, they also billed for purported components that were not actually performed.

172.   For example, Vital billed for a purported knee surgery to patient S.M. (Claim No. 0431030659) on March 22, 2018 by a physician named Robert Swift, D.O. ("Swift") at an ambulatory surgery center called Surgical Center of Southfield, LLC d/b/a Fountain View Surgery Center ("Fountain View").

173.   Swift submitted a bill to Allstate through his own medical practice called Performance Orthopedics of Michigan PLLC ("Performance Orthopedics") and claimed to have performed a medial meniscectomy (CPT Code 29881) and a limited synovectomy (CPT Code 29875).

174.   Vital also submitted a bill for Swift's services for the same surgery, which was entirely improper as it was a double bill for the exact same services.

175.   Further, Vital falsely claimed that the alleged surgery was far more extensive than Swift reported in his billing or reported in his operative report.

176.   Vital's bill claimed that the surgery included both a medial <u>and</u> lateral meniscectomy (CPT Code 29880), even though the operative report clearly states that the lateral meniscus was probed but was found to be stable and was not repaired.

177.   Vital also claimed that the synovectomy was major and of two or more compartments of S.M.'s knee (CPT Code 29876), in contradiction to Swift's bill and report of a "limited" procedure (if it was performed at all).

178.   In addition to falsely reporting these procedures, Vital billed for alleged debridement (CPT Code 29877) and a separate charge for diagnostic arthroscopy (CPT Code 29870), both of which are improper.

179.   Further confirming that the services billed by Vital did not actually occur, Fountain View's facility fee bill for the alleged March 22, 2018 procedure to S.M. included only a charge for a medial meniscectomy (CPT Code 29881) (along with a charge for a shoulder arthroscopy procedure that clearly did not occur at all).

180.   Similarly, Vital billed for an alleged shoulder surgery to patient Z.T. (Claim No. 0475979290) by Swift at Fountain View on September 27, 2018.

181.   As with the purported surgery to S.M., Swift submitted his own charge through Performance Orthopedics and all of Vital's charges were improper and fraudulent double bills for the exact same services.

182.   The specific charges billed by Vital also again differed from those billed by Swift and Fountain View and the narrative set forth by the operative report.

183.   In this instance, Vital added a charge for an alleged biceps tenodesis (CPT Code 29828), which involves detaching and reattaching a tendon to the patient's humerus, that neither Swift nor Fountain View billed.

184.   This charge was not billed by the other providers because it did not take place.

185.   Vital also billed for services not actually performed during spinal surgeries.

186.   For example, Vital billed for an alleged cervical fusion surgery to patient M.L. (Claim No. 0487923617) performed by Peter Grain, M.D. ("Grain") at Southeast Michigan Surgical Hospital, LLC ("SE MI Hospital") on July 30, 2018.

187.   Vital unbundled several charges for identical procedures, which is a fraudulent billing practice discussed in further detail below.

188.   Vital billed for the alleged performance of a structural allograft procedure (CPT Code 20931) while SE MI Hospital billed for a morselized allograft (CPT Code 20930).

189.   Vital also billed for performing a vertebral corpectomy (CPT Code 63081) to M.L.'s cervical spine, which would have involved removing at least half of M.L.'s vertebra at the level of the of the alleged procedure, and which did not occur at all.

190.   All bills by Vital for procedures and components of procedures that were not actually performed were fraudulent and are not eligible for payment by Allstate, and Allstate is entitled to repayment of the amounts it was induced to pay by the defendants' fraudulent submissions.

## VI.    UNLAWFUL SOLICITATION BY THE DEFENDANTS

### A.    MICHIGAN'S ANTI-SOLICITATION LAWS

191.    The solicitation and exploitation of motor vehicle accident victims for profit or professional gain is strictly prohibited in the State of Michigan, as is the use of factors other than legitimate medical judgment to bill insurers like Allstate.

192.    Michigan law prohibits "[a]ny physician or surgeon engaged in the practice of medicine in this state" from "employ[ing] any solicitor, capper, or drummer for the purpose of procuring patients."  Mich. Comp. Laws § 750.429.

193.    Other conduct prohibited under Michigan law ranges from the identification and solicitation of potential patients of medical providers, to the use of agents to solicit patients, and to the receipt of fees obtained through such fraudulent methods, including the mere participation in any schemes relating to such activity.  *See* Mich. Comp. Laws §§ 750.410b, 750.429, 257.503, and 500.4503(h)-(i).

194.    It is also illegal in Michigan to contact any motor vehicle accident victim to offer a service within thirty (30) days of the accident, Mich. Comp. Laws § 750.410b, and to use police reports to solicit any person identified in the report, Mich. Comp. Laws § 257.503(1)(a).

195.    Only "lawfully-render[ed] treatment" is compensable under Michigan's No-Fault Act.  Mich. Comp. Laws § 500.3157(1).

196.   As set forth more fully below, the defendants participated in and willingly benefited from schemes to solicit patients through conduct prohibited under Michigan law.

### B.   IMPROPER AND UNLAWFUL METHODS USED TO SOLICIT PATIENTS

197.   Despite Michigan's prohibition on patient solicitation, the defendants actively employed a number of unlawful and improper methods to obtain patients.

198.   Numerous patients reported receiving phone calls within days of their alleged accidents from persons soliciting them to appear at the defendant clinics.

199.   Multiple patients have testified that they were contacted and directed to the defendant clinics for treatment by Legal Genius, PLLC ("Legal Genius").

200.   Patient C.B. (Claim No. 0571268069) testified that after an alleged accident in November 2019, she was contacted a short time later by "Legal Geniuses" (sic), which referred her to defendant Optim.  Allstate was subsequently billed by Affiliated, Select, Groesbeck, United Lab, and Vital in addition to Optim.

201.   Patient G.N. (Claim No. 0574499389) stated that someone who initially falsely claimed to be associated with Allstate and later was discovered to be associated with Legal Genius contacted him and came to his home, and that he was referred to Optim by that person.  Allstate was subsequently billed by United Lab in addition to Optim.

202. Patient C.S. (Claim No. TXA-0253386) reported to Allstate that she was solicited by Legal Genius and was subsequently seen by Vital. Allstate was then billed by Groesbeck, Dynamic, VCC, Affiliated, and United Lab in addition to Vital.

203. On June 17, 2020, Mathew Carl Schwartz ("Schwartz"), who owns and controls Legal Genius, was charged by the United States of America with, *inter alia*, Conspiracy to Defraud the United States in violation of 18 U.S.C. § 371 in the matter of United States of America v. Mathew Carl Schwartz, 4:20-cr-20263-MFL-APP (E.D. Mich.).

204. The criminal complaint against Schwartz alleges that Legal Genius conspired with others to obtain State of Michigan Traffic Crash Reports through unlawful means in order to solicit crash victims in order to "refer[] them to personal injury lawyers, chiropractors, Magnetic Resonance Imaging ("MRI") facilities, and health care professionals," for which Schwartz and Legal Genius received kickbacks.

205. In or about October 2020, Schwartz pleaded guilty to the charges of conspiring to defraud the United States and to stealing crash reports from the Detroit Police Department.

206.   In addition to the admittedly illegal solicitation by Legal Genius on behalf of the defendants, numerous patients have reported being solicited to obtain treatment at the defendant clinics through other persons and entities:

- Patient S.S. (Claim No. TXA-0244610) reported that following her alleged accident she was contacted by "Mary Carson" of "Injury Health Center of MI" who referred her to Select.  Allstate was then billed by defendants Groesbeck, Affiliated, and United Lab in addition to Select.

- Patient J.M (Claim No. 0525207767) testified that he was contacted by someone named "Nicole" at Vital "the same week of the accident if not the next day" and was told that he was entitled to money as a result of his accident and that he was going to be set up to see a lawyer and doctors. Allstate was then billed by defendants Affiliated, Select, Clearpath, Dynamic, and Get Well in addition to Vital.

- Patient T.G. (Claim No. 0603793456) reported to Allstate that after her alleged accident she was contacted by someone affiliated with "Legal Services" who told her to "follow up" with Multicare, and gave her a "code word" with instructions she should not talk to anyone about the accident or her purported injuries if they did not know the code word.

- Patient R.L. (Claim No. 0493167043) reported that following his alleged accident he was referred to Multicare by his attorney.  Allstate was then billed by defendants Affiliated, Select, Clearpath, Dynamic, and Get Well in addition to Multicare.

- Patient D.H. (Claim No. 0575041157) testified he visited Select because he received a phone call from a doctor after his alleged accident asking if he would like to "come in and see about getting some therapy."  Allstate was then billed by Affiliated, Get Well, Groesbeck, and United Lab in addition to Select.

- Patient R.K. (Claim No. 0560219693) testified that following her alleged motor vehicle accident, she received calls on her father's cell phone from defendant Get Well and the Law Offices of Berry and Berri.  Both Get

Well and the law firm directed R.K. to report to Vital, which she did and which resulted in billing for services not rendered as described above.

- Patient R.M. (Claim No. FLA-0287053) testified that an individual named Matt Miller called her cell phone after her alleged motor vehicle accident and directed her to defendant Multicare.  R.M. was not aware of how this individual obtained her phone number.

- Patient C.H. (Claim No. 0587797761) testified that she was contacted by an individual named "Mike" after her alleged motor vehicle accident, and that Mike directed her to defendant Vital.

- Patient M.A. (Claim No. FLA-0301905) reported that he was called by a "case worker" who insisted that he present at defendant Vital.

207.   The unlawful solicitation and unqualified referral of patients to the defendants by laypersons was an improper non-medical factor that directly led to the unnecessary and otherwise fraudulent bills submitted to Allstate detailed herein.

208.   The referral of alleged accident victims to the defendant clinics bore no relation to the medical necessity of the patients at issue in this Complaint, who would not have sought treatment but for the unlawful solicitation and referrals.

209.   The defendants enabled and participated in this system of solicitation and referrals in order to obtain patients on whom they could implement a predetermined treatment protocol as described below in order to bill for excessive and medically unnecessary treatment designed to maximize the charges billed to Allstate under the No-Fault Act.

210.   Accordingly, the defendants' treatment of the solicited patients constituted unlawful, unreasonable, and unnecessary services that is not payable under the No-Fault Act.

## VII.  UNLAWFUL AND UNLICENSED TREATMENT AND SERVICES

211.   The defendants violated several Michigan laws and regulations in their effort to bill Allstate as much as possible, including laws and regulations requiring licensure for the lawful provision of medical treatments and services.

### A.   UNLAWFUL AND UNLICENSED ISSUANCE OF DME

212.   In order to legally issue DME in Michigan, a provider must obtain a license from the Michigan Board of Pharmacy.

213.   A license from the Michigan Board of Pharmacy is required for all "drugs and devices manufactured, distributed, prescribed, dispensed, administered, or issued in this state . . . ."  Mich. Comp. Laws § 333.17722.

214.   Optim routinely billed Allstate for purportedly dispensing and issuing DME to its patients.

215.   Optim never possessed a valid license to issue DME in the State of Michigan at any time relevant to this action.

216.   Despite having no license to issue DME, since July 2019, Optim has billed Allstate more than $11,875 for DME purportedly issued to at least sixteen (16) different patients.

217.   Not only was the DME billed by Optim medically unnecessary, as discussed in detail *infra*, because Optim did not possess a license to issue DME to patients it was unlawful and not compensable under the No-Fault Act.

218.   Allstate is not required to pay Optim for DME issued without a license and is entitled to reimbursement for payments it was induced to make by Optim's fraudulent bills.

## B.   UNLAWFUL AND UNLICENSED DISTRIBUTION OF PRESCRIPTION MEDICATIONS

219.   VCC Services submitted and caused to be submitted to Allstate records, bills, and other medical documentation for services that were not compensable under Michigan's No-Fault Act because they were not lawfully rendered.

220.   The State of Michigan prohibits the operation of a pharmacy unless licensed by the Board of Pharmacy.  Mich. Comp. Laws § 333.17741(1).

221.   Michigan defines a pharmacy as "a building or part of a building in which the practice of pharmacy is conducted."  Mich. Comp. Laws § 333.17707(5).

222.   The "practice of pharmacy" includes the interpretation and evaluation of a prescription and the compounding, dispensing, safe storage, and distribution of drugs and devices.  Mich. Comp. Laws § 333.17707(7).

223.   VCC Services submitted bills to Allstate for drugs allegedly dispensed to Allstate insureds, but VCC Services does not possess a pharmacy license from the State of Michigan.

224.   Since September 21, 2017, VCC Services billed Allstate for more than 590 prescription medications with respect to at least 185 patients.

225.   VCC Services therefore engaged in the practice of pharmacy without the appropriate license.

226.   Dispensing medication without a pharmacy license is unlawful in Michigan.

227.   As such, Allstate is not obligated to pay any pending bills for medication dispensed or distributed by VCC Services and is entitled to reimbursement for those bills for which it has already tendered payment.

## C.   UNSUPERVISED TREATMENT

228.   Many of the bills submitted by defendant Optim were for evaluations and services allegedly performed by nurse practitioners.

229.   Defendants Affiliated, Clearpath, Vital, Select, Groesbeck, Dynamic, United Lab, Get Well, and TRU also submitted bills for services allegedly ordered by Optim nurse practitioners or that were based on purported evaluations by Optim nurse practitioners.

230.   Michigan law mandates that for delegation to nurse practitioners, supervision by a licensed physician is required. *See* Mich. Comp. Laws § 333.16215.

231.   Optim's nurse practitioners were not properly supervised by a licensed physician, to the extent they were supervised at all.

232.   One licensed physician who was hired by Optim to allegedly supervise nurse practitioners was Iqbal Nasir, M.D. ("Nasir"), an ear, nose, and throat specialist who has had his medical license suspended in both Michigan and Ohio.

233.   Nasir testified that he was paid a couple hundred dollars a day to go into the Optim clinic occasionally on Fridays and Saturdays, ostensibly to supervise a nurse practitioner.

234.   Nasir testified that he worked at Optim "for about a couple weeks or a month at the most."

235.   Optim submitted bills and records to Allstate representing that Nasir purportedly "discussed and approved" patient evaluations and plans for a period of at least eight months, from August 2019 to March 2020.

236.   For example, Optim represented that treatment plans for patient B.E. (Claim No. 0560682585) were approved by Nasir on August 27, 2019, September 23, 2019, and March 10, 2020.

237.   Nasir did not actually work at Optim for this time period, and the examinations and treatment plans (including extensive orders for services that were billed by Optim's co-defendants) made by nurse practitioners could not have been supervised as required by Michigan law.

238.   Nasir further testified that he was certain that he ceased his employment with Optim by December 2019, because he spent that month traveling in the Middle East.

239.   Moreover, Nasir testified that to the extent he actually reviewed treatment plans, it was done during the limited days that he was at Optim's office (i.e., occasional Fridays and Saturdays).

240.   Optim's own website confirms that it is not actually open on Saturdays at all, which further confirms that Nasir did not provide any actual supervision.

241.   When a patient was purportedly seen on a different day of the week, Nasir testified that he was not consulted or asked to sign off on treatment plans.

242.   For example, patient B.E.'s purported initial evaluation by a nurse practitioner was on August 27, 2019, which was a Tuesday, and it resulted in orders for physical therapy, urine drug testing, x-ray imaging, topical and oral medications, and for medical transportation, all of which directly resulted in additional bills by Optim and its co-defendants and co-conspirators.

243.   Nasir confirmed during testimony that he did not review this order when it was made, and the express representation on the record submitted by Optim that he did so review was false.

244.   Allstate is not required to pay for treatment and services that were ordered and performed, if at all, by nurse practitioners without legally required physician supervision.

## VIII. UNREASONABLE AND UNNECESSARY FRAUDULENT TREATMENT

245.   The defendants' willingness to unlawfully solicit auto accident victims and to bill for services that were never rendered or that were rendered unlawfully demonstrates their willingness to also bill for treatment that was unreasonable and unnecessary.

246.   The defendants' goal was to bill as much as possible, regardless of whether treatment was reasonably necessary to patients' care, recovery, or rehabilitation, in order to generate bills for submission to Allstate.

247.   To maximize their financial gain, the defendants adhered to a predetermined protocol of unnecessary, indiscriminate, and excessive treatment and testing, as discussed more fully below.

248.   The defendants' purported treatment violated standards of care in the medical community, as the vast majority of testing, diagnostics, DME, referrals, procedures, and treatment were not medically indicated, and were redundant, excessive, and repeated without any benefit to patients.

249.   The full extent and pattern of the defendants' misrepresentations regarding the lawfulness and necessity of the treatment they billed for was not known

to Allstate until it undertook the full investigation that culminated in the filing of this action, including identification of the defendants' pattern of overtreatment.

250. The unnecessary treatment billed by the defendants, discussed more fully below, includes the treatment and patients set out in the charts annexed hereto at Exhibits 1 through 12.

251. All of the bills submitted by the defendants to Allstate through the U.S. Mail and interstate wires seeking payment for unnecessary, excessive, unlawful, and unreasonable treatment are fraudulent.

252. Allstate is not required to pay the defendants for treatment that was medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraud.

253. None of the above facts were known to Allstate until it undertook its investigation that resulted in the commencement of this action, and are not evident within the four corners of the medical records and bills submitted to Allstate by the defendants.

## A. THE DEFENDANTS' PREDETERMINED TREATMENT PROTOCOL

254. Allstate's investigation revealed a strikingly similar pattern of alleged diagnoses and treatment across all patients, including the discovery of a pattern by the defendants in (1) routinely finding substantially similar reports of generalized complaints of non-specific pain in patients' neck, back, and various joints and

extremities, (2) making highly similar, non-specific, and generalized diagnoses of "pain," "sprains," "strains," and "injury," (3) providing mirrored treatment plans, and (4) failing to indicate short- and/or long-term goals for patients.

255.   Each patient was assessed as having extremely similar reports of complaints and purported objective findings regardless of the type of accident claimed and regardless of each patient's age, sex, and pre-accident condition.

256.   These predetermined and boilerplate assessments were used to justify the extraordinary amounts of bills submitted to Allstate for purported treatment, testing, prescriptions, DME, physical therapy, and other billing submitted by the defendants and their associates.

257.   Many of the services for which the defendants billed, including physical therapy, non-emergency medical transportation, MRIs, CT scans, electrodiagnostic testing, medications, and DME, required physician prescriptions.

258.   The defendants used Vital, Select, Multicare, and Optim to generate fabricated diagnoses and issue prescriptions and orders for testing that were not based on the patient's medical needs, but rather in order to generate additional billing to Allstate.

259.   Vital, Select, Multicare, and Optim all implemented a highly similar predetermined treatment protocol with respect to almost every motor vehicle patient they saw.

260.   At each patient's initial visit and at each follow-up visit, the defendant clinics repeatedly diagnosed multiple "sprains," "strains," and "pain" in order to create the appearance of significant injuries where they did not exist in order to justify application of the defendants' predetermined treatment protocol that was designed to maximize the amount the defendants billed to Allstate.

261.   As part of their predetermined treatment protocol, each of the defendant clinics routinely ordered multiple x-rays, CT Scans, or MRIs at the initial patient visit and at subsequent follow-up visits for every area of the body for which the patient allegedly reported pain, and for which the defendant clinics made diagnosis of a "strain," "sprain," or "pain."

262.   Each of the defendant clinics routinely ordered each patient prescription and over-the-counter pain and anti-inflammatory medications, typically billed by an in-house pharmacy such as VCC Services or an associated pharmacy such as Groesbeck Rx at the initial patient visit.

263.   For example, nearly every Vital patient received prescriptions for one or more pain and anti-inflammatory medications such as Mobic and Flexeril, as well as lidocaine patches, pain creams, and gels, which were billed to Allstate by Vital's in-house "pharmacy" VCC Services.

264. The defendant clinics' predetermined treatment protocol also included prescriptions for DME, generally consisting of a combination of braces, heating pads, pillows, and Biofreeze billed by defendant Dynamic.

265. Allstate was billed for this DME with respect to nearly every one of its insureds that purportedly treated at the defendant clinics.

266. Many patients have testified that the DME was ready and waiting for them, often wrapped in a trash bag, when they arrived for their initial appointment, further confirming that it was predetermined and not patient specific.

267. Each of the defendant clinics also routinely ordered extensive urine drug testing for each patient that was billed to Allstate by defendant United Lab.

268. Each of the defendant clinics' predetermined patient orders also included (1) prescriptions for physical therapy two to three times a week for four weeks, (2) disability findings, and (3) follow-up visits approximately every four weeks.

269. Each of the defendant clinics used the predetermined monthly patient follow-up appointments to continue implementation of the treatment protocol, without consideration of medical necessity or whether the testing and treatment was medically necessary or appropriate.

270. For example, Vital's initial evaluation report routinely included language stating that "pending improvement with conservative treatments and

medications, MRIs, CT scans and other diagnostic modalities will be ordered to rule out any pathology that may have arisen through this motor vehicle accident."

271. This phrase was a self-completing statement, as upon completing its initial "reevaluation" of a patient, Vital invariably ordered further testing of patients, typically including multiple unnecessary MRIs and CT Scans, whether or not the patient reported improvement.

272. Each of the defendant clinics used follow-up appointments to order medically unnecessary testing and treatment, or to pressure patients to undergo testing and medical treatment that was medically unnecessary.

273. The follow-up monthly appointments were used by each of the defendant clinics to generate additional billing through (1) continued disability findings to permit billing for medical transportation, (2) continued physical therapy prescriptions, (3) orders for multiple unnecessary MRIs billed by defendant Affiliated and multiple unnecessary CT Scans billed by defendant Clearpath, (4) orders for electrodiagnostic testing, electroencephalograms, and other testing, (5) additional prescriptions, including prescriptions for compounded medications billed by defendants Groesbeck Rx and VCC Services, and (6) pain management referrals for unnecessary injections, for which patients were directed to defendant Select.

274. Defendants Multicare and Optim also purported to maintain their own physical therapy and chiropractic practices, meaning that nearly all of the patients

seen by those defendant clinics also received physical therapy and chiropractic treatment there as part of their predetermined treatment protocols as well.

275.   Because the defendant clinics ordered the same predetermined course of extensive treatment and testing for nearly every patient, regardless of their age, injury, co-morbidities or status, such treatment was never appropriate.

276.   Treatment and testing that was ordered by the defendant clinics as a matter of course to generate charges by other defendants was not medically necessary.

## B.   EXCESSIVE AND UNNECESSARY DISABILITY CERTIFICATES AND PRESCRIPTIONS

277.   A key component of the defendants' protocol was to provide disability certificates and prescriptions, both to bolster the appearance of legitimate claims and as an incentive to keep patients returning to them.

278.   The routine provision of disability certificates and prescriptions was also used to justify the bills for transportation services submitted by defendants Get Well and TRU.

279.   Nearly universally, the defendant clinics wrote disability certificates for unnecessary transportation services, household assistance, and replacement services, typically on a monthly basis, and without regard to the patient's individual medical needs.

280.    The vast majority of patients at issue in this Complaint had no objective documented deficits that could substantiate disability findings.

281.    This is demonstrated by the fact that on many occasions the defendant clinics continued making disability findings until the patient specifically requested that the defendant clinic not make a disability finding that, for example, the patient was unable to work or unable to drive.

282.    The decision to issue a disability finding or not that is based on the preferences of the patient is not properly based on a finding of medical necessity.

283.    In many instances, the disability services began before the patients were even seen by the defendant clinics, as many patients at issue in this Complaint were transported by Get Well, TRU, and other medical transportation companies to their initial visit with the defendant clinics.

284.    The defendants' nearly universal provision of disability certificates was not rooted in reasonable medical care, but served instead to ensure the patients would appear at the defendant clinics and to create the appearance of necessity for medical transportation, for which defendants Get Well and TRU improperly billed Allstate.

## C.    EXCESSIVE AND UNNECESSARY PHYSICAL THERAPY AND CHIROPRACTIC TREATMENT

285.    Nearly every patient of Vital, Select, Multicare, and Optim was directed to undergo physical therapy at every appointment, and patients at Multicare and Optim were routinely directed to receive chiropractic treatment as well.

51

286.   The automatic prescription of physical therapy and chiropractic for nearly every patient was designed to, and did in fact, financially benefit the defendants and their associates, including defendants Multicare and Optim, which also directly billed for purported physical therapy and chiropractic services.

287.   Patients of Multicare and Optim almost always underwent simultaneous courses of physical therapy and chiropractic treatment, each of which typically began with a purported initial evaluation by a physician at those defendant clinics, followed by purported initial evaluations by a chiropractor and a physical therapist also at those defendant clinics.

288.   Of the twenty-six (26) patients for whom Optim billed Allstate for an examination by a physician or nurse practitioner, twenty-three (23) (more than 88%) also purportedly received physical therapy at Optim.

289.   Nearly 77% of the patients for whom Multicare billed Allstate for an examination by a physician or nurse practitioner also purportedly received physical therapy at Multicare.

290.   In other words, Optim and Multicare recommended ongoing physical therapy and chiropractic treatment to the vast majority of patients, for which they then billed.

291.   Patients have reported that they were not given the option of seeking physical therapy or chiropractic care elsewhere, as Optim and Multicare simply scheduled such treatment with their own providers on the patient's behalf.

292.   For example, patient C.B. (Claim No. 0571268069) testified:

Q: Did someone recommend you have chiropractic treatment?

A: I guess the doctor did. I guess it was in her plan. I just know the lady at the front desk, she says, okay, well, you're gonna see the chiropractor today; okay, you do this, you do that, and -- which is like, you know, so confusing because all I want to do, I want relief. …

Q: And going back to the chiro treatment, do you remember this being part of the treatment plan?

A: Really, I don't -- I don't know what the treatment plan is.  . . . So I don't really know. Nobody gave me a plan of care. It was just more so the doctor talked about physical therapy, you know, more so. As far as the chiropractor, like I say, I don't know if it's part of their treatment plan. I just was going with what I was told to do.

293.   The protocol prescription of physical therapy and chiropractic treatment for nearly every patient was designed to, and did in fact, financially benefit the defendants because that treatment was also billed by Optim, Multicare, and other of the defendants' associates, and was not designed or intended to treat any actual injury.

294.   Physicians at the defendant clinics rarely evaluated the efficacy of physical therapy and almost never altered or discontinued their predetermined

physical therapy prescriptions, demonstrating that it was not ordered to treat any actual condition or injury.

295.   Valid orders for physical therapy treatment require the services be objectively indicated and cannot be based on a patient's subjective complaints of pain alone.

296.   Physical therapy and chiropractic treatment that is ordered for every patient automatically, instead of based on objective indications specific to the particular patient, can never be medically necessary.

297.   By using a predetermined treatment protocol to automatically prescribe patients physical therapy and chiropractic, the defendant clinics billed Allstate for physical therapy and chiropractic treatment that was excessive, unnecessary, and far exceeded applicable standards of care.

### 1.   **Fabricated Exam Findings**

298.   Frequently, the defendants fabricated exam findings in order to justify the excessive treatment they billed.

299.   As one example of this practice, patient J.J. (Claim No. 0575788120) reported to Optim for an initial evaluation by a nurse practitioner three (3) days after his alleged motor vehicle accident.

300.   At a follow-up visit approximately three (3) weeks later, J.J.'s only complaints were soreness and stiffness in his lower back, which he rated a 2 on a scale to 10.

301.   In contrast to the information reported in the medical evaluations of J.J., J.J. purportedly also received a chiropractic evaluation at Optim, which claimed that J.J. had neck pain, reduced range of motion, and subluxation(s) in the cervical spine, none of which had been reported in the purportedly comprehensive medical evaluation the previous day.

302.   Optim used the fabricated diagnosis of injury to the cervical spine to justify additional, unnecessary chiropractic treatment in order to bill additional amounts for its services.

303.   In fact, Optim billed for chiropractic manipulative treatment ("CMT") allegedly rendered to patient J.J. over a period of more than a year using CPT Code 98941, which is specified for spinal CMT of three (3) to four (4) regions.

304.   In other words, Optim falsely diagnosed a cervical injury for patient J.J. in order justify billing at a higher rate using CPT Code 98941, instead of CPT Code 98940, for spinal CMT of one (1) to two (2) regions.

305.   That Optim fabricated diagnoses to justify its billing is further evidenced by the fact that Optim has never submitted a bill to Allstate using CPT

Code 98940, and has only submitted bills using CPT Code 98941 for chiropractic treatment allegedly provided to the patients at issue in this complaint.

306.    It is not possible that every patient that received chiropractic treatment at Optim required CMT of three or four regions on every visit, and that a patient never experienced only neck pain or only lower back pain.

307.    A similar pattern of exaggerated and fabricated findings is exemplified by the purported re-evaluations of patient D.C. (Claim No. 0585396947) by Optim.

308.    Patient D.C. was purportedly evaluated by a nurse practitioner and was evaluated by both a physical therapist and a chiropractor at Optim on March 3, 2020, more than six (6) months after her alleged accident.

309.    The nurse practitioner's report for that date of service indicates that all testing and imaging previously performed on D.C. was negative, and diagnosed a left hip sprain and a lumbar sprain, while implementing the defendants' predetermined treatment protocol, which included physical therapy and chiropractic treatment.

310.    The physical therapist's report for the same date of service also reports only complaints of pain in the lower back and left hip, with no radiating pain.

311.    In contrast, the chiropractic examination of patient D.C. on the same date reported complaints of cervical, thoracic, and lumbar pain radiating into the hip, thigh, shoulder, forearm, and hand, while diagnosing sprains of ligaments and

subluxations in the cervical, thoracic, and lumbar spine, most or all of which was fabricated to create the appearance of necessity for the purported treatments billed by Optim.

312.  Defendant Multicare also exaggerated and fabricated its chiropractic and physical therapy examination findings in order to create the appearance of justification for the excessive courses of therapy for which it billed.

313.  For example, Multicare billed for a purported comprehensive evaluation of patient T.J. (Claim No. 0496244666) on April 4, 2018, at which time she was reported to have, *inter alia*, full range of motion in her right upper extremity and no report of muscle weakness.

314.  The following  day, April 5 2018, a Multicare physical therapist allegedly performed an evaluation and claimed that T.J. had just 90 degrees of range of motion in her right shoulder (approximately half of normal) and extreme muscle weakness of 3/5 on the Oxford scale, which signifies she was unable to resist against any force stronger than gravity.

315.  It is not possible that the alleged comprehensive evaluation of T.J. the previous day failed to notice these purported severe limitations.

316.  Multicare fabricated and exaggerated these types of findings in order to create the appearance of necessity for the extensive course of treatment ordered and billed relative to T.J. and the other patients at issue in this Complaint.

### 2. Improper Resort to Immediate Physical Therapy and Chiropractic Treatment

317.   In the vast majority of all motor vehicle accident cases, mild injuries will resolve themselves within a few weeks without any treatment whatsoever.

318.   Thus, the immediate resort to physical therapy and chiropractic treatment using a predetermined protocol of excessive treatment was not related to the care, recovery, or rehabilitation of the patient, thus rendering such services medically unnecessary and not compensable under the No-Fault Act.

319.   Moreover, the defendants' immediate resort to extensive treatment may have caused harm to the patients at issue herein, as acute processes of injury were not allowed to dissipate naturally and follow the expected course of recovery.

320.   The defendants' own doctors recognized that the immediate resort to physical therapy and other treatment could harm patients, yet the defendants continued to apply the same predetermined protocol.

321.   For example, in notes from an examination of patient K.B. (Claim No. 0566134110), the examining physician noted that "physical therapy will cause her to have more symptoms because the more activity she does, the shoulder will start subluxing and she will have more pain."

322.   Nevertheless, Optim continued billing for physical therapy for patient K.B., with the next bill just four (4) days after this examination, and continuing for months thereafter.

323.   Multicare's practice of immediately prescribing physical therapy as a matter of course is confirmed by the fact that during the relevant period, it billed Allstate for both medical evaluations and for physical therapy treatment or evaluations for at least 119 patients, and of those patients, it billed for purported physical therapy relative to at least 104 within seven (7) days of their alleged initial evaluation.  *See* Exhibit 5.

324.   Optim's practice of immediately prescribing physical therapy as a matter of course is confirmed by the fact that during the relevant period, it billed Allstate for both medical evaluations and for physical therapy treatment or evaluations for at least twenty-six (26) patients, and of those patients, it billed for purported physical therapy relative to at least twenty-two (22) within seven (7) days of their alleged initial evaluation.  *See* Exhibit 6.

325.   In addition to immediate physical therapy referrals, Multicare and Optim also immediately billed Allstate for purported chiropractic treatment.

326.   For example, of twenty (20) patients for whom Optim submitted billing to Allstate for purported chiropractic treatment at issue herein, seventeen (17) (85%) allegedly started chiropractic treatment within two (2) weeks of their initial medical examination.  Id.

327.   The defendants' immediate resort to physical therapy and chiropractic treatment constitutes excessive and medically unnecessary medical treatment, and

Allstate is not obligated to pay for billing submitted to it by the defendants for such treatment and is entitled to reimbursement for payments made by it for such treatments.

### 3.    Identical and Excessive Treatment Plans

328.    After developing the appearance of necessity for treatment through fabricated examination findings, Multicare and Optim ordered highly similar courses of lengthy physical therapy and chiropractic treatment for nearly every patient so that they could bill Allstate for extensive unnecessary treatment over the course of many months.

329.    Optim billed for alleged application of hot/cold packs for 100% of the patients for whom it allegedly performed therapy, electrical stimulation for 100%, ultrasound treatment for 96%, and therapeutic exercises for 77% of such patients. *See* Exhibit 6.

330.    Multicare billed for application of hot/cold packs for 100% of the patients for whom it allegedly performed therapy, electrical stimulation for more than 98%, and therapeutic exercises for more than 92% of such patients.  *See* Exhibit 5.

331.    The physical therapy and chiropractic treatment billed by Multicare and Optim were also unreasonably excessive in length.

332.   For example, Multicare billed Allstate for alleged physical therapy and chiropractic treatment of Patient A.D. (Claim No. 0469426464) for at least 86 dates of service over a period of twelve (12) months, during which time Multicare billed for providing nearly identical physical therapy and chiropractic treatment on almost every date.

333.   Multicare billed Allstate for physical therapy allegedly provided to Patient D.F. (Claim No. 0543498298) for at least 105 dates of service over a period of twelve (12) months, during which time Multicare billed for providing nearly identical physical therapy treatment on almost every date.

334.   Following the same practice, Optim billed Allstate for alleged physical therapy and chiropractic treatment of Patient B.E. (Claim No. 0560682585) for at least 155 dates of service over a period of thirteen (13) months, during which time Optim billed for providing the nearly identical physical therapy and chiropractic treatment on almost every date.

335.   Treatment allegedly provided to patients rarely changed based on an evaluation that treatment was effective or ineffective.

336.   Rather, once patients were set on the extensive predetermined courses of treatment used by the defendants, those treatments were rarely altered or discontinued, even in the face of clear evidence that they were not working.

337.   For example, Multicare billed for physical therapy relative to patient J.G. (Claim No. 0493177737), whom it diagnosed with a back and shoulder strain and thigh and knee injury, for almost eight (8) months without significantly altering his treatment and despite documenting no significant improvement throughout this period other than a repeated formulaic statement that the "therapist noted improving AROM."

338.   As another example, Multicare billed for physical therapy sessions for patient R.L. (Claim No. 0493177737), whom it diagnosed with a back strain, left knee and left ankle strain, for a period of approximately six (6) months despite noting approximately four (4) months into treatment that "patient reports increase in low back pain," clearly indicating that its treatments were ineffective.

339.   Despite diagnosing different alleged injuries for patients R.L. and J.G., the physical therapy treatment plans for each were identical, consisting of "MHP x 15 Min, Electric Stim x 15 Min, Ultrasound x 15 Min, Massage x 15 Min."

340.   As another example, following a purported auto accident in August 2019, Optim billed for physical therapy sessions for patient D.C. (Claim No. 0585396947) for periods from August to September 2019 and again in March and April 2020.

341.   Following an initial physical therapy evaluation in August 2019, Optim diagnosed D.C. with cervical and lumbar strains, and left hip, left knee, and left ankle strains.

342.   Following a physical therapy evaluation in March 2020, Optim diagnosed D.C. with only a lumbar strain and left hip strain.

343.   Despite the significantly different diagnosis, the reported physical therapy that Optim billed for the two different time periods was essentially identical.

344.   A patient rarely should receive physical therapy for more than four (4) to six (6) weeks, as after such time the physical therapy will have reached its maximum benefit and the patient should either cease in-office physical therapy or be recommended for a different type of treatment.

345.   When a patient is no longer making objective progress in physical therapy, the treatment plan must be changed or the patient discharged.

346.   As documented by Exhibits 5 and 6, patients at Multicare and Optim routinely continued physical therapy for dozens of appointments over a period of many months without regard to effectiveness in order to continue generating bills for submission to Allstate.

347.   The full extent and pattern of Multicare's and Optim's misrepresentations regarding the lawfulness and necessity of the treatment they billed for was not known to Allstate until it undertook the full investigation that

culminated in the filing of this action, including identification of the defendants' pattern of predetermined overtreatment.

348.   Allstate is not required to pay Multicare and Optim for treatment that was rendered based on a predetermined treatment protocol that was not patient-specific, and therefore medically unnecessary, and it is entitled to the return of money paid in reliance on the defendants' fraud.

### D.   EXCESSIVE AND MEDICALLY UNNECESSARY MRIs

349.   The defendants' predetermined treatment protocol also included excessive orders for immediate MRIs because such orders allowed the defendants' associates, including defendant Affiliated, to submit hundreds of thousands of dollars of additional charges to Allstate for imaging studies billed at absurd rates.

350.   The MRIs ordered by the defendant clinics and billed by Affiliated were to generate charges for the defendants' scheme and were not used to guide patient care.

351.   As set forth below, the defendants' practice of ordering MRIs as a matter of course based on fabricated diagnoses and patients' alleged subjective pain complaints violates established standards of care for MRI testing and the bills submitted to Allstate as a result of such practice are fraudulent.

### 1.   **Standard of Care for MRI Testing**

352.   Affiliated had a responsibility to ensure that MRIs were properly ordered, but it intentionally chose not to do so in order to maximize the amount of charges it could submit to Allstate.

353.   The American College of Radiology ("ACR") is the principal professional organization of radiologists, radiation oncologists, and clinical medical physicists, and it defines the practice parameters and technical standards for conducting MRI scans.

354.   According to the ACR, an MRI should only be ordered after the physician has thoroughly evaluated and examined the patient and recorded the findings in the patient's medical record.

355.   For musculoskeletal joint MRIs, a basic orthopedic examination of the applicable part of the body, including documentation of range of motion and response to provocative maneuvers, should be performed and documented in the medical record.

356.   Prior to referring a patient for an MRI to rule out damage to spinal nerve roots or intervertebral discs, a physician should perform a basic neurological examination and document the findings of such testing, including the results of muscle stretch reflexes, pathological reflexes, muscle strength testing, and sensation (tested by using a pin prick or light touching).

357.   The ACR promulgates specific "Appropriateness Criteria" rating the appropriateness of various types of imaging studies in light of a patient's presenting symptoms and history.

358.   For example, ACR Appropriateness Criteria for cervical spine imaging guides that MRIs are "usually not appropriate" as the initial study for patients with chronic pain, including when the patient has a history of trauma or prior surgery.

359.   Instead, it is "usually appropriate" to perform x-rays, and it only becomes appropriate to move to an MRI when the x-ray is abnormal, or where there is documented "[p]ersistant pain following failure of conservative management only in select cases."

360.   Even when a cervical spine x-ray reveals degenerative changes, the ACR only guides that it "may be appropriate" (emphasis added) to perform an MRI, and again only when pain persists following failure of conservative care.

361.   The ACR states that "[p]atients with normal [cervical spine] radiographs and no neurologic signs or symptoms need no immediate further imaging."

362.   MRIs should not be ordered in violation of the ACR guidelines unless there is a clinical reason in the specific case and that reason must be documented in the patient's medical record.

363.   Examples of the defendants' failure to following these guidelines include:

- Patient C.F. (Claim No. 0570039651) reported to Vital at her first re-evaluation just over one (1) month after her alleged accident that her pain level was reduced to a level of 4 out of 10 from a level of 7 reported at her visit approximately a month earlier, and that physical therapy was helping.  Despite the reported improvement in C.F.'s condition, Vital ordered, and Affiliated billed for, MRIs of the cervical spine, lumbar spine, and left hip without any documented reason for the MRIs.

- Patient R.P. (Claim No. TXA-0241767) was seen by Vital following an initial visit at which x-rays of her cervical spine, dorsal spine, lumbar spine, right shoulder and both knees were obtained.  The x-rays revealed no fractures, and R.P. reported to Vital that physical therapy was helping and that her pain was reduced.  Despite this reported improvement, Vital ordered and Affiliated billed for MRIs of the cervical, thoracic, and lumbar spine approximately one month after her accident.

364.   The defendant clinics routinely ordered MRIs based only on patients' subject pain complaints, when x-rays showed no abnormality, even when conservative treatment was effective, and without documenting a clinical reason for the MRIs ordered as required by the ACR guidelines.

365.   Vague, minor, and non-specific pain complaints such as those routinely reported by the defendant clinics are precisely the findings that the ACR Appropriateness Criteria are designed to remove from early resort to MRIs.

366.   The ACR also provides that MRI prescription forms should provide sufficient information to demonstrate the medical necessity of the MRI and allow for its proper performance and interpretation.

67

367. If the prescription does not contain sufficient information to demonstrate the medical necessity of the examination and allow for its proper performance and interpretation, the radiologist should contact the referring practitioner (who should be familiar with the patient's clinic problem or question) to obtain the missing information.

368. Only upon receiving such information is it appropriate for the radiologist to interpret the study and issue a radiology report setting forth the professional findings and interpretation.

369. MRI findings may be misleading if not closely correlated with the patient's clinical history, clinical examination, or physiologic tests.

370. The ACR mandates that the interpreting physician "shall have the responsibility for all aspects of the study including, but not limited to, reviewing all indications for the examination . . . ."

371. Nevertheless, the MRIs at issue in this Complaint routinely lacked any documentation of why the MRI was recommended or medically necessary, much less sufficient information to allow for proper performance and interpretation of the MRIs prescribed by referring physicians.

372. Pursuant to the ACR guidelines, it was the responsibility of Affiliated to assure that all MRIs performed were proper.

373.   Rather than perform the duties required by the ACR, the defendants routinely billed for excessive and medically unnecessary MRIs in order to increase the amount of payment sought from Allstate.

### 2.     MRIs Billed During Initial Stages of Treatment

374.   MRIs at issue herein were routinely ordered by the defendant clinics at the outset of the patient's treatment, typically at the patient's initial visit or first follow-up appointment, and before allowing time for conservative treatment to be effective (or in many cases, even begin), thus evidencing that MRIs were ordered as a matter of course regardless of each patient's unique symptoms and each patient's response to initial treatment.

375.   Such a practice is belied by medical literature stating "that unnecessary imaging may do more harm than good.  Multiple randomized controlled trials have shown that the early use of imaging for [lower back pain] is not associated with improved outcomes and may even be harmful to the patient."   Brendan J. McCullough, et al., Lumbar MR Imaging and Reporting Epidemiology: Do Epidemiologic Data in Reports Affect Clinical Management?, 262 Radiology 941, 942 (2012).

376.   Indeed, early resort to MRI has been denounced by The American College of Physicians for its "inefficiencies" and "potential harms."  Id. at 945.

377.   At the onset of a soft-tissue injury (the type of injury claimed by almost all of the patients at issue herein), an MRI should only be ordered if there are objective neurological symptoms of spinal cord or other neurological injuries, including radiculopathy (severe back pain radiating into an extremity) or where the medical practitioner suspects the patient has suffered a fracture.

378.   Short of these circumstances, an MRI should be deferred to allow for conservative treatment to run its course.

379.   Affiliated routinely billed for MRIs of patients who had only just initiated treatment.

380.   More than 49% of the MRIs billed to Allstate by Affiliated with respect to the patients at issue herein were purportedly performed within two (2) months of the patients' alleged motor vehicle accidents.

381.   On numerous occasions, the defendant clinics ordered and Affiliated billed for multiple MRIs less than a week after patients' alleged motor vehicle accidents.

382.   Affiliated's pre-printed forms require disclosure of date of injury – which proves that it impossible it did not know it was billing for scans just days after alleged motor vehicle accidents:



383.   Examples of this practice include the following MRIs ordered by the

defendant clinics and billed by Affiliated:

- Affiliated billed for four (4) MRIs of patient L.L. (Claim No. 0557318011) just six (6) days after her purported auto accident.

- Affiliated billed for two (2) MRIs of patient M.C. (Claim No. 0536798704) just four (4) days after his purported auto accident, and then for three (3) additional MRIs at Affiliated just three (3) weeks later.

- Affiliated billed for three (3) MRIs of patient M.F. (Claim No. TXA-0248024) just five (5) days after his purported accident.

384.   It is not possible for patients for whom MRIs were performed just days

or weeks after their alleged motor vehicle accidents to have attempted the

conservative treatment required by the ACR guidelines before resorting to MRIs.

385.   The patients at issue herein for whom Affiliated billed for MRIs within

the first days and weeks after their alleged motor vehicle accidents had non-emergent

medical conditions that were often "diagnosed" as nothing more than pain, not the

type of fracture or neurological injury that would justify overriding the ACR's

directives to attempt conservative treatment before imaging.

386.   Likewise, the patients at issue herein who received MRIs at Affiliated while still undergoing conservative treatment even though their conditions was improving as a result of such treatment and there was no objective indication for ordering MRIs such as a fracture or neurological injury, had non-emergent medical conditions that did not justify overriding the ACR's directives.

### 3.   Excessive MRI Scans

387.   In addition to billing for MRIs as soon as possible after an alleged accident in violation of the standard of care, the defendants also sought to maximize the amount of the charges submitted to Allstate by ordering and billing for far more MRIs than were medically necessary.

388.   MRIs should be limited to the symptomatic body part and it is uncommon to order MRIs on more than one region.

389.   The rarity of MRIs of multiple body parts of the same patient is confirmed by the data reported to the State of Michigan by all MRI providers in 2019, which documents that just 12.32% (111,535 of 905,117) of all patients underwent MRIs of multiple body parts during the same visit, and only 3.4% (31,044 of 905,117) of all patients underwent MRIs of three (3) or more body parts during the same visit.

390.   This figure includes MRIs performed at hospitals, trauma centers, cancer treatment centers, and other facilities providing treatment to traumatically injured and gravely ill patients.

391.   By comparison, in 2019, Affiliated performed two (2) or more MRIs per patient visit at more than five (5) times the statewide average, with 68.4% of patients purportedly receiving at least two (2) MRIs, and it performed three (3) or more MRIs per patient visit at more than twelve (12) times the statewide average, with 41.5% of patients receiving three (3) or more MRIs.

392.   Because the defendants intentionally targeted automobile insurers for excessive and medically unnecessary MRIs, Affiliated billed for two or more MRIs for patients referred by the defendant clinics at even higher rates.

393.   Affiliated reported it performed MRIs of two (2) or more body parts relative to 71.2% (94 of 132) of MRIs ordered by Zukkoor for Vital patients in 2019, and for three (3) or more body parts for 48.4% (64 of 132) of those patients.

394.   Affiliated reported it performed MRIs of two (2) or more body parts relative to 82.6% (315 of 381) of MRIs ordered by Bitkowski for Select patients in 2019, and for three (3) or more body parts for 63.5% (242 of 381) of those patients.

395.   Affiliated reported it performed MRIs of two (2) or more body parts relative to 88.2% (90 of 102) of MRIs ordered by Jboor for Vital patients in 2019, and for three (3) or more body parts for 63.5% (60 of 102) of those patients.

396.   Affiliated reported performing MRIs of five (5) or more body parts relative to an incredible 62 patients that were ordered by just Zukkoor, Bitkowski, and Jboor in 2019.

397.   Allstate was billed for MRIs of more than one body part relative to 84.3% of the patients at issue herein. *See* Exhibit 1.

398.   The extreme number of MRIs per patient performed by Affiliated is illustrated on the chart below:



399.   Out of the 501 patients at issue herein who allegedly underwent MRIs at Affiliated, 300 (60%) patients had MRIs of three (3) or more body parts. *See* Exhibit 1.

400.   Affiliated billed for four (4) separate MRIs relative to at least 91 patients at issue herein and for five (5) or more separate MRIs relative to at least 58 patients at issue herein.

401.   As discussed above, the defendant clinics immediately ordering MRIs for any part of the body where patients complained of even the slightest pain fell dramatically short of ACR standards for appropriate MRIs, and produced excessive medically unnecessary bills from Affiliated that Allstate is not required to pay.

402.   Affiliated's billing for multiple MRIs that it could not have believed to be medically appropriate is exemplified by patient O.S. (Claim No. 0555370402), who was purportedly evaluated by Vital just five (5) days after an alleged accident.

403.   Affiliated then billed Allstate for allegedly performing four (4) MRIs on O.S. just eight (8) days after her purported accident.

404.   The medical records for patient O.S. indicate that Affiliated never questioned the medical necessity of performing four (4) MRIs on a patient involved in a minor alleged accident and who was diagnosed with nothing more than expected pain and soreness.

405.   Other representative examples of Affiliated's excessive number of MRIs include:

- Patient M.A. (Claim No. 0558908133).  Affiliated billed Allstate for five (5) MRIs at Affiliated just two (2) days after he was allegedly involved in an accident.

- Patient K.N. (Claim No. 0558041273).  Affiliated billed Allstate for five (5) MRIs just ten (10) days after she was allegedly involved in an accident on May 4, 2019.

- Patient D.B. (Claim No. 0588919506). Affiliated billed Allstate for three (3) MRIs twelve (12) days after his alleged accident.

- Patient T.V. (Claim No. 0579803692).  Affiliated billed Allstate for four (4) MRIs three (3) days after his alleged accident.

- Patient J.R. (Claim No. 0575219613).  Affiliated billed Allstate for four (4) MRIs three (3) weeks after his alleged accident.

406.   Allstate is entitled to the return of money paid for Affiliated's medically unnecessary imaging ordered pursuant to the defendants' predetermined treatment protocol.

### E.   EXCESSIVE AND MEDICALLY UNNECESSARY CT SCANS

407.   The defendants' predetermined treatment protocol also included excessive and medically unnecessary orders for CT scans, which were ordered solely to generate bills by defendant Clearpath.

408.   The defendant clinics routinely ordered multiple unnecessary CT scans by applying the same treatment protocol used by the defendant clinics to order MRIs, and frequently ordered CT scans in addition to MRIs, which is dangerous to patients and completely unnecessary.

409.   Since September 28, 2017, Clearpath billed Allstate with respect to at least 61 different patients, of which 53 were also patients of one of the defendant clinics.  *See* Exhibit 2.

410.   Twenty-eight (28) of the patients for which Clearpath billed Allstate also purportedly underwent MRIs at Affiliated, in addition to their alleged CT scan(s).  *See* Exhibits 1 and 2.

411. Of the thirty-three (33) Clearpath patients not also associated with Affiliated, Clearpath billed Allstate for multiple CT scans with respect to twenty-three (23) patients, or 72% of the time.

412. Fourteen (14) of those patients, or more than half, allegedly received at least three (3) CT scans.

413. For example, Clearpath billed for three (3) CT scans of patient R.M. (Claim No. 0577751928) just sixteen (16) days after an alleged motor vehicle accident.

414. There was no medical justification for ordering the CT scans of R.M., which were based solely on his subjective reports of neck and back "pain" and a non-specific diagnosis of a "sprain."

415. Clearpath also frequently billed for CT scans on regions of the body on which MRIs were also ordered, often billing for CT scans only a short time after an MRI had been billed.

416. For example, patient E.D. (Claim No. 0477011886) was seen for an initial evaluation by Vital, and allegedly underwent an MRI of his lumbar spine at Affiliated one (1) week later.

417. Approximately three (3) weeks after his MRI, E.D. again visited Vital, at which time Vital ordered a CT scan of his lumber spine, which was allegedly

performed at Clearpath a few days after that, and less than a month after his MRI of the same region.

418.   There was no medical justification for the defendant clinics to order or for Clearpath to bill for CT scans of the same area where an MRI had recently been performed.

419.   The CT scans ordered by the defendant clinics and billed by Clearpath were ordered solely to generate charges for the defendants' scheme and were not used to guide patient care.

420.   The defendant clinics ordered these CT scans because they allowed their associate, Clearpath, to submit tens of thousands of dollars of additional charges to Allstate for imaging studies billed at absurd rates that cost very little to perform.

421.   As with the improper bills for MRIs at issue herein, the defendants' practice of ordering CT scans as a matter of course based on fabricated diagnoses and patients' alleged subjective pain complaints, whether in lieu of or in addition to ordering MRIs, violated standards of care for ordering and performing CT scans and the bills submitted to Allstate as a result of such practice are fraudulent.

422.   Clearpath had a responsibility to ensure that CT scans it performed were properly ordered, but it intentionally chose not to do so in order to maximize the amount of charges it could submit to Allstate.

423.   As with MRIs, the ACR defines the practice parameters and technical standards for conducting CT scans.

424.   According to the ACR, an order for a CT should "provide sufficient information to demonstrate the medical necessity of the examination and allow for its proper performance and interpretation."

425.   The ACR also promulgates specific "Appropriateness Criteria" for CT scans, as it does for MRIs as discussed above.

426.   For example, ACR Appropriateness Criteria for cervical spine imaging guides that CT scans are "usually not appropriate" immediately following acute trauma, such as an auto accident, if one of the following "low-risk factors" is present: (1) the pain was the result of a simple rear-end motor vehicle crash, (2) the patient is able to sit "in sitting position," (3) the patient is ambulatory, (4) there was delayed onset of neck pain, or (5) there is an absence of midline cervical spine tenderness.

427.   As one example of the defendants' immediate resort to CT scans in spite of the presence of low risk factors, patient M.S. (Claim No. 0481037190) was initially evaluated at Vital just four (4) days after an alleged auto accident, at which time she reported experiencing "lower back and cervical discomfort" and having already received negative x-rays.

428.   At that time, Vital diagnosed M.S. with cervical and lumbar muscle pain and recommended a treatment plan that included chiropractic treatment of the

affected areas, and did not note any specific risk factors such as midline cervical spine tenderness.

429.   At a follow up visit one month later, Vital noted that M.S.'s cervical and lumbar spine pain was only a "4 out of 10," that chiropractic care was going well, that medications were working, and again noted no risk factors to justify performance of CT scans just a month after an alleged accident.

430.   Despite this benign history and report, Vital ordered three (3) CT scans that were billed by Clearpath over the following two (2) weeks.

431.   Vague, minor, and non-specific pain complaints such as those routinely reported by the defendant clinics are precisely the findings that the ACR Appropriateness Criteria are designed to remove from early resort to CT scans.

432.   Nevertheless, the defendant clinics routinely ordered CT scans based only on patients' subject pain complaints, even when conservative treatment was effective and without documenting medical necessity for the CT scans ordered as required by the ACR Practice Parameters.

433.   For example, four (4) days after her alleged accident, Vital purportedly conducted an initial evaluation of patient A.M. (Claim No. 0488890930) who reported neck and back pain without numbness, tingling, radiation, or weakness.

434.   At the time of that initial evaluation of A.M., Vital ordered a number of different tests, including x-rays of the cervical and thoracic spine, which were both "unremarkable."

435.   At a follow-up visit one (1) month later, A.M reported that physical therapy was helping with her pain, but Vital nevertheless ordered CT scans of her cervical, thoracic, and lumbar spine at that time.

436.   At an additional follow-up visit one (1) month later, A.M. had not yet received the CT scans previously ordered by Vital, and reported that her lumbar spine pain was doing better, and again reported that physical therapy was helping with her other reported pain, yet Vital continued to recommend the previously ordered CT scans.

437.   Allstate is entitled to the return of money paid for Clearpath's medically unnecessary imaging ordered pursuant to the defendants' predetermined treatment protocol.

### F.   UNNECESSARY DRUG TESTING

438.   Each of the defendant clinics ordered urine drug testing for the vast majority of patients at issue in this Complaint who were allegedly seen at the defendant clinics.

439.   These predetermined and unnecessary orders for drug testing were done to permit defendant United Lab and other associates of the defendants to submit

thousands of dollars of bills to Allstate for alleged testing performed on each specimen purportedly collected from the patients at issue herein, not for reasons of medical necessity.

440.   That the drug testing ordered by the defendant clinics was not based on medical necessity or in order to further the treatment of patients is confirmed by the example of patient G.N. (Claim No. 0574499389), who was asked to give a urine specimen at initial visit to Optim and was told to "put it in the cabinet."

441.   G.N. reported that he was never told why a urine specimen was required, and that when he went to place his specimen in the designated cabinet there were "like 15 other peoples'" specimens in the cabinet that were not properly sealed, labeled, or otherwise secured.

442.   Indeed, in approximately July 2019, shortly after the formation of United Lab by the defendants, Vital, Select, Multicare, and Optim all began routinely ordering definitive drug testing from United Lab for nearly every patient, for which United Lab routinely billed Allstate for a litany of allegedly performed testing that was medically unnecessary, unreasonable, excessive, and not performed in accordance with standards of care for urine drug testing.

443.   The automatic ordering of definitive urine drug testing for nearly every patient illustrates the lack of consideration of individual medical necessity for such testing.

444.   In fact, the defendant clinics routinely ordered, and United Lab routinely billed for, definitive urine drug tests on patients even when there was no clinical indication for ordering drug testing and the patient was not prescribed any medications, meaning the order was without medical basis.

### 1.   Medically Unnecessary Presumptive Urine Screens

445.   Defendant Select routinely ordered both presumptive and definitive urine drug testing to be performed on the same date of service for many of the patients at issue in this Complaint.

446.   Pursuant to this improper policy, Select billed Allstate for alleged presumptive urine screens associated with respect to at least 90 purported patient examinations, even when patients were not prescribed narcotics or other medications susceptible to abuse or misuse.

447.   The presumptive drug testing billed by Select refers to urine testing that is performed at the time of the patient's appointment and is visually interpreted by the individual conducting the testing.

448.   Typically, presumptive drug testing is conducted using reagent dipsticks that can be purchased for less than $1.00 and takes only seconds to perform.

449.   During the relevant period, Select billed Allstate $75 for each alleged presumptive urine screen on 90 dates associated with 83 patient examinations, even

when patients were not prescribed narcotics or other medications susceptible to abuse or misuse.

450.   Presumptive drug testing is properly used in the context of pain management treatment when it is random and designed to ascertain whether patients are abusing or diverting potentially dangerous medications.

451.   Rather than using urine drug testing for medically necessary purposes, Select billed Allstate for presumptive drug screens for nearly every patient.

452.   Allstate is not required to pay Select for presumptive drug testing that was performed as part of a predetermined treatment protocol, and that was not based on an individualized determination of patient necessity or used to guide treatment of the patient.

### 2.   **Medically Unnecessary Definitive Urine Drug Testing**

453.   Defendants Select, Vital, Multicare, and Optim all routinely ordered comprehensive definitive drug testing panels for all of their motor vehicle accident patients.

454.   The definitive drug testing panels ordered by the defendant clinics included testing for dozens of substances that were not customized to the patient's alleged clinical condition.

455.   The automatic ordering of definitive urine drug testing by Vital, Select, Multicare, and Optim for nearly every patient illustrates the lack of consideration of individual medical necessity for such testing.

456.   In fact, all of the defendant clinics routinely ordered definitive urine drug tests on patients without any medical basis for doing so, even when the patient was not prescribed any medications and there was no indication of suspected illicit drug use.

457.   Accordingly, all of the definitive urine drug testing ordered by the defendant clinics and billed by United Lab was performed as a matter of course and without regard to medical necessity.

458.   As an example of this practice, patient A.A. (Claim No. 0577748270) presented to Select for an initial evaluation on February 11, 2020.

459.   Select's billing and report for that visit indicates that A.A. denied drug use, that Select performed a presumptive drug screen for 11 different drugs at the appointment that was negative, and that A.A. was only prescribed Naproxen, a nonsteroidal anti-inflammatory drug available over the counter as "Aleve," and Flexeril, a muscle relaxant.

460.   Despite these findings and the negative presumptive screening test results, Select ordered a "Comprehensive" definitive drug testing panel from United

Lab, which billed Allstate a total of $2,485 for at least 25 different tests allegedly performed on the urine specimen provided by A.A.

461.   Further demonstrating that this testing was unnecessary and ordered only to generate additional billing, Select's report for patient A.A.'s follow-up appointment on March 10, 2020 simply repeated the statement from A.A.'s initial visit report that "patient denied drug use" and failed mention or discuss the drug testing allegedly performed by United Lab at all.

462.   Similarly, patient C.F. (Claim No. 0570039651) presented to Vital for an initial evaluation on December 6, 2019, at which time Vital ordered definitive drug testing allegedly performed by United Lab on the same date.

463.   Vital's records for patient C.F.'s visit included no rationale for ordering the definitive drug testing, including why or how the extensive definitive testing was being used for management of C.F's medical problem, no controlled substances were prescribed to C.F. by any provider at Vital, and Vital's records mentioned no concern of drug abuse by C.F.

464.   Vital's records for C.F.'s follow-up visit to Vital on January 7, 2020 do not mention the drug testing results, or indicate that the testing results were reviewed by the treating practitioner or used to aid in determining C.F.'s course of treatment.

465.   As another example, patient N.W. (Claim No. 0589542363) presented to Multicare for an initial evaluation on July 15, 2020, at which time Multicare ordered definitive drug testing allegedly performed by United Lab on the same date.

466.   Multicare's records for patient N.W.'s visit do not state what type of testing was ordered or how the results of the testing would be used, and there was no mention of N.W. having any suspected issues with drug abuse or misuse, or of a controlled substance being prescribed to N.W.

467.   Multicare's records for N.W.'s follow-up visit on January 7, 2020 do not mention the drug testing results or indicate that the testing results were reviewed by the treating practitioner or used to aid in determining N.W.'s course of treatment.

468.   Patient C.H. (claim No. 0569481294) presented to Optim for an initial evaluation on July 26, 2019, at which time Optim completed a requisition form for definitive drug testing billed by United Lab on the same date.

469.   Optim reported that a "urine drug screen for drug monitoring purposes" was ordered, but Optim prescribed no medications for which monitoring would be appropriate and did not find any concern of drug abuse or misuse by C.H.

470.   At a follow-up appointment a month later, Optim did not address the drug testing results, or even indicate that such results were available or reviewed by the practitioner to aid in determining C.H.'s course of treatment.

471.   As another example, patient J.J. (Claim No. 0575788120) reported to Optim for an initial visit on November 20, 2019.

472.   Optim's notes for that visit expressly state that no oral medications were given and note no concerns of suspected drug use or use of other prescriptions by J.J., yet Optim nevertheless ordered, and United Lab billed for, a comprehensive definitive drug screening.

473.   Even on the rare occasion that a patient's urine drug test revealed an unexpected result, the defendant clinics did not use the results to make any change to the patient's alleged treatment or further prescription of medications.

474.   For example, patient C.F.'s (Claim No. 0570039651) urine drug testing from her initial evaluation at Vital was positive for THC-COOH, but notes for her follow-up visits to Vital make no mention of the test results and do not indicate that they were used in any way to guide the treatment C.F. received from Vital.

475.   As another example, patient F.B.'s (Claim No. 0561906314) urine drug screening from his initial evaluation at Vital was positive for morphine, fentanyl, and THC, and at his follow-up appointment he admitted to using heroin prior to his initial visit to Vital.

476.   Nevertheless, Vital continued its standard implementation of its predetermined treatment protocol with respect to patient F.B. without any change based on this serious drug abuse.

88

477.   Urine drug tests that have no bearing on patients' treatment are clinically useless and not medically necessary, and are therefore not compensable under the No-Fault Act.

478.   Billing for services that are not medically necessary for each patient's care, recovery, or rehabilitation is prohibited under the Michigan No-Fault Act.

479.   Vital, Multicare, and Optim routinely ordered full comprehensive definitive drug testing panels even when there was no rationale or medical basis for the orders, including for patients where there was no suspected drug abuse or misuse, and for patients who were not prescribed any controlled substances, for which defendant United Lab routinely billed Allstate for a litany of allegedly performed testing that was medically unnecessary, unreasonable, and excessive, and was not performed in accordance with established standards of care for urine drug testing.

480.   Select routinely ordered full comprehensive definitive drug testing panels even when it already had allegedly performed presumptive drug screens on the same date of service, and even when the presumptive testing showed no unexpected results or indications that patients were misusing their prescribed medications, for which defendant United Lab routinely billed Allstate for a litany of allegedly performed testing that was medically unnecessary, unreasonable, and excessive, and was not performed in accordance with established standards of care for urine drug testing.

89

481.   It is almost never proper to order both a presumptive screening test and confirmatory laboratory testing at the same time.

482.   Only when screening shows unexpected results, such as the presence of an illicit drug or a medication that was not prescribed, should confirmatory testing be performed.

483.   This standard is documented by the Substance Abuse and Mental Health Services Administration (SAMHSA), a federal agency within the Department of Health and Human Services ("HHS") that sets guidelines for clinical drug testing federal programs, and states that "[i]n clinical settings, confirmation is not always necessary.  Clinical correlation is appropriate . . . .  In addition, a confirmatory test may not be needed; patients may admit to drug use or not taking scheduled medications when told of the drug test results, negating the necessity of a confirmatory test.  However, if the patient disputes the unexpected findings, a confirmatory test should be done" (emphasis added).

484.   Thus, SAMHSA confirms that, at most, only unexpected initial screening results should be confirmed in the absence of a patient-specific decision otherwise from the treating provider.

485.   The level of confirmation defendant Select ordered during routine evaluations after involvement in low-level motor vehicle accidents significantly

exceeded the level of confirmation required by the Nuclear Regulatory Commission's ("NRC") policy on drug testing confirmation.

486.   Persons authorized to operate a nuclear power reactor under the scope of the NRC are required to submit to drug and alcohol testing as part of their continued duties.  10 C.F.R. § 26.31 (NRC's Fitness for Duty Program).

487.   The NRC mandates that "[s]pecimens that yield positive initial drug test results or are determined by initial validity testing to be of questionable validity must be subject to confirmatory testing by the laboratory, except for invalid specimens that cannot be tested."  10 C.F.R. § 26.31(d)(3).

488.   The NRC defines "initial drug test" as "a test to differentiate 'negative' specimens from those that require confirmatory testing."  10 C.F.R. § 26.5.

489.   Thus, the NRC does not require that confirmatory testing be performed on negative screening (i.e., initial drug test) results for persons entrusted with operating nuclear reactors.

490.   Even when presumptive screens produce unexpected results, it is not proper to immediately refer a urine specimen for more extensive testing.

491.   Instead, the physician should discuss the unexpected results with the patient, and if the patient admits to drug misuse, further confirmatory testing is unnecessary.

492.   Select did not address unexpected test results with patients, as both the urine screens and confirmatory tests it ordered and allegedly performed were only intended to generate bills to Allstate.

493.   United Lab routinely billed Allstate in excess of $2,000 for definitive urine drug testing of nearly every patient allegedly treated by the defendant clinics despite the lack of any justification for such testing.

494.   Allstate reasonably relied on the defendants' bills and records to contain truthful and accurate representations regarding the necessity of urine drug testing allegedly performed.

495.   Although it is required to properly submit bills for definitive urine drug testing, United Lab does not report the methodology it uses on its laboratory reports.

496.   All laboratory reports submitted by United Lab to Allstate contain a disclaimer admitting that "[t]his test is considered a laboratory-developed test (LDT) and has not been cleared by the FDA."

### 3.   Improper Predetermined Drug Testing

497.   The defendant clinics knew that the drug testing they ordered was medically unnecessary.

498.   Abusive laboratory practices, including non-patient-specific testing and the use of pre-printed forms that encourage excessive testing, have been condemned by authorities and are improper.

499.   The automatic ordering of unnecessary drug testing was facilitated by the requisition forms provided to the defendant clinics by United Lab.

500.   The United Lab forms also permit providers to order predetermined and not patient specific "panels" of tests:



501.   The use of these predetermined panels of tests that are not specific to patient needs does not comply with the applicable standard of care for such testing.

502.   As discussed above, definitive drug testing is not required or appropriate except in specific situations such as those involving an unexpected result from a presumptive drug screen.

503.   For example, per the Centers for Disease Control and Prevention guidelines for practitioners prescribing opioids for chronic pain, the use of confirmatory testing should be done based on the need to detect specific opioids not identified through presumptive drug testing or in the event of the presence of unexpected presumptive drug testing results.

504.   Clinicians should not test for substances for which results would not affect patient management or for which implications for management are unclear.

505.   Federal regulations require that all diagnostic testing must be ordered by the treating physician, must be patient specific, and must be utilized in medical management of the patient's specific problem.

506.   The federal government has expressly stated that it holds laboratories responsible for unnecessary testing and does not allow laboratories to blame excessive urine drug testing on the referring provider.  63 Fed. Reg. 45080 (Aug. 24, 1998).

507.   Further, the Office of Inspector General ("OIG") of the Department of Health and Human Services ("HHS") has stated that "[t]he laboratory should construct the requisition form to ensure that the physician or other authorized individual has made an independent medical necessity decision with regard to each test the laboratory will bill."

508.   The United Lab requisition forms did not identify what individual tests were included in its "standard" or "comprehensive" panels, and there is no indication that the specific testing to be performed as part of either panel was selected by the ordering practitioner, and were therefore improper.

509.   United Lab requisition forms allowed providers to check a box to report the "medical necessity" for the testing being ordered which included to "establish[] a baseline or confirm[] a presumptive screen for a new patient," that is vague and does not establish a specific rationale for performing expensive and extensive definitive testing.

510.   No physician or testing facility can properly make a blanket determination across all patients and all dates of service as to what constitutes reasonable definitive urine drug testing in all cases.

511.   Instead, the individual provider must determine the reasonableness and necessity of urine drug testing, and the specific testing to be performed, on a patient-by-patient and visit-by-visit basis.

512.   Despite these requirements, the defendant clinics routinely ordered non-specific and undifferentiated comprehensive drug testing without such determination for nearly every patient for whom they billed Allstate.

513.   Each of the defendant clinics each routinely ordered "comprehensive" or "standard" panels of urine drug testing for each new patient without determining the specific medical necessity for the specific patient and without identifying the specific testing required for the patient.

514.   None of the records submitted to Allstate by the defendant clinics contain any indication that the physicians or nurse practitioners ordering drug tests made any determination as to what type of testing should be performed or what substances should be tested.

515.   Use of a predetermined slate of tests is necessarily not patient-specific as the drugs/analytes to be tested are established prior to the patient's urine drug testing referral.

516.   By testing for the same exact substances for each patient, regardless of age, medications prescribed, comorbidities, or other factors, the defendant clinics knowingly ordered and the drug labs knowingly billed for urine drug testing that could not have been medically necessary for each patient's clinic condition.

517.   The OIG also guides that "[l]aboratories should take all reasonable steps to ensure that it is not submitting claims for services that are not covered, reasonable, and necessary for the beneficiary, given his or her clinical condition." *See* 63 Fed. Reg. at 45079.

518.   Instead of taking steps to ensure that it was only submitting claims for necessary drug testing, United Lab intentionally worked to increase the number of medically unnecessary tests referred by physicians and billed to payors like Allstate.

519.   Drug tests that were improperly ordered and performed, and which produced unreliable results, could not have been used to actually guide patient care.

520.   Allstate is not required to pay the defendants for drug testing that is redundant, not patient-specific, and that is unnecessary, and is entitled to a return of monies it paid to the defendants for these medically unnecessary drug tests.

### G.   UNNECESSARY TRANSPORTATION SERVICES

521.   Defendants Get Well and TRU billed Allstate for purported medical transportation services that were medically unnecessary and performed, if at all, only to multiply the amount of the defendants' bills for No-Fault benefits.

522.  To properly bill for medical transportation, a licensed healthcare provider must determine that an individual is disabled and unable to drive and must document this determination in the patient's medical record.

523.  Once a patient is evaluated and determined to be disabled, the licensed healthcare provider gives the patient a disability certificate that identifies the form(s) of necessary assistance, including medical transportation if necessary.

524.  The defendant clinics routinely issued disability certificates claiming that patients were unable to drive, but never explained why or how patients' supposed injuries impacted their ability to drive.

525.  Indeed, the defendant clinics did not perform the types of orthopedic and neurological examinations that would permit them to make a determination of whether a patient was capable of driving.

526.  The issuance of disability certificates as a matter of course rather than a matter of medical necessity resulted in bills submitted by Get Well and TRU relative to patients who did not require transportation assistance, were able to drive, and were in fact driving, during the same time period they were allegedly disabled from doing so.

527.  As one example of the use of unnecessary disability findings by the defendant clinics, and unnecessary transportation billed to Allstate, Optim billed for

a re-evaluation of patient A.A. (Claim No. 0575788120) just twenty-six (26) days after his alleged injury and twenty-three (23) days after his initial appointment.

528.   At that re-evaluation, A.A. reported that most of his pain had resolved and pain in his lower back was reduced to a level of two (2) on a scale of one (1) to ten (10), and that he wanted to return to work without any restrictions.

529.   Despite this report, Optim issued a disability certificate without any work restriction, but continued to claim that A.A.'s injuries required transportation assistance, and continued to do so for many months thereafter.

530.   The defendant clinics' issuance of medically unsupported disability findings are further exemplified by the following:

- Patient R.P. (Claim No. TXA-0241767) attended a follow-up appointment at Vital on November 18, 2019 where she reported that her knees and shoulder were pain free and that she had reduced back pain that she rated at 2 out of 10. She also reported that physical therapy was helping and that she wanted to return to work. Vital found that R.P. could return to work with no restrictions, but ordered continued transportation assistance without any explanation why such services were required.

- Patient J.G. (Claim No. 0493177737) attended a follow-up appointment at Multicare on February 8, 2020, approximately one month after he was allegedly involved in an auto accident. Multicare's report notes that J.G. had been working and that "he will be returning to work without restriction," but continued his disability finding stating that he "will need housework and transportation assistance."

- Patient D.C. (Claim No. 0585396947) was a sixteen-year-old seen by defendant Optim for a follow-up visit on March 3, 2020. Optim's report notes no significant physical limitations and diagnosed the patient with only a hip and lumbar sprain. Nevertheless, Optim issued a disability finding for transportation assistance, even though the patient was

accompanied to appointments by her mother because "she is a minor and requires transportation."

- Patient C.F. (Claim No. 0570039651) was seen by Vital on January 7, 2020, approximately five (5) weeks after her alleged accident.  At that time, Vital found that C.F. had returned to work and "does not require any restrictions," but continued to provide a disability finding for transportation assistance.

531.   Defendants Get Well and TRU knowingly obtained these and other unsupported disability certificates from the defendant clinics and used them to attempt to justify their medically unnecessary purported services.

532.   Moreover, Get Well and TRU frequently billed for transportation services prior to any determination by a licensed healthcare provider that the patient required transportation services.

533.   The defendants also billed for purported transportation services on dates on which patients did not undergo medical treatment at all.

534.   For example, defendant TRU billed Allstate for allegedly transporting patient L.J. (Claim No. 0568811210) on August 6, 2019 (and did not provide Allstate with the name or location of the purported transportation) but no medical provider has billed for any purported service to L.J. on that date.

535.   Allstate has no obligation to pay for transportation services that were medically unnecessary.

## H.   UNNECESSARY DURABLE MEDICAL EQUIPMENT

536.   Another integral part of the defendants' predetermined treatment protocol was to prescribe excessive and unnecessary items of DME.

537.   The defendant clinics' unnecessary DME prescriptions were made in order to generate additional claims for themselves and for their associates, including defendant Dynamic.

538.   Much of the DME billed by the defendants, including back braces, was counter-productive to treatment of the type of myofascial pain complaints reported by the majority of patients at issue herein.

539.   The DME prescribed and billed by the defendants was done as a predetermined matter of course, with nearly every patient receiving a similar collection of DME at or following an initial visit to one of the defendant clinics.

540.   For example, Vital prescribed virtually identical DME to each of its patients, typically consisting of a heating pad, cervical pillow, lumbrosacral back brace or other types of brace(s), and Biofreeze gel, at their initial appointments.

541.   Many patients have described arriving at Vital's offices to find a trash bag containing these items of DME waiting for them, proving that these were ordered as part of Vital's predetermined treatment protocol, and not to treat patients' specific injuries or conditions following examination and diagnosis.

542.   Despite being handed these trash bags of DME by Vital, it was often defendant Dynamic that submitted bills to Allstate.

543.   For example, patient L.B. (Claim No. 0560335861) testified to being transported to an appointment at Vital where "they gave me a trash bag with my supplies in it."

544.   Dynamic billed Allstate for allegedly issuing a pillow, a heating pad, an electronic stimulation unit, a lumbar brace, a knee brace, and Biofreeze gel to L.B.

545.   Patient J.M. (Claim No. 0525207767) described a similar experience, stating that "[t]he first day they gave me a pillow, Biofreeze, a brace, all in a garbage bag. They had them all lined up ready to go."

546.   Dynamic billed Allstate for allegedly issuing a pillow, a heating pad, an electronic stimulation unit, a lumbar brace, and Biofreeze gel to J.M.

547.   Vital routinely issued this standard collection of DME to patients without regard to medical necessity or the patient's specific condition or need.

548.   Additional examples of this practice by Vital include:

- Patient J.C. (Claim No. TXA-0247737), a 78-year-old taking medications for high blood pressure and prostate conditions. At his initial appointment, J.C. was purportedly given Biofreeze, a lumbrosacral brace, a cervical pillow, and a heating pad, all of which was billed by Dynamic.

- Patient F.B. (Claim No. 0561906314), who allegedly sustained a broken ankle and laceration in a motor vehicle accident, along with

vague spinal diagnoses.  Vital ordered Biofreeze, a lumbrosacral brace, a cervical pillow, and a heating pad, all of which were billed to Allstate by Dynamic.

- Patient L.E. (Claim No. TXA-0245170) reported right knee, neck, and lumbar pain, and that her main issue was "primarily stiffness" at her initial Vital visit.  Vital ordered Biofreeze, a lumbosacral brace, a cervical pillow, a heating pad, all of which were billed to Allstate by Dynamic.

549.   Defendants Select and Multicare also both followed a predetermined protocol with respect to ordering unnecessary DME similar to Vital's, and routinely issued motor vehicle accident patients Biofreeze, back braces, and cervical pillows.

550.   As with the unnecessary DME ordered by Vital, the *pro forma* DME orders made by Select and Multicare were routinely billed by Dynamic, which charged exorbitant amounts for the DME.

551.   Optim's predetermined treatment protocol also included ordering unnecessary DME similar to Vital, Select, and Multicare, but Optim typically billed Allstate directly for the DME it allegedly supplied to its patients.

552.   DME that was issued and billed as part of a predetermined treatment protocol, and not to address the specific conditions or treatment needs of the patient, is not payable under the Michigan No-Fault Act.

553.   The defendants' *pro forma* DME orders routinely included transcutaneous electrical nerve stimulation ("TENS") devices and INF units.

554. TENS and INF are adjunctive treatments that use electricity to reduce the perception of acute post-operative pain or chronic intractable musculoskeletal or neuropathic pain where there is a demonstrable pain source.

555. Except for treatment of acute post-operative pain, an appropriate prescription for TENS or INF must be supported by findings that the patient's pain is chronic (greater than three (3) months in duration), has an identified pain source, and has failed to respond to traditional pain relief strategies (e.g., physical therapy, chiropractic, and bracing).

556. There is no medical justification of prescribing TENS or INF devices in the acute stage of care.

557. The vast majority of the patients at issue herein who received prescriptions for TENS and INF devices from the defendant clinics were issued such prescriptions improperly and unnecessarily, during the acute stage of treatment.

558. There is no medical support for use of TENS and INF electrotherapies for chronic low back pain, which is defined as pain that has existed for greater than three (3) months.

559. The defendants routinely improperly ordered and issued TENS and INF devices for injuries that were in the acute stage and for chronic low back pain, neither of which could be medically necessary.

560.   In many cases, the defendants ordered and issued these TENS and INF devices before attempting to perform conservative treatments, in violation of applicable standards of care.

561.   As one example of this practice, patient T.H. (Claim No. 0492694856) was allegedly provided an INF unit just two (2) months after his accident, while still undergoing physical therapy, apparently for treatment of muscle spasms in the lumbar spine; meaning that the INF unit was improperly issued for low back pain for which it is not indicated, that was in the acute stage, and before first giving conservative treatment time to be effective.

562.   The TENS and INF devices ordered and issued by the defendants were also frequently for patients who were already undergoing electrical stimulation as part of the extensive courses of physical therapy treatment billed by defendants Multicare and Optim.

563.   Issuing electrotherapy devices to patients who were already undergoing such treatment, usually with limited or no benefit, was redundant and unnecessary.

564.   Patients' responses to TENS and INF therapy are variable and unpredictable, and therefore a trial period of use of the device lasting 1-2 months is necessary before purchasing a device.  It is imperative that patients be monitored by the prescribing physician during the trial period.  Only after efficacy and tolerance of the TENS therapy are confirmed should the device be purchased.

565.   Rather than adhere to these widely-accepted standards for the usage of TENS and INF therapy, the defendant clinics ordered and issued such devices to their patients without regard to medical necessity, without providing proper instruction on their use, and without monitoring the use and effectiveness of the devices.

566.   Patients were never provided the rental of a TENS or INF device during a trial period.  Instead, after the defendant clinics ordered the devices they were immediately issued, typically by Dynamic, which billed Allstate exorbitant amounts for the sale of the devices.

567.   INF units are nearly identical to TENS devices, so much so that the devices are subject to the same Centers for Medicare and Medicaid Services ("CMS") national coverage determination ("NCD") assessing their medical utility.

568.   Indeed, CMS requires claims for INF units to be submitted using the HCPCS Code for TENS devices, for which the average payment amount is approximately $70.

569.   The defendants routinely billed Allstate $2,100 for INF units and $650 for TENS devices, the former of which appear to have been issued solely to generate this higher charge amount as the defendants never explained a reason that an INF unit was needed.

570.   On numerous occasions, the defendants billed Allstate for allegedly supplying multiple units of the same DME to the same patient, which is clearly redundant and unnecessary.

571.   For example, Vital ordered and Dynamic billed for INF units allegedly provided to patient T.H. (Claim No. 0492694856) on November 7, 2017 and again on November 8, 2018.

572.   Since October 1, 2017, Dynamic has billed Allstate for supplying the same customer with the same item of DME on more than one occasion at least twenty-six (26) times, totaling charges of $45,300.

573.   The defendant clinics also failed to monitor the continued use of the TENS and INF devices they ordered and issued, which is a violation of the standard of care.

574.   Indeed, despite billing for monthly re-evaluations of patients, the defendant clinics' reports almost never mentioned the previously issued TENS and INF units, or reported whether they were actually being used or effective.

575.   For example, patient T.H. (Claim No. 0492694856) was purportedly issued an INF device by Vital on November 7, 2017 that was billed by Dynamic on that date.

576.   Over the next year, patient T.H. was seen by Vital at least seven (7) times, but none of the reports mention the previously-issued INF device, or whether it was actually used or effective.

577.   That TENS and INF units were issued to patients simply as a way to generate additional billing and were not intended to and did not treat patients' actual medication conditions is further demonstrated by the fact that the defendants almost never provided patients with replacement electrodes for the devices.

578.   When used properly and in accordance with instructions, electrodes that attach to a patient's skin last for approximately one month.

579.   Dynamic issued replacement electrodes just twelve (12) times despite having issued at least 147 INF or TENS devices to the patients at issue herein, meaning that none of the other patients to whom INF or TENS devices were allegedly issued could have used the devices for any extended period of time.

580.   DME that was prescribed and issued for the defendants' financial gain and not based on an individualized evaluation of medical necessity is fraudulent and non-compensable under Michigan's No-Fault Act.

## I.   UNNECESSARY PRESCRIPTIONS AND COMPOUNDED MEDICATIONS

581.   The defendant clinics' predetermined treatment protocol also included routinely prescribing their patients medications from a standard set of pain medications, muscle relaxers, and anti-inflammatory medications.

582.   Nearly all patients were prescribed similar medications, often Flexeril and Mobic, at their initial appointments, which were then either refilled at subsequent appointments, or were replaced with other similar pain medications and muscle relaxers.

583.   The issuance of pain and anti-inflammatory patches and gels was also standard protocol.

584.   For example, Vital maintained pre-signed prescription forms for those products as illustrated below:

585.   Frequently, these medications were prescribed to patients at initial appointments that occurred on the same day, or only a day or two after, the patient was seen and discharged by a hospital emergency room, where they were given only ibuprofen or similar over-the-counter medications, which demonstrates that other medical professionals determined that the medications prescribed by the defendant clinics were unnecessary.

586.   These prescriptions from the defendant clinics typically were filled by Vital's in-house pharmacy, defendant VCC Services, or by associated pharmacies, such as defendant Groesbeck Rx, which billed Allstate amounts that far exceed the actual or reasonable costs of these medications.

587.   On numerous occasions, the defendant pharmacies continued to bill for medications that the defendant clinics did not order and their own medical personnel had determined were not needed.

588.   For example, Groesbeck Rx billed for a compounded cream it allegedly supplied to patient J.J. (Claim No. 0575788120) on February 26, 2020 even though an evaluation by Optim just six days earlier noted that J.J. did not require more medications, and billed for a compounded cream it allegedly provided to J.J. on March 24, 2020 despite a notation by Optim from March 19, 2020 that, again, did not mention a need for new medications, and even though the initial prescription did not authorize any refills of the medication.

589. Allstate is not required to pay bills for prescriptions that were not medically necessary, that were not actually ordered, and that were prescribed as part of a predetermined treatment protocol and not based on the individual patient's condition or medical needs.

590. The defendant clinics also prescribed medically unnecessary compounded medications and creams in order to generate additional bills.

591. These compounded creams were invariably filled by defendant Groesbeck Rx, which is located approximately 25 miles away from Vital and Select, and more than 10 miles from Optim and Multicare.

592. The defendant clinics' orders for compounded medications used indecipherable names and were not accompanied by any instruction to patients.

593. There is little to no research to support the use of topical compounded products and they are therefore largely considered experimental.

594. In order to establish any medical necessity for compounded topical agents, one (1) or more of the following must be established: (1) intolerance to commercially available products, (2) failure to improve in spite of commercially available products, (3) avoidance of gastrointestinal problems from oral intake, (4) need to reduce systematic exposure, or (5) documented difficulties ingesting oral medication.

595.   The defendants did not document any justification for the use of compounded medications.

596.   Rather, the use of compounded medications was part of the defendants' predetermined slate of drugs prescribed as a matter of course, without any analysis of the efficacy or tolerance of commercially-available options.

597.   Frequently, the reports from the examinations at which the compounded medications were ordered do not even mention the orders, much less explain the reasons they were ordered, and follow-up examinations almost never indicate that the use or effectiveness of the compounded medications that were ordered were discussed with the patient.

598.   The improper use of compounded medications as a matter of course rather than as a response to patient-specific contraindications for commercially-available products also is evidenced by the use of preprinted prescription forms by the defendant clinics to order compounded medications from Groesbeck Rx, which confirm that compounds were not prescribed and created to address unique patient problems:

By signing this prescription, Prescriber is authorizing pharmacy to substitute as necessary.

**TOPICAL APPLICATIONS**

ANTI-INFLAMATION/MUSCLE RELAXANT

℞ Baclofen 2%  Cyclobenzaprine 2%  Ketoprofen 15%  Lidocaine 4%  Microderm Base
SIZE: 120 Gram _____    240 Gram  ✓    360 Gram _____        Alternate Size: _____ Grams
SiG: APPLY ___5___ grams to affected area  2  times daily        REFILLS:  1  2  3  4  5  6  7  8  9  10

ANTI-INFLAMATION/NEUROPATHIC PAIN

℞ Diclofenac 5%  Gabapentin 10%  Baclofen 2%  Amantadine 8%  Lidocaine 4%  Microderm Base
SIZE: 120 Gram _____    240 Gram _____    360 Gram _____        Alternate Size: _____ Grams
SiG: APPLY _____ grams to affected area _____ times daily        REFILLS:  1  2  3  4  5  6  7  8  9  10

℞ Ketamine 10% HCL 10% Gabapentin 6% Amitriptyline HCL 2% Baclofen 2% Diclofenac 3% Lidocaine 5% Microderm Base
SIZE: 120 Gram _____    240 Gram _____    360 Gram _____        Alternate Size: _____ Grams
SiG: APPLY _____ grams to affected area _____ times daily        REFILLS:  1  2  3  4  5  6  7  8  9  10

℞ Ketamine 5%  Gabapentin 6%  Amitriptyline 2%  Cyclobenzaprine 2%  Diclofenac 5%  Magnesium Chloride Hexahydrate 3%  Lidocaine 2%  Prilocaine 3%
SIZE: 120 Gram _____    240 Gram _____    360 Gram _____        Alternate Size: _____ Grams

599.   Many of the compounded creams billed by Groesbeck included multiple ingredients that almost certainly had no medical benefit or that were not approved for use.

600.   For example, three (3) of the four (4) pre-printed topical applications Groesbeck offered included diclofenac as an ingredient among the combination of medications in each.

601.   Diclofenac is a non-steroidal anti-inflammatory that is only approved for use in peripheral joints, but these compounds were routinely ordered and billed in relation to patients who were diagnosed with spinal sprains and strains.

602.   Another ingredient in two (2) of the formulas is cyclobenzaprine, a muscle relaxer that is only available in oral tablets and has no topical formulation or indication.

603.   Baclofen, an ingredient in three (3) of the four (4) formulas, cyclobenzaprine, and gabapentin, an ingredient in two (2) of the formulas, are not approved by the FDA for topical use.

604.   Any use of cyclobenzaprine, baclofen, or gabapentin in a cream medication is necessarily experimental.

605.   A study by the Annals of Internal Medicine published in 2019 found that compounded pain creams were no better at reducing pain than placebo creams containing no active ingredients and concluded that "they should not be used to treat chronic localized pain."

606.   When compounded medications were prescribed to the patients at issue herein, it was never clear what body part(s) the cream was intended to treat.

607.   The defendant clinics did not provide patients with instructions as to where or how the compounded creams prescribed were to be applied.

608.   It is unlikely that any of the ingredients in Groesbeck's pre-printed formulas could penetrate deeply enough to provide therapeutic benefit to a shoulder or spine, which were the source of the most commonly documented pain complaints by the defendant clinics, or that any provided benefit beyond what the individual ingredients may have provided.

609.   The compounded creams prescribed by the defendant clinics and billed by Groesbeck Rx were designed solely to increase the total amount of charges

submitted to Allstate and not for the actual medically necessary treatment of patients, as each prescription for compounded creams was billed to Allstate at many times the cost of the component ingredients.

610.   As one example of this practice, Optim billed for an initial evaluation of a fifteen-year-old patient, D.C. (Claim No. 0585396947), two days after her alleged accident, and diagnosed various areas of "pain" and "sprains."

611.   Despite reporting no prior or ineffective use of commercially available products by patient D.C., Optim immediately ordered, and Groesbeck billed for, an "Anti-Inflammation/Muscle Relaxant" compounded cream for D.C. without any finding of medical necessity.

612.   That the compounded cream prescribed by Optim for D.C. was done as part of its predetermined treatment protocol and not based on medical necessity is further demonstrated by the fact that since Groesbeck began its business operations in 2019, Allstate has received billing from Groesbeck for more than 86% of patients for whom Optim billed Allstate during that time.

613.   As another example, Select billed for an initial evaluation of a 56-year-old patient M.S. (Claim No. 0406670604) more than three (3) years after an alleged motor vehicle accident, and diagnosed various areas of "pain" in the back and left shoulder.

614.   Select's notes from the visit include no discussion of previous medical treatment or medications received by M.S. in the more than three (3) years since his accident, and instead implement Select's standard predetermined treatment protocol, including ordering a compounded cream billed by Groesbeck without any finding of medical necessity.

615.   That the compounded cream prescribed by Select for M.S. was done as part of its predetermined treatment protocol and not based on medical necessity is further demonstrated by the fact that since Groesbeck began its business operations in 2019, Allstate has received billing from Groesbeck for nearly half of patients for whom Select billed Allstate for new patient visits during that time.

616.   As another example, Vital billed for an initial evaluation of patient O.S. (Claim No. 0555370402) just five (5) days after an alleged accident, at which time it diagnosed sprains of several body parts.

617.   Despite O.S. having attempted no other medications besides Motrin, Vital immediately ordered a compounded cream that was billed by Groesbeck without any finding of medical necessity or explanation of how the cream was to be used, including no explanation of which of the several body parts for which sprains were diagnosed O.S. was supposed to apply the cream.

618.   As another example, Groesbeck billed Allstate $1,856.54 for a compounded cream allegedly issued to patient R.D. (Claim No. 0553633702) on October 10, 2019.

619.   The medication was purportedly ordered by Multicare, despite no indication that R.D. had tried or could not use normal topical or other medications.

620.   On November 12, 2019, Multicare reported that R.D. "did not receive the compounded formulation for topical application yet from the pharmacy," confirming that Groesbeck's bill is yet another example of the defendants' billing for services and treatments that were not actually rendered.

621.   But even if R.D. did receive a compounded medication from Groesbeck, there was absolutely no medical justification for resorting to an unapproved compound for this routine care.

622.   Allstate has no obligation to pay for compounded medications that are prescribed as a matter of course and that are medically unnecessary.

**J.**   **EXCESSIVE AND UNNECESSARY ELECTRODIAGNOSTIC TESTING**

623.   Defendants Vital and Multicare also routinely billed for medically unnecessary electrodiagnostic testing that was not indicated when ordered and was not used to inform patients' courses of treatment.

624.   Electrodiagnostic testing includes electromyography (EMG) and nerve conduction studies (NCS).

625.   EMG testing involves the use of an electromyography machine to record the electrical activity of a skeletal muscle to evaluate the existence of muscle and/or nerve abnormalities.

626.   A needle EMG is an invasive procedure that involves the insertion of a small needle electrode directly into an individual muscle.

627.   To perform a NCS, the clinician must measure nerve impulses following nerve stimulation and obtain information regarding the speed (i.e., velocity), timing, and strength (i.e., amplitude) of nerve impulses.

628.   NCS involve tests in which peripheral nerves in the upper and lower limbs (i.e., arms and legs) are stimulated through the skin by the application of an electrical current.

629.   For EMG and NCS testing to be medically justified, the clinical examination must indicate symptoms or signs of radiculopathy, which is a pathological condition of the nerve roots where one or more root nerves along the spine become damaged causing radiating pain to the part of the body served by the particular nerve.

630.   The patient's subjective symptoms alone cannot properly support the performance of an electrodiagnostic study.

631.   EMG and NCS are not indicated where, as is the case with nearly all patients of the defendant clinics, neurologic deficits are not detected in the patients.

632.   Despite this, the defendants routinely ordered EMG and NCS testing based solely on a patient's subjective reporting and for purposes of diagnosis, rather than through a physical exam, without first making objective findings of abnormal neurology, and without first giving sufficient time for conservative treatments to be effective.

633.   Therefore, the defendants subjected patients to unnecessary pain and risk of infection and billed Allstate for unnecessary and unjustified EMG and NCS.

634.   The defendants also did not use the electrodiagnostic testing allegedly performed to inform or influence patients' treatment plans, which were predetermined.

635.   As one example, defendant Vital billed for an alleged evaluation of patient C.R. (Claim No. 0508548351) on May 4, 2018, just two (2) days after an alleged accident, at which time Vital diagnosed only sprains.

636.   Rather than pursue conservative treatment in light of the fact that the alleged accident occurred only two (2) days earlier, Vital immediately ordered by EMG and NCS testing of C.R.

637.   EMG and NCS testing of C.R.'s upper extremities was billed by Vital on June 1, 2018.

638.   Vital billed for a re-evaluation of C.R. on June 29, 2018, and noted that her pain in "her cervical spine and left knee are mostly resolved at this time."

639.  Vital nevertheless persisted with EMG and NCS testing of C.R.'s lower extremities on July 13, 2018, and which predictably was an "essentially normal exam."

640.  Subsequent reevaluations of C.R. by Vital never mentioned any radicular complaints or symptoms.

641.  Similarly, Multicare allegedly saw patient J.G. (Claim No. 0493177737) on April 10, 2018, at which time the patient did not indicate radiculopathy.

642.  Multicare nevertheless ordered electrodiagnostic testing and billed for its performance two (2) weeks later on April 24, 2018, and unsurprisingly revealed "an essentially normal" exam, with no evidence of radiculopathy.

643.  In addition to billing for electrodiagnostic testing when not indicated by any objective examination findings (or in many cases, even subjective complaints suggesting radiculopathy), Vital and Multicare improperly used a predetermined protocol of muscles subjected to electrodiagnostic testing.

644.  Electrodiagnostic testing is an extension of the clinical exam and should be used, if at all, in accordance with a patient's individualized objective symptoms.

645.  Accordingly, the nature and number of the peripheral nerves and the types of nerve fibers tested in a NCS should be dynamic (i.e., varied from patient to patient), and should never be based on a predetermined protocol.

646.   Likewise, EMG tests should not be conducted pursuant to a predetermined protocol of muscles to be tested.

647.   Patients for whom Vital and Multicare billed Allstate for EMGs and NCS almost always had testing performed on the same nerves and muscle groups, regardless of the patients' individual complaints and without regard to the results being found by the physician performing the tests.

648.   Electrodiagnostic testing that is performed pursuant to a predetermined protocol and without medical justification is not compensable pursuant to the No-Fault Act, and Allstate is entitled to repayment of amounts it was induced to pay by the defendants' misrepresentations.

649.   Allstate is not required to pay the defendants under the No-Fault Act for EMGs and NCS that were not medically necessary, unsupported by an appropriate medical diagnosis, not used to guide a patient's treatment, or that were ordered solely to generate additional billing.

### K.   UNNECESSARY AND CLINICALLY USELESS EEGs

650.   Defendant Vital's predetermined treatment protocol also included ordering and billing for unnecessary and clinically useless electroencephalograms ("EEGs").

651.   An EEG is a test that detects electrical activity in the brain using small, metal discs (electrodes) attached to the scalp.

652.   EEGs are primarily used to diagnose seizure disorders and to confirm diagnoses of epilepsy.

653.   None of the patients at issue herein were seeking treatment from the defendants for seizures or epilepsy causally related to motor vehicle accidents.

654.   Patients for whom EEGs were ordered often reported nothing more than headaches immediately following an accident, and typically were not even diagnosed with a concussion or any type of even mild traumatic brain injury beyond a conclusory statement added to patient reports by the defendant clinics.

655.   There is no clinical diagnostic value to performing EEGs on patients who have suffered no or only mild brain injury, which includes all or nearly all of the patients at issue herein, nor can EEGs be used to diagnose conditions such a post-concussive syndrome ("PCS") or other conditions in these types of cases.

656.   EEGs do not predict, confirm, or measure PCS, nor can mild EEG abnormality be used to substantiate an objective clinical brain injury, nor can a normal EEG exclude an initial significant brain injury.

657.   As an example of this practice, at her initial examination at Vital just four (4) days after her alleged auto accident, patient A.M. (Claim No. 0488890930) denied striking her head or loss of consciousness at the time of her accident.

658.   Nevertheless, Vital diagnosed patient A.M. with a closed head injury for which it referred her for a head injury specialist evaluation, and also ordered an EEG at that time.

659.   Vital's reports from A.M.'s visits following her EEG make no mention of the results of the EEG that was allegedly performed, do not indicate that the EEG was used in any way in the diagnosis or treatment of patient A.M., and no longer diagnosed or referred to the previous diagnosis of A.M.'s alleged closed head injury.

660.   Vital's practice of ordering EEGs based on patients' reported symptoms, including things like alleged headaches and dizziness, was medically unnecessary, served no clinical purpose related to the diagnosis or treatment of patients, and was done solely to generate billing under the No-Fault Act.

661.   Vital also improperly billed for the alleged interpretation of ambulatory EEG test results using CPT Code 95957.  *See* Exhibit 3.

662.   CPT Code 95957 is only appropriately used when a physician must analyze "spikes" in the data recorded during an EEG, and only when a patient is diagnosed with intractable epilepsy.

663.   None of the patients at issue herein were diagnosed with intractable epilepsy, and therefore none of the claims submitted by Vital using CPT Code 95957 were ever medically necessary or appropriate.

664.   EEG testing that is not ordered for purposes of diagnosing or treating any actual injury or medical condition is not medically necessary and is not payable under the No-Fault Act.

## L.   MEDICALLY   UNNECESSARY   PSYCHOLOGICAL   AND NEUROPSYCHOLOGICAL TESTING

665.   The defendant clinics frequently billed for psychological and neuropsychological testing and treatment of patients that was medically unnecessary, to the extent it was provided at all, and was not used to guide the treatment or care of patients.

666.   In a clinical setting, psychological testing is properly used as an assessment tool to measure and observe behavior to arrive at a diagnosis and guide treatment of a particular problem.

667.   Neuropsychological testing is used to measure psychological function, and in a clinical setting is used for the diagnosis of changes in a patient's thinking or memory.

668.   There is no medical justification for conducting routine psychological testing or neuropsychological testing of patients involved in minor traffic accidents.

669.   Despite this, defendants Select and Optim routinely billed for psychological testing of motor vehicle accident patients, including testing for Attention Deficit Hyperactivity Disorder ("ADHD") and testing for depression, anxiety, and stress, none of which causally relates to motor vehicle accidents.

670.   Select and Optim billed for psychological testing even where there was no objective indication for performing such testing, the testing had no possible relevance to the treatment of patients' purported injuries from motor vehicle accidents, and it was not used to guide the patients' treatment.

671.   For example, on August 7, 2019, Select billed Allstate using CPT Code 96103, a code which was deleted effective January 1, 2019, for purportedly administering an adult ADHD self-report assessment and a depression, anxiety, and stress self-assessment with respect to patient A.S. (Claim No. 0556229037) at her initial evaluation at Select.

672.   At her initial evaluation, A.S. reported no psychological problems or concerns, and Select's notes from the visit report that A.S. was "alert and oriented x3, in no apparent distress with appropriate mood and affect," and identified no deficiency or specific complaint warranting psychological testing.

673.   Rather, the psychological testing billed by Select was billed as part of its predetermined treatment protocol designed to maximize billing of insurers like Allstate, not to diagnose or treat patients' actual medical conditions.

674.   During the relevant period, Select billed Allstate for conducting this type of psychological testing using CPT Code 96103 or CPT Code 96138 ("Psychological or neuropsychological test administration and scoring by

technician, two or more tests, any method, first 30 minutes") with respect to at least twenty-three (23) different patients.  *See* Exhibit 4.

675.   Optim billed Allstate for conducting the same psychological testing and as with Select, there was no medical necessity for the psychological testing for which Optim billed Allstate.

676.   For example, Optim billed Allstate $290 using CPT Code 96138 for purportedly administering an adult ADHD self-report assessment and a depression, anxiety, and stress self-assessment with respect to patient D.C. (Claim No. 0585396947), who was just sixteen (16) at the time, at her initial evaluation at Optim, even though D.C.'s complaints were limited.

677.   Optim's report for the visit identifies no medical necessity for such psychological testing, nor was there any; instead, the testing was billed for as part of Optim's predetermined treatment protocol designed to maximize billing of insurers like Allstate.

## M.   MEDICALLY UNNECESSARY INJECTIONS

678.   Defendant Select, often based on referrals from the other defendant clinics, also subjected patients to a battery of unnecessary epidural steroid injections ("ESI"), facet joint injections, and other injection-related services.

679.   These patients frequently were referred to Select by the other defendant clinics as part of the predetermined treatment protocol utilized by the defendants, where they were pressured to undergo these injections.

680.   The performance of invasive procedures (such as injections) for the relief of pain must be based upon adequate diagnosis and legitimate medical necessity.

681.   As discussed above, examinations billed by the defendants, if they were performed at all, resulted only in boilerplate findings and treatment plans that were not adequate to support the performance of invasive procedures.

682.   Many of the injections billed by the defendants had no explanation at all and were not part of treatment plans allegedly established for the patients at issue herein.

683.   Indeed, many of the injections billed by the defendants were diagnostic in nature and should have been used to establish diagnoses such as radiculopathies, which were instead assigned to patients without basis and without performing adequate tests, as detailed above.

684.   Select and Bitkowski rarely allowed conservative treatment to run its course prior to recommending the patient for ESI, and frequently encouraged patients to undergo ESI almost immediately after the patients' accidents.

685.   Even in those instances where patients reported improvement from conservative treatment, Select and Bitkowski nonetheless continued to push for ESI to be administered.

686.   Select and Bitkowski also directed patients to return for repeat injections of the same body parts without evaluating the efficacy of prior procedures, and in many cases, even when there was clear evidence that the prior procedures were not effective and therefore there could be no medical basis to attempt again.

687.   For example, patient Z.T. (Claim No. 0475979290) reported on November 17, 2017 that she had pain in her left shoulder that she rated as just 2 of 10 on the pain scale.

688.   Vital nevertheless arranged for a consultation with Swift, who billed for a shoulder injection on December 1, 2017.

689.   On December 15, 2017, Z.T. reported to Vital physician Darrah that the shoulder injection had made her pain much worse.

690.   Z.T. was referred to Select and Bitkowski anyway, and on December 30, 2017 Select billed for a repeat injection with no explanation of why such treatment was indicated in light of the prior negative impact of the same procedure. Indeed, it does not appear that Select and Bitkowski reviewed the records regarding the prior injection.

691.    Select and Bitkowski then billed for yet another shoulder injection on January 27, 2018, again without documenting an interim evaluation.

692.    When Z.T. returned to Vital on April 6, 2018, her shoulder pain had increased to 5 of 10 on the pain scale.

693.    Despite repeated reports that injections were hurting, not helping, Z.T., Select and Bitkowski billed for a fourth injection on April 14, 2018 and a fifth injection on August 4, 2018.

694.    Patient F.W. (Claim No. 0445409097), another representative example of the defendants' reckless, improper, and unnecessary use of injections solely to generate bills, was also subjected to an incredible number of injections despite reporting virtually no pain throughout treatment.

695.    From February 9, 2017 to June 15, 2017, F.W.'s pain scores in his spine decreased from 5 of 10 to 1-2 of 10 in all areas.

696.    Electrodiagnostic testing allegedly performed on F.W. on June 13, 2017 found nothing wrong, and expressly reported that the results were "essentially normal."

697.    F.W. was nevertheless referred to Select and Bitkowski, who billed for epidural steroid injections on July 8, 2017, July 27, 2017, September 23, 2017, November 4, 2017, and December 9, 2017.

698.   At no point during F.W.'s extensive course of steroid injections did Select or Bitkowski perform any detailed examination or review of the efficacy of the prior procedures, and F.W. continued to report to his primary pain management physician that his pain levels remained at very low levels of 1 or 2 of 10 on the pain scale.

699.   Allstate is not required to pay Select and Bitkowski for medically unnecessary ESI treatment that was only recommended and performed to bolster claims submitted to Allstate.

## IX.   <u>FRAUDULENT BILLING PRACTICES</u>

700.   Providers like the defendants have a responsibility to select and submit the billing codes that accurately and truthfully identify the services performed and the complexity involved in rendering those services.

701.   The defendants failed to meet this responsibility and instead submitted bills for unreasonable payments to Allstate for medically unnecessary and excessive services and used fraudulent billing practices, as discussed *infra*.

702.   All of the medical records, bills, and invoices submitted to Allstate by, and on behalf of, the defendants contained CPT Codes, which are published by the AMA.

703.   The bills submitted to Allstate by the defendants were submitted on Health Insurance Claim Forms (HICF) approved by the National Uniform Claim Committee (NUCC) and referenced in the NUCC Instruction Manual.

704.   The back of all HICF forms contains the following language in bold font: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

705.   Despite the warning on the back of the HICF forms, the defendants included false, incomplete, and misleading information in the bills and medical records submitted to Allstate through interstate wires and the U.S. Mail.

## A.   FRAUDULENT UNBUNDLING

706.   The Centers for Medicare and Medicaid Services instituted the National Correct Coding Initiative ("NCCI") to promote national correct coding methodologies and to control improper coding leading to inappropriate payment for Medicare Part B claims.

707.   The NCCI contains an edit table entitled the "Column One/Column Two Correct Coding Edit Table" that identifies billing codes that should not be reported together because the services (and payment) of the Column Two code is subsumed by the services (and payment) for the Column One code.

708.   Violation of the edits (billing a Column One code and a Column Two code on the same day for the same patient) is known as "unbundling," which occurs when a provider bills separately for individual components of a procedure that are included in another billing code also billed for the same date of service.

709.   The defendants routinely unbundled services billed to Allstate, which resulted in tens of thousands of dollars in fraudulent bills.

### 1.   Vital's Fraudulent Unbundling

710.   As discussed above, Vital frequently billed Allstate for medically unnecessary EEGs.

711.   Vital routinely unbundled EEG testing CPT Codes it billed to Allstate, which resulted in thousands of dollars in fraudulent bills.

712.   Records submitted by Vital with its billing for these EEGs indicate that to the extent they occurred at all, testing was performed using eVox, which is a hardware and software system that performs EEGs and electrocardiography ("ECG") testing in approximately 25 minutes.

713.   According to a coverage determination published in April 2019 by CMS, testing that is performed using the eVox system should only be billed using CPT Code 95999 (which describes "other" neurology and neuromuscular procedures), and should not be billed separately using CPT codes such as 92585,

95816, 95930, 95957, 96120, and 96146, which describe specifically defined neurology procedures.

714.   Vital routinely and improperly unbundled charges for alleged eVox testing using CPT codes 92585 (auditory evoked potentials testing), 95816 (electroencephalogram), 95930 (evoked potentials and reflect testing), 95957 (special EEG tests), 96120 (neuropsychological testing, a deleted code as of January 1, 2019), and 96146 (automated testing and results).

715.   Vital's fraudulent unbundling of charges for purported eVox testing routinely led to charges totaling nearly $5,000 for testing that should have cost just a couple hundred dollars pursuant to proper billing requirements and guidelines.

716.   Vital also routinely and improperly unbundled charges for bilateral shoulder x-rays.

717.   Where a provider obtains x-rays of the bilateral shoulder, the bilateral shoulder x-ray should be billed with a single charge, appended with modifier 50 to indicate a bilateral service.

718.   Instead, Vital routinely submitted separate charges for the bilateral shoulder x-ray, but failed to provide evidence that more than one radiologic view was taken.

## 2.    **United Lab's Fraudulent Unbundling**

719.   United Lab routinely unbundled urine drug testing CPT Codes, which resulted in thousands of dollars in fraudulent bills.

720.   For example, United Lab billed Allstate using CPT Code 80305 ("drug test(s), presumptive, any number of drug classes, any number of devices or procedures; capable of being read by direct optical observation only (e.g., utilizing immunoassay [e.g., dipsticks, cups, cards, or cartridges]), *includes sample validation when performed"*).

721.   As the emphasized language above makes clear, sample validation is included as part of presumptive drug testing under CPT Code 80305.

722.   However, United Lab routinely separately billed Allstate for sample validation using CPT Codes 82542, 82570, and 83986, which are Column Two CPT codes as described above.

723.    United Lab's practice of unbundling the Column Two codes and improperly billing these three (3) inclusive codes as separate charges constitutes fraudulent billing.

## 3.    **Select's Fraudulent Unbundling**

724.   Select routinely submitted charges to Allstate using CPT Code 99070, which is the billing code for supplies and materials over and above those usually

included with the office visit or service rendered, in conjunction with billing submitted for performing epidural steroid injections.

725.   In order to properly bill using CPT Code 99070, the excess material or supplies used by the medical provider must be specifically identified along with the reason the materials and supplies used were abnormal for the procedure.

726.   Select never identified the supplies and materials it allegedly used over and above those usually included with the service it purportedly rendered.

727.   Select's practice of separately billing for supplies and materials that are a normal and expected component of a procedure constitutes fraudulent unbundling.

### 4.   Fraudulent Unbundling of Chiropractic Bills

728.   Multicare and Optim routinely submitted charges to Allstate using CPT Codes 98940 and 98941 for chiropractic manipulation and using CPT Code 97124 for massage therapy.

729.   CPT Code 97124 is a Column Two code and CMT billed using CPT Codes 98940 and 98941 are Column One code when billed for the same patient on the same date of service.

730.   As just one example (of many), Multicare billed Allstate using CPT Code 98940 and CPT Code 97124 on the same dates of service with respect to patient A.D. (Claim No. 0469426464) on at least 63 occasions between September 22, 2017 and August 2018.

731.   Similarly, Optim billed Allstate using CPT Code 98941 and CPT Code 97124 on the same dates of service with respect to patient B.E. (Claim No. 0560682585) on at least 42 occasions over a nine (9) months period between September 2019 and June 2020.

732.   Multicare submitted claims totaling at least $78,110 for purported CMT using CPT Code 98940 or CPT Code 98941 on the same dates of service it billed for purported massage using CPT Code 97124.

733.   Optim submitted claims totaling at least $12,920 for purported CMT using CPT Code 98941 on the same dates of service it billed for purported massage using CPT Code 97124.

734.   Bills for alleged chiropractic manipulation and massage to the same patient on the same date constitute fraudulent unbundling and Allstate is not obligated to pay such unbundled claims.

### 5.   Fraudulent Unbundling of Psychological Testing

735.   As previously discussed, part of the predetermined treatment protocol implemented by Select and Optim included medically unnecessary psychological testing.

736.   Select and Optim billed Allstate for the purported psychological testing using CPT Code 96138, even though the testing did not satisfy the timed component of that billing code.

737.   The defendants also invariably billed using CPT Code 96138 on the same date of service as they billed using patient evaluation and management codes.

738.   The alleged testing billed by the defendants using CPT Code 96138 properly should have been included as a component of the evaluation and management codes billed by the defendants.

739.   The defendants' practice of billing using CPT Code 96138 on the same date of service as they billed using evaluation and management codes constitutes fraudulent unbundling.

### B.   FRAUDULENT UPCODING

740.   As discussed above, the defendants made misrepresentations to Allstate by submitting documentation that included CPT Codes for medical services that (1) were not actually performed, (2) were not performed consistent with established standards of care, and (3) were wholly unwarranted and unnecessary.

741.   The billing codes submitted to Allstate by the defendants also consistently exaggerated the complexity of evaluations purportedly provided in order to inflate the charges submitted to Allstate.

742.   Physician examinations of patients are billed using CPT Codes that reflect the complexity involved in the examination and it is the responsibility of the provider to select the appropriate CPT Code for the complexity involved in the examination.

743.   There are five (5) levels at which an office visit/examination or office consultation can be billed, with level one being the least involved examination and level five being the most complex.

744.   Initial office visits/examinations are billed using a CPT Code that starts with the numbers "9920"; reexaminations are billed using a CPT Code that starts with the numbers "9921"; and consultations are billed using a CPT Code that starts with the numbers "9924."

745.   The final number to complete each five-digit CPT Code for examinations and consultations is one (1) through five (5), depending on the complexity of the evaluation performed.

746.   To properly bill using level 5 complexity codes, the physician must have taken a comprehensive history, performed a comprehensive examination, and engaged in medical decision-making of high complexity.

747.   To properly bill using level 4 complexity codes, the physician must have taken a comprehensive (initial encounter) or detailed (reevaluation) history, performed a comprehensive (initial encounter) or detailed (reevaluation) examination, and engaged in medical decision-making of moderate complexity.

748.   The AMA has guided that level 5 initial examinations should involve approximately 60 minutes of face-to-face time with the patient, and level 5

reexaminations should involve approximately 40 minutes of face-to-face time with the patient.

749.   Level 4 examinations typically involve 45 minutes of face-to-face time, and level 4 reexaminations typically involve 25 minutes of face-to-face time.

750.   To warrant a medical bill demanding payment for a level 4 examination, the injury/condition necessarily requires: moderate risk of mortality, morbidity and/or complications; moderate diagnoses and review of complex data; and requires the medical provider to: (1) obtain comprehensive patient histories; (2) conduct comprehensive examinations; and (3) evaluate the patient (face-to-face) in an interaction lasting approximately 45 minutes.

751.   Each of the defendant clinics almost always submitted charges billed to Allstate for level 4 examinations (i.e., CPT Codes 99204 and 99214), and also billed Allstate for purported level 5 examinations (i.e., CPT Codes 99205 and 99215), that were not warranted by the examination and decision making performed.   *See* Exhibits 3-6.

752.   All bills submitted using CPT Codes 99204, 99205, 99214, and 99215 as a matter of course rather than based on an independent assessment of the complexity of medical decision-making were fraudulent.

753.   Vital has billed Allstate for at least 1,515 patient examinations since September 21, 2017.  *See* Exhibit 3.

754.   Not a single purported examination was billed as a level 1 encounter. Id.

755.   Just one (1) of these purported examinations was billed as a level 2 encounter.  Id.

756.   Just thirty-one (31), or 2%, of the 1,515 patient examinations billed by Vital were billed as level 3 encounters.  Id.

757.   1,481, or 97.7%, of the 1,515 patient examinations billed by Vital were billed as a level 4 examination.  Id.

758.   Select has billed Allstate for at least 464 patient examinations since December 16, 2017.  See Exhibit 4.

759.   Not a single purported examination by Select was billed as a level 1 encounter.  Id.

760.   Just one (1) of these purported examinations was billed as a level 2 encounter.  Id.

761.   Just twenty-four (24), or 5%, of the 464 patient examinations billed by Select were billed as level 3 encounters.  Id.

762.   437, or 94%, of the 464 patient examinations billed by Select were billed as a level 4 examination.  Id.

763.   Optim has billed Allstate for at least 167 patient examinations since July 24, 2019.  See Exhibit 6.

764.   Optim's own template billing records do not permit its physicians to bill for anything less than a level 4 encounter:



765.   It is never appropriate to predetermine that every patient encounter will be complex and comprehensive and most, if not all, of the alleged patient encounters at Optim were not complex or comprehensive.

766.   The defendant clinics' examinations fall woefully short of meeting the threshold standard to bill for level 4 and level 5 encounters.

767.   The defendant clinics almost never obtained comprehensive patient histories or performed detailed physical examinations, and their use of a predetermined treatment protocol for virtually every patient does not reflect decision making of moderate complexity required to bill for a level 4 and 5 examinations.

768.   For the patient appointments resulting in formulaic reports and office records based off the predetermined treatment protocol described above, the defendant clinics uniformly and improperly upcoded bills to represent alleged complex medical evaluations.

769.    The defendant clinics engaged in this improper and fraudulent upcoding in order to increase the amount they were able to bill to Allstate for patient appointments.

770.    Multicare and Optim also improperly billed Allstate for multiple initial examinations of patients by different medical providers in their practice.

771.    For example, both Multicare and Optim frequently billed for an initial examination by a medical doctor or nurse practitioner and then submitted a second bill for another initial examination of equal or greater complexity allegedly performed by a chiropractor the same day or only a few days later.

772.    New patient evaluations are generally paid at higher rates than established patient evaluations, so improperly claiming to have performed multiple initial examinations is improper upcoding.

773.    Examples of this practice by Multicare and Optim include:

- Patient A.H. (Claim No. 0505805473).  Multicare billed Allstate $385 for an initial examination on June 13, 2018 and billed Allstate $425 for another initial examination just one (1) day later, on June 14, 2018.

- Patient S.D. (Claim No. 055900208).  Multicare billed Allstate $425 for an initial examination on June 26, 2019 using CPT Code 99204 and billed Allstate $385 for another initial examination just one (1) week later, on July 3, 2019.

- Patient T.B. (Claim No. 0582237145).  Optim billed Allstate $425 for an initial examination on August 16, 2019 using CPT Code 99204 and billed Allstate $385 for another initial examination just four (4) days later on August 20, 2019.

- Patient L.J. (Claim No. 0568811210).  Optim billed Allstate $425 for an initial examination on August 12, 2019 using CPT Code 99204 and billed Allstate $385 for another initial examination just one (1) day later on August 13, 2019.

774.   By creating medical bills that included CPT codes for office visits and then causing such bills to be faxed and mailed to Allstate, the defendants represented to Allstate that the invoiced medical services had been performed in conformity with the AMA's CPT Code Guidelines.

775.   However, the bills prepared, faxed, and mailed by the defendants were submitted using fraudulent and deceptive examination CPT codes representing patient encounters that did not actually occur as billed.

776.   As such, Allstate is not obligated to pay any pending bills for office visits and is entitled to reimbursement for those office visits for which it has already tendered payment.

### C.   IMPROPER BILLING FOR URINE DRUG TESTING

777.   The CPT Code Book details the correct CPT Codes for definitive/quantitative urine drug tests.

778.   CPT Codes for definitive/quantitative testing are usually specific to the drug being measured in a specimen.

779.   The onus is on the laboratory to select the appropriate billing code based on the drug tested for or the type of urine drug test performed (i.e., presumptive/qualitative, semi-quantitative, or definitive/quantitative).

780.   As discussed above, many of the bills submitted by United Lab for definitive/quantitative urine drug testing failed to identify the testing methodology purportedly used, rendering them improper.

781.   Since January 2019, United Lab submitted charges to Allstate using CPT Code 82542 on at least 316 occasions.  *See* Exhibit 10.

782.   CPT Code 82542 is a chemistry code defined by the AMA as "column chromatography, includes mass spectrometry, if performed (e.g. HPLC, LC, LC/MS, LC/MS-MS, GC/MS, HPLC/MS)), non-drug analyte(s) not elsewhere specified, quantitative or quantitative, each specimen."

783.   CPT Code 82542 is an unspecified analyte code that can only be billed when a code for quantitative testing for the specific drug tested is not listed in the CPT Code Book.

784.   Chemistry codes, such as CPT Code 82542, which are not specifically requested by an ordering physician and are derived from the results of other ordered or performed tests, are considered part of the ordered procedure and are not separately billable.

785.   United Lab nevertheless routinely billed Allstate using chemistry codes for services that should have been included in the numerous charges submitted for the dozens of drugs/analytes tested.

### D.   IMPROPER BILLING FOR PHYSICAL THERAPY EVALUATIONS

786.   Initial physical therapy evaluations are billed using complexity based codes similar to those used for medical evaluations, discussed above.

787.   Physical therapy re-evaluations, which the defendants should have performed regularly but did not since their treatment protocols were predetermined and were not altered based on patient improvement or failure of therapy, have only one CPT Code, 97164, which is to be used regardless of the purported complexity of the evaluation.

788.   To the extent that defendant Multicare claimed to perform re-evaluations of its courses of physical therapy at all, it frequently billed Allstate for multiple units of such evaluations on the same date.

789.   Evaluations are not services that can be billed in multiple units; if an evaluation actually occurred and met the requirements of the AMA coding guidelines, a single unit may be billed.

790.   Each attempt by Multicare to obtain payment from Allstate for more than one unit of a purported evaluation on the same alleged date of service was improper and non-compensable.

## X.   EXCESSIVE AND UNREASONABLE CHARGES

791.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products,

services and accommodations for an injured person's care, recovery, or rehabilitation." Mich. Comp. Laws § 500.3107(1)(a).

792.    The defendants routinely billed Allstate at rates that were unreasonable and had no relation to the services allegedly performed.

793.    In each such case, including those described in the following sections, Allstate was harmed when it was induced to pay the unreasonable rates billed by the defendants.

794.    Allstate also was harmed even when it did not pay the unreasonable and excessive amounts charged by the defendants, because it was nevertheless obligated to investigate and adjust each claim thereby incurring costs.

A.    EXCESSIVE AND UNREASONABLE MRI CHARGES

795.    In 2017, Affiliated filed an application with the State of Michigan for a Certificate of Need ("CON") to expand service on a mobile MRI route.

796.    This application included disclosure of financial information, including statements of projected revenue and expense related to performance of MRIs.

797.    The application to expand mobile MRI route service represented that Affiliated's average charge per MRI would be $425 in 2017, $471 in 2018, and $512 in 2019 and that Affiliated's average cost per MRI would be $261 in 2017, $251 in 2018, and $242 in 2019.

798.   These projections were comprehensive and detailed, and accounted for all conceivable operating expenses, including salaries and wages, fringe benefits, rent, leased equipment costs, maintenance and repair, depreciation, interest, utilities, insurance, professional services, medical supplies, office supplies, consultant fees, and other.

799.   Despite representing to the State of Michigan that, based on all of its costs and expenses, Affiliated would profit approximately 100% from 2017 through 2019 by charging $425 to $512 per MRI, Affiliated never charged Allstate less than $4,350 per MRI and usually charged at least $4,450 per MRI.  *See* Exhibit 1.

800.   Thus, Affiliated always charged Allstate at least 8.4 times more than it represented its charges would be in order to obtain its CON from the State of Michigan.

801.   Moreover, Affiliated always charged Allstate at least 16.5 times the amount that it represented was its maximum cost for performing an MRI.

802.   It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

803.   Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment.

804.   Affiliated's charges are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

### B.   EXCESSIVE AND UNREASONABLE TRANSPORTATION CHARGES

805.   The transportation charges submitted by Get Well and TRU to Allstate were unreasonable and excessive.

806.   Get Well and TRU did not use medical or specialized vehicles, but rather just used normal vehicles to transport patients, if they did so at all.  In other words, there was nothing unique or special about the transportation billed by Get Well and TRU.

807.   Get Well and TRU both routinely billed Allstate $35 pick-up and drop off fees for every patient trip, plus approximately $3.50 per mile.

808.   Get Well and TRU billed these unreasonable amounts even when they transported multiple patients in the same vehicle at the same time.

809.   For example, patients R.P. and W.P. (Claim No. TXA-0241767) were involved in the same motor vehicle accident and allegedly received round trip transportation together from their home to Affiliated.

810.   TRU billed Allstate $114.10 for each patient or $228.20 in total, including $3.50 per mile and $35 pick-up and drop off fees charged to Allstate for both patients despite the patients being transported together, for a single 12.6 mile round trip.

147

811.   The charges for transportation services submitted by Get Well and TRU are particularly unreasonable when compared to pricing from taxicab or ridesharing services for the same distance.

812.   For example, the rate for taxi service in Detroit includes a base charge of $2.50 and $2.50 per mile, meaning the cost of the 12.6 mile round trip allegedly provided to R.P. and W.P., including a 15% tip, would have been approximately $42, far less than the $228.20 that TRU charged.

813.   A ride sharing services such as Uber would have been even cheaper, with a one-way trip booked on Uber from R.P. and W.P.'s home to Affiliated costing as little as $11.22.

814.   As another example of this practice, TRU billed Allstate $239.05 for allegedly transporting patient J.J. (Claim No. 0575788120) to Affiliated, a 48.3 mile round trip, which was at least $100 more than a taxi would have cost, and approximately $175 more than booking a ride with Uber.

815.   Get Well also billed Allstate with respect to patient J.J., charging Allstate $102.90 on multiple occasions for transporting J.J. to and from Optim, for a total of 9.4 miles.

816.   An equivalent taxi ride would have cost less than $30, and an Uber ride to and from Optim's office would have cost less than $20.

817.   The amounts billed by Get Well and TRU are particularly outrageous considering Get Well and TRU typically transported multiple passengers at the same time.

818.   Get Well and TRU billed excessive and unreasonable rates for transportation services and they cannot sustain their burden of proving otherwise.

### C.   EXCESSIVE AND UNREASONABLE DME CHARGES

819.   In addition to being unlicensed, medically unnecessary, and issued contrary to applicable standards of care, as discussed *supra*, items of DME billed by Dynamic and Optim were charged at unreasonable rates.

820.   As discussed above, the predetermined treatment protocol used by the defendants involved billing for the issuance of DME, including a variety of braces, heating pads, cervical pillows, and electrostimulation devices.

821.   All of the DME billed by Dynamic and Optim was charged at outrageous prices many times higher than the actual cost of these items.

822.   For example, Dynamic billed Allstate for various DME allegedly issued to Vital patient R.E. (Claim No. 0539777853), including $250 for a back brace, $250 for an electric heating pad, $150 for a cervical pillow, and $150 for a knee brace.

823.   After Allstate requested information related to the DME allegedly issued to patient R.E., including the cost of that DME to Dynamic, Dynamic presented Allstate with purported invoices from a company called Biomedical

Wholesale purporting to demonstrate that Dynamic paid $135.50 for a "Mueller back brace with adjustable compression, 28-50," $78.88 for a "Veridian Heating Pad," $92.50 for a "Core Cervical Pillow," and $85.93 for a "Mueller Sports Medicine Knee Brace."

824.   Based on the Biomedical Wholesale invoices provided to Allstate by Dynamic, Dynamic charged Allstate excessive and unreasonable prices for its DME that were between 62% and 217% higher than its costs.

825.   In fact, the actual amount of the markup of DME billed by Dynamic was much higher because Biomedical Wholesale is another entity that is controlled by the defendants.

826.   In other words, the invoices from Biomedical Wholesale were created by the defendants only to deceive Allstate and create the appearance that they paid significantly more for DME than they actually did.

827.   In this case, all of the DME issued to patient R.E. could have been purchased at retail businesses such as Amazon at far lower prices.

828.   For example, the "Mueller back brace with adjustable compression, 28"-50" billed to Allstate for $250 can be purchased for $40.99 on Amazon, meaning Dynamic billed Allstate at more than six (6) times its reasonable cost.

829.   A "Veridian Heating Pad" can be purchased on Amazon for $25.26, meaning Dynamic billed Allstate almost ten (10) times its actual reasonable cost.

830. A "Core Cervical Pillow" can be purchased on Amazon for between $25 to $35 dollars, meaning Dynamic billed Allstate at least four (4) times its actual reasonable cost.

831. DME charged at markups of four (4) to ten (10) times commercially available prices cannot be considered a "reasonable" charge, and Dynamic cannot sustain its burden of proving otherwise.

832. Dynamic also billed Allstate $2,750 for four lead TENS devices that can be purchased from retail suppliers for between $30 and $50.

833. The average payment amount for TENS devices by CMS is approximately $70.

834. In other words, Dynamic applied a markup of more than 3,800% to TENS devices it billed to Allstate.

835. Dynamic billed Allstate $2,100 for INF units using HCPCS code E1399, which is the code for miscellaneous DME, on more than 100 occasions. *See* Exhibit 9.

836. CMS requires claims for INF Units to be submitted using the HCPCS code for TENS devices, not HCPCS Code E1399.

837. Dynamic billed Allstate using HCPCS Code E1399 because it believed it would be paid a greater amount than if it used the proper code for TENS devices.

838.   Optim also billed Allstate at excessive rates similar to the rates billed by Dynamic for the DME it claims to have issued to the patients at issue herein.

839.   For example, Optim billed Allstate $265 for heating pads, $275 for lumbar back braces, and $165 for cervical pillows.

840.   Each of these amounts billed by Optim was between $15 and $25 more than Dynamic billed for similar items, and were excessive and unreasonable for the same reasons the bills submitted by Dynamic were unreasonable.

841.   Allstate is not required to pay Dynamic and Optim for DME fraudulently billed pursuant to a predetermined treatment protocol, or for which it was charged more than reasonable and customary rates, and is entitled to the return of all sums paid due to the fraudulent issuance of DME by Dynamic and Optim.

### D.   EXCESSIVE AND UNREASONABLE PRESCRIPTION DRUG CHARGES

842.   As previously described, the defendant clinics prescribed a number of medications to patients as part of their implementation of the defendants' predetermined treatment protocol.

843.   In order to maximize the payments they induced Allstate to make, the defendants ensured that prescriptions written by Vital's doctors were almost always filled by defendant VCC Services, which is Vital's "in house" unlicensed pharmacy.

844.   VCC Services, in turn, charged Allstate excessive and unreasonable prices for those prescription and over-the-counter medications and that were many times the retail prices of those medications in order to further inflate billing.

845.   As one example, Vital prescribed a ninety (90) day supply of the muscle relaxant Flexeril (cyclobenzaprine HCL) 7.5 milligrams to patient C.R. (Claim No. 0508548351) for which VCC Services billed Allstate $649.76 and a sixty (60) day supply of the anti-inflammatory drug Meloxicam 7.5 milligrams for which VCC Services billed Allstate $233.14.

846.   The average retail price in Southfield, Michigan for a ninety (90) day supply of 7.5 milligram Cyclobenzaprine HCL is approximately $20, meaning the price billed to Allstate by VCC Services represented a markup of more than 3,149%.

847.   VCC Services billed this amount to Allstate for this same medication at least 23 times just in the year 2019.

848.   The average retail price in Southfield, Michigan for a sixty (60) day supply of 7.5 milligram Meloxicam is approximately $13, meaning the price billed to Allstate by VCC Services represented a 1,693% markup.

849.   VCC Services billed this amount to Allstate for this same medication at least 90 times between October 2017 and August 2020.

850.   VCC Services billed Allstate for other medications with similarly outrageous markups over their reasonable price.

851. The following chart lists the amounts charged by VCC Services for the medications it most frequently billed to Allstate:

| National Drug Code | Drug | Units | Local Michigan Pharmacy Charge | Amount Billed to Allstate by VCC Services | Percentage Markup by VCC Services | Number of Times VCC Billed Allstate |
|---|---|---|---|---|---|---|
| 29300-124-10 | Meloxicam Tablet 7.5mg | 60 | $13 (for 60 units) | $233.14 | 1,693% | 119 |
| 29300-125-10 | Meloxicam Tablet 15mg | 60 | $11.60 (for 60 units) | $353.84 | 2,950% | 34 |
| 65162-190-11 | Naproxen Tablet 500mg | 60 | $29.82 (for 60 units) | $88.52 | 196% | 51 |
| 69420-1001-1 | Cyclobenzaprine HCL Tablet 7.5mg | 90 | $20 (for 90 units) | $682.99 | 3,314% | 157 |

852. Vital and the other defendant clinics also used Groesbeck Rx to fill certain prescriptions.

853. For example, Vital prescribed patient W.P. (Claim No. TXA-0241767) 150 ml of Diclofenac Sodium 1.5% topical solution using a pre-printed Groesbeck Rx order form, meaning that patient W.P was not given any choice of where to have the prescription filled.

854. Groesbeck Rx charged Allstate $1,459.50 for the 150 ml of Diclofenac Sodium 1.5% topical solution it allegedly supplied to W.P.

855. The average retail price of an equivalent amount of Diclofenac Sodium 1.5% topical solution at retail pharmacies in Southfield, Michigan is approximately $10, representing more than a 1,400% markup by Groesbeck Rx.

856.   Groesbeck routinely charged Allstate similarly outrageous amounts for prescription medications ordered by the defendant clinics.

857.   Allstate is not required to pay the defendants for medications prescribed and dispensed for the purpose of inflating claims to Allstate or for which it did not charge Allstate a reasonable amount.

### E.   EXCESSIVE AND UNREASONABLE CHARGES FOR COMPOUNDED MEDICATIONS

858.   As previously described, the defendant clinics frequently prescribed patients compounded creams, ointments, and other medications as part of their predetermined treatment protocol that were invariably billed to Allstate by Groesbeck Rx.

859.   Despite the fact that these compounded medications were medically unproven and not medically justified, Groesbeck Rx charged Allstate amounts that were tens or hundreds of times more than the retail price of the individual components.

860.   Typical of Groesbeck's billing practices, on August 29, 2019, Groesbeck Rx billed Allstate $1,827.32 for 240 grams of its "anti-inflammation/muscle relaxant" compounded cream ordered by Zukkoor at Vital for patient L.J. (Claim No. 0568811210).

861.   According to Groesbeck Rx's pre-printed forms, this medication is comprised of a microderm base, 2% Baclofen, 2% Cyclobenzaprine, 1.5% Ketoprofen, and 4% Lidocain.

862.   The individual components of the compounded medication prescribed to Patient L.J. had a retail cost of less than $100, representing a 1,772% markup by Groesbeck Rx.

863.   Groesbeck routinely billed Allstate for each of the individual components of its compounded medications at amounts that were far in excess of their reasonable price.

864.   Allstate is not required to pay Groesbeck Rx for compounded medications that were not medically necessary or effective, were prescribed and dispensed for the purpose of inflating claims to Allstate, and for which it did not charge Allstate a reasonable amount.

### F.   EXCESSIVE AND UNREASONABLE CHARGES FOR CT SCANS

865.   As previously discussed, Clearpath routinely billed Allstate for multiple, medically unnecessary CT scans ordered by the defendant clinics.

866.   Clearpath routinely charged Allstate between $1,950 and $2,250 for each of the CT scans it allegedly performed on Allstate insureds using CPT codes 70450, 72125, 72131, 73200, and 73700.

867.   The payment rates set by CMS for CT scans billed using CPT Codes 70450, 72125, 72131, 73200, 73700 for the year 2019 were each between $119.31 and $168.23.

868.   These payment amounts are indicative of the range of what constitutes a reasonable charge for CT Scans.

869.   The Michigan No-Fault Act requires providers like Clearpath to charge "a reasonable amount for the treatment."   Mich. Comp. Laws § 500.3157(1) (emphasis added).

870.   Even using the highest payment rate set by CMS of $168.23, the amounts billed by Clearpath to Allstate for the same service was more than ten (10) times higher than the CMS payment rates.

871.   A charge that is more than ten (10) times higher than the maximum charged permitted by CMS regulations cannot be reasonable under the Michigan No-Fault Act.

872.   It is untenable that the Michigan No-Fault Act was enacted to permit such gross exploitation of the benefits available thereunder.

873.   Indeed, such excessive charges stand in stark contrast to the established public policy in Michigan that the No-Fault Act should not increase the cost of healthcare treatment.

874.   Clearpath's charges are not and were not reasonable and the defendants cannot sustain their burden of proving otherwise.

875.   Allstate is not required to pay the defendants for CT scans that were not medically necessary, were performed for the purpose of inflating claims to Allstate, and for which they did not charge Allstate a reasonable amount.

## XI.   MISREPRESENTATIONS MADE BY THE DEFENDANTS AND RELIED ON BY ALLSTATE

### A.   MISREPRESENTATIONS BY THE DEFENDANTS

876.   To induce Allstate to pay promptly their fraudulent charges, the defendants submitted and caused to be submitted to Allstate false documentation that materially misrepresented that the services they referred and billed for were necessary within the meaning of the Michigan No-Fault Act, that the charges for the same were reasonable, and that all treatment was lawfully and actually rendered.

877.   Claims for medical benefits under Michigan's No-Fault Act can only be made for "reasonable charges incurred for reasonably necessary products, services and accommodations for an injured person's care, recovery, or rehabilitation."  Mich. Comp. Laws § 500.3107(1)(a).

878.   Moreover, claims for medical benefits under Michigan's No-Fault Act can only be made for services that are "lawfully render[ed]."  Mich. Comp. Laws § 500.3157(1).

879.    Thus, every time the defendants submitted bills and medical records to Allstate supporting their claims for No-Fault benefits, the defendants necessarily warranted that such bills and records related to lawfully and actually rendered and necessary treatment for their patients' care, recovery, or rehabilitation.

880.    There are no less than sixteen (16) separate reasons why the defendants' alleged treatment was not in fact performed, was not lawful, was not medically necessary, and was fraudulently billed to Allstate:

   a.   Affiliated, Vital, Select, and United Labs routinely billed for services that were not performed at all.

   b.   The defendants engaged in financial *quid pro quo* relationships with other medical providers to improperly incentivize referrals of patients into their network and within their network.

   c.   The defendants illegally solicited patients for unnecessary treatment and engaged in *quid pro quo* relationships with each other.   The defendants utilized runners, police reports, and telephonic solicitation to identify and recruit individuals who claimed to be in motor vehicle accidents to receive unnecessary treatment and intentionally sought out patients who did not require medical care and would not have presented for the same but for the unlawful solicitation.   The defendants' methods of obtaining patients did not include considerations of medical necessity and allowed individuals with no medical training to control patients' treatment.

   d.   The defendants used an improper predetermined treatment protocol, implemented by use of pre-printed, boilerplate, fabricated, and exaggerated purported examination findings, to order excessive physical therapy, chiropractic treatment, injections, surgical procedures, DME, urine drug testing, medications, MRIs, CT scans, and medical transportation.   This predetermined protocol is confirmed by the identical purported findings and treatment plans ordered for

patients at issue in this Complaint, which have no relationship to medical necessity or any patient-specific considerations.

e.  Optim, VCC Services, and Dynamic unlawfully billed for the purported issuance of DME and medications without possessing the licensure required by the State of Michigan.

f.  Vital, Select, Multicare, and Optim ordered and pressured patients to undergo MRIs and CT scans that were medically unnecessary and performed in violation of applicable standards of care in furtherance of the scheme to bill Allstate for as many ancillary services as possible, and not based on the individual needs of patients.

g.  Affiliated and Clearpath submitted bills to Allstate seeking payment for medically unnecessary MRIs and CT scans that were ordered as a matter of course at the outset of treatment and were excessive in number in violation of the standard of care.

h.  Optim and Dynamic billed Allstate for medically unnecessary and contraindicated DME in furtherance of the defendants' predetermined treatment protocol to bill Allstate for as many ancillary services as possible for profit and not based on individual patient need.

i.  Groesbeck and VCC Services billed Allstate for medically unnecessary and contraindicated prescription medications, including compounded creams, that had no basis or appropriate use in furtherance of the defendants' predetermined treatment protocol to bill Allstate for as many ancillary services as possible for profit and not based on individual patient need.

j.  Vital, Select, Multicare, and Optim billed for extensive purported testing, including electrodiagnostic testing, EEGs, psychologic testing, and neuropsychological testing that was billed for as a matter of course to generate claims and had no actual medical basis.

k.  Vital, Select, and Bitkowski ordered and billed for medically unnecessary injections and surgical procedures in violation of applicable standards of care.

l. Vital, Select, Multicare, Optim, and United Lab submitted claims using multiple CPT codes to describe the same procedure allegedly performed, which is a fraudulent billing practice known as unbundling.

m. Vital, Select, Multicare, and Optim submitted claims representing that purported patient encounters were more complex than they actually were, which is a fraudulent billing practice known as upcoding.

n. Get Well, TRU, and Moussa submitted charges to Allstate for medically unnecessary transportation before the patient had ever been evaluated by any physician or obtained any disability certificate disabling the patient from driving, and relative to patients who were not actually disabled from driving.

o. United Lab billed for urine drug testing that was excessive, predetermined, medically unnecessary, and not actually used in any way to guide patient care or medical decision-making.

p. Affiliated, Clearpath, Optim, VCC Services, Groesbeck, Dynamic, Get Well, and TRU submitted bills at rates that had no basis and were many times higher than reasonable to charge for services, if such services were rendered at all.

881. As detailed *supra*, the defendants frequently violated established standards of care, treated excessively, and billed for treatment without basis or adequate substantiation.

882. If treatment is not required for a patient's care, recovery, or rehabilitation, such treatment is not medically necessary.

883. The foregoing facts – billing for services not rendered, unlawfully soliciting patients, paying kickbacks, using a predetermined treatment protocol to inflate charges, and misrepresenting the necessity of treatment and testing – were

not, and could not have been, known to Allstate until it commenced its investigation of the defendants shortly before the filing of this action.

884.   Allstate had no access to information or documents exposing the defendants' fraudulent conduct until it conducted the investigation that led to the filing of this action.

885.   Taken as a whole, the prevalence of such facts and the defendants' failure to abide by accepted standards of care render the treatment and testing by the defendants unnecessary and unlawful.

886.   The fact of violations of medical standards is present with respect to every patient at issue in this Complaint, including those specific patient examples set out above and in the charts annexed at Exhibits 1 through 12.

887.   Thus, each claim for payment (and accompanying medical records) under Michigan's No-Fault Act faxed and mailed to Allstate by, on behalf of, or with the knowledge of the defendants constitutes a misrepresentation because the treatment underlying the claim was not lawful and medically necessary, as it must be in order to be compensable under Michigan law.

888.   Moreover, each HICF submitted to Allstate by the defendants contained the following notation: "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading

information may be guilty of a criminal act punishable under law and may be subject to civil penalties."

889.   Through the submission of patient records, invoices, HICFs, and other medical documentation to Allstate via the interstate wires and the U.S. Mail, the defendants attested to the fact, lawfulness, and medical necessity of the visits, examinations, testing, procedures, medications, DME, and ancillary services for which they billed Allstate.

890.   As the defendants did not render lawful and reasonably necessary medical treatment and testing, and misrepresented the treatment and testing purportedly performed, each bill and accompanying documentation faxed or mailed by or on behalf of the defendants to Allstate constitutes a material misrepresentation.

### B.   ALLSTATE'S JUSTIFIABLE RELIANCE

891.   The facially valid documents submitted to Allstate by the defendants were designed to, and did in fact, induce Allstate to rely on the documents.

892.   At all relevant times, the defendants concealed from Allstate facts regarding the fact, lawfulness, and medical necessity of services allegedly provided and referred by them to prevent Allstate from discovering that the claims submitted by and on behalf of the defendants were not compensable under the No-Fault Act.

893.   These   misrepresentations   include   submitting   false   medical documentation, including HICFs, documenting the fact, lawfulness, and necessity of

medical treatment, testing, and services in order to seek payment under Michigan's No-Fault Act.

894.   Evidence of the fraudulent scheme detailed in this Complaint was not discovered until after patterns had emerged and Allstate began to investigate the defendants, revealing the true nature and full scope of their fraudulent scheme.

895.   Due to the defendants' material misrepresentations and other affirmative acts designed to conceal their fraudulent scheme, Allstate did not and could not have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

896.   In reliance on the defendants' misrepresentations, Allstate paid money to the defendants to its detriment.

897.   Allstate would not have paid these monies had the defendants provided true and accurate information about the fact, lawfulness, and necessity of the referrals and medical services billed.

898.   As a result, Allstate has paid in excess of $3,381,011 to the defendants in reasonable reliance on the false medical documentation and false representations regarding the defendants' eligibility for payment under the Michigan No-Fault Act.

## XII.   MAIL AND WIRE FRAUD RACKETEERING ACTIVITY

899.   As discussed above, the referrals, treatment, and services billed by the defendants were not medically necessary, were unlawful, and were fraudulently billed.

900.   The objective of the scheme to defraud Allstate, which occurred throughout the period noted in Exhibits 1 through 12, was to collect No-Fault benefits to which the defendants were not entitled because the medical services rendered, if at all, were a product of unlawful solicitation, unlawful kickbacks, were not necessary and were not lawfully rendered, were fraudulently billed, and were billed at excessive and unreasonable amounts.

901.   This objective necessarily required the submission of bills for payment to Allstate.

902.   The defendants created, prepared, and submitted false medical documentation and placed in a post office and/or authorized depository for mail matter things to be sent and delivered by the United States Postal Service or sent through faxes over interstate wires.

903.   All documents, medical records, notes, reports, HICFs, medical diagnoses, letters, correspondence, and requests for payment in connection with the insurance claims referenced throughout this pleading traveled through interstate wires or the U.S. Mail.

904.   All medical records and bills submitted through interstate wires by the defendants were faxed from the defendants in Michigan to Allstate in Iowa.

905.   Allstate received all medical records and bills faxed to it by the defendants in Iowa.

906.   Every automobile insurance claim detailed herein involved at least one (1) use of the U.S. Mail, including the mailing of, among other things, the notice of claim, insurance payments, and the return of cancelled checks.

907.   It was foreseeable to the defendants that faxing bills and medical records to Allstate would trigger mailings in furtherance of the scheme to defraud, including actual payment of fraudulent bills via checks mailed by Allstate.

908.   Every payment at issue in this Complaint where Allstate was induced to rely on the defendants' false medical records and bills was tendered via a check mailed by Allstate using the U.S. Mail.

909.   The fraudulent medical billing scheme detailed herein generated thousands of mailings and faxes.

910.   A chart highlighting representative examples of mail and wire fraud arising from the defendants' patient/business files is annexed hereto at Exhibit 13.

911.   As detailed herein, the defendants also submitted, caused to be submitted, or knew medical documentation and claims for payment would be

submitted to Allstate via fax or mail related to each exemplar patient discussed in this Complaint.

912.   It was within the ordinary course of business for Affiliated, Clearpath, Vital, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, and TRU (the "entity defendants") to submit claims for No-Fault payment to insurance carriers like Allstate through interstate wires and the U.S. Mail.

913.   Moreover, the business of billing for medical services by each of the entity defendants at issue herein is regularly conducted by fraudulently seeking payment to which each defendant clinic is not entitled through the use of fraudulent communications sent via intestate wires and the U.S. Mail.

914.   In other words, discrete (claim- and patient-specific) instances of mail and wire fraud are a regular way of doing business for each of the defendants.

915.   The entity defendants, at the direction and with the knowledge of their owners and managers, continue to submit claims for payment to Allstate and, in some instances, continue to commence litigation against Allstate seeking to collect on unpaid claims.

916.   Thus, the defendants' commission of mail and wire fraud continues.

917.   As all of the defendants named herein agreed that they would use (and, in fact, did use) the mails in furtherance of their scheme to defraud Allstate by

seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed mail fraud, as defined in 18 U.S.C. § 1341.

918.   As several of the defendants named herein agreed that they would use (and, in fact, did use) faxes over interstate wires in furtherance of their scheme to defraud Allstate by seeking payment for services that are not compensable under the Michigan No-Fault Act, these defendants committed wire fraud, as defined in 18 U.S.C. § 1343.

919.   Allstate reasonably relied on the submissions it received from Affiliated, Clearpath, Vital, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, and TRU, including the representative submissions set out in Exhibits 1 through 12 annexed hereto and identified in the exemplar claims above.

920.   As the defendants agreed to pursue the same criminal objective (namely, mail and wire fraud), they committed a conspiracy within the meaning of the RICO Act, 18 U.S.C. § 1962(d), and are therefore jointly and severally liable for Allstate's damages.

## XIII. <u>DAMAGES</u>

921.   The pattern of fraudulent conduct by the defendants injured Allstate in its business and property by reason of the aforesaid violations of law.

922.   Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation, and Allstate's damages continue to accrue, Allstate's injury includes, but is not limited to, compensatory damages in excess of $3,381,011.

923.   Exhibits 14 through 25 annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to and for the benefit of the defendants by date, payor, patient claim number, check number, and amount.

924.   Exhibit 14 (Affiliated), Exhibit 15 (Clearpath), Exhibit 16 (Vital), Exhibit 17 (Select), Exhibit 18 (Multicare), Exhibit 19 (Optim), Exhibit 20 (VCC Services), Exhibit 21 (Groesbeck Rx), Exhibit 22 (Dynamic), Exhibit 23 (United Lab), Exhibit 24 (Get Well), and Exhibit 25 (TRU) annexed hereto and incorporated herein as if fully set forth in their entirety, identify monies paid by Allstate to the defendants by date, payor, patient claim number, check number, and amount.

925.   Allstate's claim for compensatory damages, as set out in Exhibits 14 through 25, does not include payment made with respect to any Assigned Claim Facility/Michigan Automobile Insurance Placement Facility claimant.

926.   Every payment identified in Exhibits 14 through 25 was made by Allstate alone and Allstate has not been reimbursed for the payments itemized in Exhibits 14 through 25.

927.   Moreover, every payment identified in Exhibits 14 through 25 derives from a check sent by Allstate to the defendants through the U.S. Mail.

928.   As such, the defendants knew that the U.S. Mail would be used as part of their scheme to defraud as the defendants only faxed and mailed medical records and bills for the purpose of having Allstate rely on such documents and mail payment in response thereto.

929.   Allstate also seeks damages, in an amount to be determined at trial, related to the cost of claims handling/adjustment for claims mailed and faxed by the defendants, which includes the cost of investigation to uncover the fraudulent nature of the claims submitted by the defendants.

930.   Allstate investigated each of the defendants both individually and in connection with the comprehensive scheme detailed herein and incurred investigative and claims handling expenses with respect to each defendant.

## XIV.  CAUSES OF ACTION

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Affiliated Enterprise)**
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.**

931.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

932.   Affiliated constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

933.   In connection with each of the claims identified in the within Complaint, defendants Vital, Select, Multicare, Optim, TRU, Bazzi, Bakri, Zukkoor, and Bitkowski ("Count I defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Affiliated, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Affiliated's business, or should have reasonably foreseen that the mailing of such false medical documentation by Affiliated would occur, in furtherance of the Count I defendants' scheme to defraud.

934.   The Count I defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 13.

935.   As documented above, the Count I defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Affiliated, which they knew would be billed by Affiliated in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

936.   Bazzi and Bakri owned, managed, and controlled Affiliated and were responsible for all actions taken by Affiliated and its staff.

937.   Bazzi, Bakri, Zukkoor, Bitkowski, Vital, Select, Multicare, and Optim were responsible for the illegal solicitation and inducement of patients and improper referrals that resulted in unlawful and unnecessary imaging billed by Affiliated.

938.   Vital, Select, Multicare, Optim, Zukkoor, and Bitkowski were responsible for the MRI prescriptions that allowed Affiliated to submit bills to Allstate for medically unnecessary imaging.

939.   TRU was responsible for transporting patients to Affiliated for unnecessary imaging.

940.   Vital, Select, Multicare, Optim, Zukkoor, and Bitkowski billed Allstate for medically unnecessary treatment that was used to falsely create the appearance that Affiliated's MRIs were medically necessary and used to guide patient treatment, and directed patients to present for office visits that led to prescriptions for the MRIs billed by Affiliated.

941.   The Count I defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Affiliated to continue billing for unlawful and medically unnecessary MRIs, if provided at all.

942.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Affiliated for the benefit of the Count I defendants that would not otherwise have been paid.

943.   The Count I defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

944.   By virtue of the Count I defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Affiliated Enterprise)
### Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.

945.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

946.   Defendants Vital, Select, Multicare, Optim, TRU, Bazzi, Bakri, Zukkoor, and Bitkowski ("Count II defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Affiliated.

173

947.   The Count II defendants each agreed to further, facilitate, support, and operate the Affiliated enterprise.

948.   As such, the Count II defendants conspired to violate 18 U.S.C. § 1962(c).

949.   The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Affiliated even though Affiliated was not eligible to collect such payments by virtue of its unlawful conduct.

950.   The Count II defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of solicited patients and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

951.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count II defendants' unlawful conduct described herein.

952.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count II defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count II defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Clearpath Enterprise)
### Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Get Well Medical Transport Co., Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa

964.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

965.   Clearpath constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

966.   In connection with each of the claims identified in the within Complaint, defendants Vital, Select, Multicare, Optim, Get Well, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count III defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Clearpath, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Clearpath's business, or should have reasonably foreseen that the mailing of such false medical documentation by Clearpath would occur, in furtherance of the Count III defendants' scheme to defraud.

967.   The Count III defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 13.

968.   As documented above, the Count III defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Clearpath, which they knew would be billed by Clearpath in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

969.   Bazzi and Bakri owned, managed, and controlled Clearpath and were responsible for all actions taken by Clearpath and its staff.

970.   Bazzi, Bakri, Zukkoor, Bitkowski, Vital, Select, Multicare, and Optim were responsible for the illegal solicitation and inducement of patients and improper referrals that resulted in unlawful and unnecessary imaging billed by Clearpath.

971.   Vital, Select, Multicare, Optim, Zukkoor, and Bitkowski were responsible for the CT scan prescriptions that allowed Clearpath to submit bills to Allstate for medically unnecessary imaging.

972.   Get Well and Moussa were responsible for transporting patients to Clearpath for unnecessary imaging.

973.   Vital, Select, Multicare, Optim, Zukkoor, and Bitkowski billed Allstate for medically unnecessary treatment that was used to falsely create the appearance that Clearpath's CT scans were medically necessary and used to guide patient treatment, and directed patients to present for appointments that led to prescriptions for the CT scans billed by Clearpath.

176

974.   The Count III defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Clearpath to continue billing for unlawful and medically unnecessary CT scans, if provided at all.

975.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Clearpath for the benefit of the Count III defendants that would not otherwise have been paid.

976.   The Count III defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

977.   By virtue of the Count III defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT IV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Clearpath Enterprise)
### Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Get Well Medical Transport Co., Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa

978.    Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

979.    Defendants Vital, Select, Multicare, Optim, Get Well, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count IV defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Clearpath.

980.    The Count IV defendants each agreed to further, facilitate, support, and operate the Clearpath enterprise.

981.    As such, the Count IV defendants conspired to violate 18 U.S.C. § 1962(c).

982.    The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Clearpath even though Clearpath was not eligible to collect such payments by virtue of its unlawful conduct.

983.    The Count IV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of solicited patients and the creation and submission to Allstate of

insurance claim and medical record documents containing material misrepresentations.

984.   Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count IV defendants' unlawful conduct described herein.

985.   By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Vital Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, VCC Services PLLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

986.   Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

987.   Vital constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

988.   In connection with each of the claims identified in the within Complaint, Affiliated, Clearpath, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count V defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Vital, or knew that such false medical documentation would be faxed and mailed in the ordinary course of Vital's business, or should have reasonably foreseen that the mailing of such false medical documentation by Vital would occur, in furtherance of the Count V defendants' scheme to defraud.

989.   The Count V defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 13.

990.   As documented above, the Count V defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Vital, which they knew would be billed by Vital in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

991.   Bazzi, Bakri, and Zukkoor owned, managed, and controlled Vital and were responsible for all actions taken by Vital and its staff.

992.   Bazzi, Bakri, and Zukkoor were responsible for the excessive, medically unnecessary medical treatment billed by Vital, if treatment was rendered at all.

993.   Get Well, TRU, and Moussa were responsible for transporting patients to Vital for unnecessary medical treatment, and for transporting patients to Affiliated and Clearpath, which allowed Vital to bill Allstate and to generate referrals to the other defendants for unnecessary medical treatment and testing.

994.   Bazzi, Bakri, Zukkoor, Select, Multicare, and Optim were responsible for the illegal solicitation and inducement of patients and improper referrals that resulted in unlawful and unnecessary treatment by Vital that was billed to Allstate

995.   Affiliated, Clearpath, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa made and received patient referrals to and from Vital that allowed Vital to continue billing Allstate and falsely giving the appearance of injury used to submit billing to Allstate.

996.   Affiliated and Clearpath billed Allstate for medically unnecessary imaging, which was used to create the appearance that Vital was performing lawful and necessary treatment to the patients at issue herein and the false appearance that patients needed treatment from Vital.

997.   The Count V defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Vital to continue billing for unlawful and medically unnecessary treatment, if provided at all.

998.   As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Vital for the benefit of the Count III defendants that would not otherwise have been paid.

999.   The Count V defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1000. By virtue of the Count V defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Vital Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, VCC Services PLLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

1001. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1002. Defendants Affiliated, Clearpath, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count VI defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Vital.

1003. The Count VI defendants each agreed to further, facilitate, support, and operate the Vital enterprise.

1004. As such, the Count VI defendants conspired to violate 18 U.S.C. § 1962(c).

1005. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Vital even though Vital was not eligible to collect such payments by virtue of its unlawful conduct.

1006. The Count VI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between

themselves of solicited patients and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1007. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VI defendants' unlawful conduct described herein.

1008. By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT VII
### VIOLATION OF 18 U.S.C. § 1962(c)
#### (Select Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Multicare Health Center LLC, Optim Care Center LLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

1009. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1010. Select constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1011. In connection with each of the claims identified in the within Complaint, Affiliated, Clearpath, Vital, Multicare, Optim, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count VII defendants") intentionally caused to be prepared and mailed false medical documentation by Select, or knew that such false medical documentation would be mailed in the ordinary course of Select's business, or should have reasonably foreseen that the mailing of such false medical documentation by Select would occur, in furtherance of the Count VII defendants' scheme to defraud.

1012. The Count VII defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 13.

1013. As documented above, the Count VII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Select, which they knew would be billed by Select in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1014. Bitkowski owned, managed, and controlled Select and was responsible for all actions taken by Select and its staff.

1015. Bitkowski was responsible for the excessive, medically unnecessary medical treatment billed by Select, if treatment was rendered at all.

1016. Get Well, TRU, and Moussa were responsible for transporting patients to Select for unnecessary medical treatment, and to Affiliated and Clearpath for unnecessary imaging ordered by Select, which allowed Select to bill Allstate and to generate referrals to the other defendants for unnecessary medical treatment and testing.

1017. Bazzi, Bakri, Zukkoor, Bitkowski, Vital, Multicare, and Optim were responsible for the illegal solicitation and inducement of patients and improper referrals that resulted in unlawful and unnecessary treatment by Select that was billed to Allstate.

1018. Affiliated, Clearpath, Vital, Multicare, Optim, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa made and received patient referrals to and from Select that allowed Select to continue billing Allstate and falsely giving the appearance of injury used to submit billing to Allstate.

1019. Affiliated and Clearpath billed Allstate for medically unnecessary imaging, which was used to create the appearance that Select was performing lawful and necessary treatment to the patients at issue herein and the false appearance that patients needed treatment from Select.

1020. The Count VII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of

injury and permitted Select to continue billing for unlawful and medically unnecessary treatment, if provided at all.

1021. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Select for the benefit of the Count VII defendants that would not otherwise have been paid.

1022. The Count VII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1023. By virtue of the Count VII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**<u>COUNT VIII</u>**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Select Enterprise)**
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Multicare Health Center LLC, Optim Care Center LLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

1024. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1025. Defendants Affiliated, Clearpath, Vital, Multicare, Optim, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count VIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Select.

1026. The Count VIII defendants each agreed to further, facilitate, support, and operate the Select enterprise.

1027. As such, the Count VIII defendants conspired to violate 18 U.S.C. § 1962(c).

1028. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Select even though Select was not eligible to collect such payments by virtue of its unlawful conduct.

1029. The Count VIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of solicited patients and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1030. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count VIII defendants' unlawful conduct described herein.

1031. By virtue of this violation of 18 U.S.C. § 1962(d), the Count VIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count VI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Multicare Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Select Specialists LLC, Optim Care Center LLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

1032. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1033. Multicare constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1034. In connection with each of the claims identified in the within Complaint, Affiliated, Clearpath, Vital, Select, Optim, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count IX defendants") intentionally caused to be prepared and mailed false medical documentation by Multicare, or knew that such false medical documentation would be mailed in the ordinary course of Multicare's business, or should have reasonably

189

foreseen that the mailing of such false medical documentation by Multicare would occur, in furtherance of the Count IX defendants' scheme to defraud.

1035. The Count IX defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 13.

1036. As documented above, the Count IX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Multicare, which they knew would be billed by Multicare in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1037. Get Well, TRU, and Moussa were responsible for transporting patients to Multicare for unnecessary medical treatment, and to Affiliated and Clearpath for unnecessary imaging ordered by Multicare, which allowed Multicare to bill Allstate and to generate referrals to the other defendants for unnecessary medical treatment and testing.

1038. Bazzi, Bakri, Zukkoor, Bitkowski, Vital, Select, and Optim were responsible for the illegal solicitation and inducement of patients and improper referrals that resulted in unlawful and unnecessary treatment by Multicare that was billed to Allstate.

1039. Affiliated, Clearpath, Vital, Select, Optim, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa made and received patient referrals to and from Multicare that allowed Multicare to continue billing Allstate and falsely giving the appearance of injury used to submit billing to Allstate.

1040. Affiliated and Clearpath billed Allstate for medically unnecessary imaging, which were used to create the appearance that Multicare was performing lawful and necessary treatment to the patients at issue herein and the false appearance that patients needed treatment from Multicare.

1041. The Count IX defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Multicare to continue billing for unlawful and medically unnecessary treatment, if provided at all.

1042. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Multicare for the benefit of the Count IX defendants that would not otherwise have been paid.

1043. The Count IX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1044. By virtue of the Count IX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT X**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Multicare Enterprise)**
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Select Specialists LLC, Optim Care Center LLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

1045. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1046. Defendants Affiliated, Clearpath, Vital, Select, Optim, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count X defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Multicare.

1047. The Count X defendants each agreed to further, facilitate, support, and operate the Multicare enterprise.

1048. As such, the Count X defendants conspired to violate 18 U.S.C. § 1962(c).

1049. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Multicare even though Multicare was not eligible to collect such payments by virtue of its unlawful conduct.

1050. The Count X defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of solicited patients and the creation and submission  to Allstate of insurance claim and medical record documents containing material misrepresentations.

1051. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count X defendants' unlawful conduct described herein.

1052. By virtue of this violation of 18 U.S.C. § 1962(d), the Count X defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count X defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XI
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Optim Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Select Specialists LLC, Multicare Health Center LLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

1053. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1054. Optim constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1055. In connection with each of the claims identified in the within Complaint, Affiliated, Clearpath, Vital, Select, Multicare, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count XI defendants") intentionally caused to be prepared and mailed false medical documentation by Optim, or knew that such false medical documentation would be mailed in the ordinary course of Optim's business, or should have reasonably foreseen that the mailing of such false medical documentation by Optim would occur, in furtherance of the Count XI defendants' scheme to defraud.

1056. The Count XI defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 13.

1057. As documented above, the Count XI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly performed by Optim, which they knew would be billed by Optim in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1058. Get Well, TRU, and Moussa were responsible for transporting patients to Optim for unnecessary medical treatment, and to Affiliated and Clearpath for medically unnecessary imaging ordered by Optim, which allowed Optim to bill Allstate and to generate referrals to the other defendants for unnecessary medical treatment and testing.

1059. Bazzi, Bakri, Zukkoor, Bitkowski, Vital, Select, and Multicare were responsible for the illegal solicitation and inducement of patients and improper referrals that resulted in unlawful and unnecessary treatment by Optim that was billed to Allstate.

1060. Affiliated, Clearpath, Vital, Select, Multicare, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa made and received patient referrals to and from Optim that allowed Optim to continue billing Allstate and falsely giving the appearance of injury used to submit billing to Allstate.

1061. Affiliated and Clearpath billed Allstate for medically unnecessary imaging, which were used to create the appearance that Optim was performing lawful and necessary treatment to the patients at issue herein and the false appearance that patients needed treatment from Optim.

1062. The Count XI defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Optim to continue billing for unlawful and medically unnecessary treatment, if provided at all.

1063. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Optim for the benefit of the Count XI defendants that would not otherwise have been paid.

1064. The Count XI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1065. By virtue of the Count XI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Optim Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Select Specialists LLC, Multicare Health Center LLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

1066. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1067. Defendants Affiliated, Clearpath, Vital, Select, Multicare, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count XII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Optim.

1068. The Count XII defendants each agreed to further, facilitate, support, and operate the Optim enterprise.

1069. As such, the Count XII defendants conspired to violate 18 U.S.C. § 1962(c).

1070. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Optim even though Optim was not eligible to collect such payments by virtue of its unlawful conduct.

1071. The Count XII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between

197

themselves of solicited patients and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1072. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XII defendants' unlawful conduct described herein.

1073. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIII
### VIOLATION OF 18 U.S.C. § 1962(c)
### (VCC Services Enterprise)
### Against Vital Community Care, P.C., Amale Bazzi, Youssef Bakri, and Namir Zukkoor M.D.

1074. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1075. VCC Services constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1076. In connection with each of the claims identified in the within Complaint, defendants Vital, Bazzi, Bakri, and Zukkoor ("Count XIII defendants") intentionally caused to be prepared and mailed false medical documentation by VCC Services, or knew that such false medical documentation would be mailed in the ordinary course of VCC Services's business, or should have reasonably foreseen that the mailing of such false medical documentation by VCC Services would occur, in furtherance of the Count XIII defendants' scheme to defraud.

1077. The Count XIII defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 13.

1078. As documented above, the Count XIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly provided by VCC Services, which they knew would be billed by VCC Services in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1079. Vital, Bazzi, Bakri, and Zukkoor managed and controlled VCC Services and were responsible for all actions taken by VCC Services and its staff.

1080. Vital and Zukkoor were responsible for the prescriptions that allowed VCC Services to submit bills to Allstate for medically unnecessary drugs and medications purportedly filled by VCC Services.

1081. Vital and Zukkoor billed Allstate for medically unnecessary treatment that was used to falsely create the appearance that prescriptions billed by VCC Services were medically necessary.

1082. The Count XIII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted VCC Services to continue billing for unlawful and medically unnecessary drug testing, if performed at all.

1083. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to VCC Services for the benefit of the Count XIII defendants that would not otherwise have been paid.

1084. The Count XIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1085. By virtue of the Count XIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (VCC Services Enterprise)
### Against Vital Community Care, P.C., Amale Bazzi, Youssef Bakri, and Namir Zukkoor M.D.

1086. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1087. Defendants Vital, Bazzi, Bakri, and Zukkoor ("Count XIV defendants") conspired with each other to violate 18 U.S.C. § 1962(d) through the facilitation of the operation of VCC Services.

1088. The Count XIV defendants each agreed to further, facilitate, support, and operate the VCC Services enterprise.

1089. As such, the Count XIV defendants conspired to violate 18 U.S.C. § 1962(c).

1090. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of VCC Services even though VCC Services was not eligible to collect such payments by virtue of its unlawful conduct.

1091. The Count XIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of solicited patients and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1092. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XIV defendants' unlawful conduct described herein.

1093. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XV**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Groesbeck Rx Enterprise)**
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.**

1094. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1095. Groesbeck Rx constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1096. In connection with each of the claims identified in the within Complaint, defendants Vital, Select, Multicare, Optim, Bazzi, Bakri, Zukkoor, and Bitkowski ("Count XV defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by Groesbeck, or knew that such false medical

documentation would be faxed and mailed in the ordinary course of Groesbeck Rx's business, or should have reasonably foreseen that the mailing of such false medical documentation by Groesbeck Rx would occur, in furtherance of the Count XV defendants' scheme to defraud.

1097. The Count XV defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 13.

1098. As documented above, the Count XV defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical services that were purportedly provided by Groesbeck Rx, which they knew would be billed by Groesbeck Rx in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1099. Bazzi, Bakri, Vital, Select, Multicare, and Optim were responsible for the illegal solicitation and inducement of patients and improper referrals to them that resulted in orders and billing for unlawful and unnecessary prescriptions and compounded medications by Groesbeck Rx.

1100. Vital, Select, Multicare, Optim, Zukkoor, and Bitkowski were responsible for the prescriptions that allowed Groesbeck Rx to submit bills to Allstate for medically unnecessary drug testing.

1101. Vital, Select, Multicare, Optim, Zukkoor, and Bitkowski billed Allstate for medically unnecessary treatment that was used to falsely create the appearance that prescription medications and compounded medications billed by Groesbeck Rx were medically necessary.

1102. The Count XV defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Groesbeck Rx to provide unlawful and medically unnecessary medications and compounded medications, if provided at all.

1103. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Groesbeck Rx for the benefit of the Count XV defendants that would not otherwise have been paid.

1104. The Count XV defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1105. By virtue of the Count XV defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XVI
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Groesbeck Rx Enterprise)
### Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.

1106. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1107. Defendants Vital, Select, Multicare, Optim, Bazzi, Bakri, Zukkoor, and Bitkowski ("Count XVI defendants") conspired with each other to violate 18 U.S.C. § 1962(d) through the facilitation of the operation of Groesbeck Rx.

1108. The Count XVI defendants each agreed to further, facilitate, support, and operate the Groesbeck Rx enterprise.

1109. As such, the Count XVI defendants conspired to violate 18 U.S.C. § 1962(c).

1110. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Groesbeck Rx even though Groesbeck Rx was not eligible to collect such payments by virtue of its unlawful conduct.

1111. The Count XVI defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of solicited patients and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1112. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XVI defendants' unlawful conduct described herein.

1113. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVI defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVI defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**<u>COUNT XVII</u>**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Dynamic Enterprise)**
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.**

1114. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1115. Dynamic constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1116. In connection with each of the claims identified in the within Complaint, defendants Vital, Select, Multicare, Optim, Bazzi, Bakri, Zukkoor, and Bitkowski ("Count XVII defendants") intentionally caused to be prepared and mailed false medical documentation by Dynamic, or knew that such false medical

206

documentation would be mailed in the ordinary course of Dynamic's business, or should have reasonably foreseen that the mailing of such false medical documentation by Dynamic would occur, in furtherance of the Count XVII defendants' scheme to defraud.

1117. The Count XVII defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 13.

1118. As documented above, the Count XVII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical goods and services that were purportedly provided by Dynamic, which they knew would be billed by Dynamic in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1119. Bazzi, Bakri, Zukkoor, and Vital controlled Dynamic and were responsible for all actions taken by Dynamic and its staff.

1120. Bazzi, Bakri, Zukkoor, Vital, Select, Multicare, and Optim were responsible for the illegal solicitation and inducement of patients and improper referrals that resulted in the issuance of unlawful and unnecessary DME billed by Dynamic.

1121. Vital, Select, Multicare, Optim, Zukkoor, and Bitkowski were responsible for the orders and prescriptions for DME that allowed Dynamic to submit bills to Allstate for medically unnecessary DME.

1122. Vital, Select, Multicare, Optim, Zukkoor, and Bitkowski billed Allstate for medically unnecessary treatment that was used to falsely create the appearance that DME billed by Dynamic was medically necessary.

1123. The Count XVII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Dynamic to continue supply unlawful and medically unnecessary DME, if provided at all.

1124. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Dynamic for the benefit of the Count XVII defendants that would not otherwise have been paid.

1125. The Count XVII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1126. By virtue of the Count XVII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted

by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

### COUNT XVIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Dynamic Enterprise)
### Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.

1127. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1128. Defendants Vital, Select, Multicare, Optim, Bazzi, Bakri, Zukkoor, and Bitkowski ("Count XVIII defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the facilitation of the operation of Dynamic.

1129. The Count XVIII defendants each agreed to further, facilitate, support, and operate the Dynamic enterprise.

1130. As such, the Count XVIII defendants conspired to violate 18 U.S.C. § 1962(c).

1131. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Dynamic even though Dynamic was not eligible to collect such payments by virtue of its unlawful conduct.

1132. The Count XVIII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of solicited patients and the creation and submission to Allstate of

insurance claim and medical record documents containing material misrepresentations.

1133. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XVIII defendants' unlawful conduct described herein.

1134. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XVIII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XVIII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XIX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (United Lab Enterprise)
### Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.

1135. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1136. United Lab constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1137. In connection with each of the claims identified in the within Complaint, defendants Vital, Select, Multicare, Optim, Bazzi, Bakri, Zukkoor, and Bitkowski ("Count XIX defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by United Lab, or knew that such false medical documentation would be faxed and mailed in the ordinary course of United Lab's business, or should have reasonably foreseen that the mailing of such false medical documentation by United Lab would occur, in furtherance of the Count XIX defendants' scheme to defraud.

1138. The Count XIX defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 13.

1139. As documented above, the Count XIX defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for medical goods and services that were purportedly provided by United Lab, which they knew would be billed by United Lab in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1140. Bazzi and Bakri managed and controlled United Lab and were responsible for all actions taken by United Lab and its staff.

1141. Bazzi, Bakri, Zukkoor, Bitkowski, Vital, Select, Multicare, and Optim were responsible for the illegal solicitation and inducement of patients and improper referrals to the defendant clinics that resulted in orders and billing for unlawful and unnecessary drug testing services by United Lab.

1142. Vital, Select, Multicare, Optim, Zukkoor, and Bitkowski were responsible for the orders for urine drug testing that allowed United Lab to submit bills to Allstate for medically unnecessary urine drug testing.

1143. Vital, Select, Multicare, Optim, Zukkoor, and Bitkowski billed Allstate for medically unnecessary treatment that was used to falsely create the appearance that urine drug testing billed by United Lab was medically necessary.

1144. The Count XIX defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted United Lab to continue to bill for unlawful and medically unnecessary urine drug testing, if performed at all.

1145. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to United Lab for the benefit of the Count XIX defendants that would not otherwise have been paid.

1146. The Count XIX defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1147. By virtue of the Count XIX defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XX
## VIOLATION OF 18 U.S.C. § 1962(d)
### (United Lab Enterprise)
### Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.

1148. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1149. Defendants Vital, Select, Multicare, Optim, Bazzi, Bakri, Zukkoor, and Bitkowski ("Count XX defendants") conspired with each other to violate 18 U.S.C. § 1962(d) through the facilitation of the operation of United Lab.

1150. The Count XX defendants each agreed to further, facilitate, support, and operate the United Lab enterprise.

1151. As such, the Count XX defendants conspired to violate 18 U.S.C. § 1962(c).

1152. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of United Lab even though United Lab was not eligible to collect such payments by virtue of its unlawful conduct.

1153. The Count XX defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of solicited patients and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1154. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XX defendants' unlawful conduct described herein.

1155. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XX defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XX defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Get Well Enterprise)
### Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Clearpath Diagnostics, LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa

1156. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1157. Get Well constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1158. In connection with each of the claims identified in the within Complaint, defendants Vital, Select, Multicare, Optim, Clearpath, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count XXI defendants") intentionally caused to be prepared and mailed false medical documentation by Get Well, or knew that such false medical documentation would be mailed in the ordinary course of Get Well's business, or should have reasonably foreseen that the mailing of such false medical documentation by Get Well would occur, in furtherance of the Count XXI defendants' scheme to defraud.

1159. The Count XXI defendants knew that two (2) or more mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings identified in the chart annexed hereto at Exhibit 13.

1160. As documented above, the Count XXI defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for services that were purportedly provided by Get Well, which they knew would be billed by Get Well in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1161. Moussa owned and controlled Get Well and was responsible for all actions taken by Get Well and its staff.

215

1162. Vital, Select, Multicare, Optim, Bazzi, Bakri, and Moussa were responsible for the illegal solicitation and inducement of patients and improper referrals to the defendant clinics that resulted in orders and billing for unlawful and unnecessary patient transportation by Get Well.

1163. Vital, Select, Multicare, Optim, Zukkoor, and Bitkowski were responsible for the disability certificates and prescriptions that allowed Get Well to submit bills to Allstate for medically unnecessary transportation services.

1164. Vital, Select, Multicare, Optim, Clearpath, Zukkoor, and Bitkowski billed Allstate for medically unnecessary evaluating, imaging, testing, and treatment that allowed Get Well to bill for unnecessary and improper transportation services.

1165. The Count XXI defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance of injury and permitted Get Well to continue billing for medically unnecessary transportation services, if performed at all.

1166. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to Get Well for the benefit of the Count XXI defendants that would not otherwise have been paid.

1167. The Count XXI defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1168. By virtue of the Count XXI defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Get Well Enterprise)
### Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Clearpath Diagnostics, LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa

1169. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1170. Defendants Vital, Select, Multicare, Optim, Clearpath, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count XXII defendants") conspired with each other to violate 18 U.S.C. § 1962(d) through the facilitation of the operation of Get Well.

1171. The Count XXII defendants each agreed to further, facilitate, support, and operate the Get Well enterprise.

1172. As such, the Count XXII defendants conspired to violate 18 U.S.C. § 1962(c).

1173. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of Get Well even though Get Well was not eligible to collect such payments by virtue of its unlawful conduct.

1174. The Count XXII defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of solicited patients and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1175. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XXII defendants' unlawful conduct described herein.

1176. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XXII defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XXII defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT XXIII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (TRU Enterprise)
### Against Affiliated Diagnostic of Oakland, LLC, Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.

1177. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1178. TRU constitutes an enterprise, as defined in 18 U.S.C. § 1961(4), engaged in, and the activities of which affect, interstate commerce.

1179. In connection with each of the claims identified in the within Complaint, defendants Affiliated, Vital, Select, Multicare, Optim, Bazzi, Bakri, Zukkoor, and Bitkowski ("Count XXIII defendants") intentionally caused to be prepared, faxed, and mailed false medical documentation by TRU, or knew that such false medical documentation would be faxed and mailed in the ordinary course of TRU's business, or should have reasonably foreseen that the mailing of such false medical documentation by TRU would occur, in furtherance of the Count XXIII defendants' scheme to defraud.

1180. The Count XXIII defendants knew that two (2) or more faxes and mailings would be sent to demand and receive payment from Allstate on certain dates, including, but not limited to, those mailings and faxes identified in the chart annexed hereto at Exhibit 13.

1181. As documented above, the Count XXIII defendants repeatedly and intentionally submitted, caused to be submitted, or knew that documentation would be submitted to Allstate for services that were purportedly provided by TRU, which they knew would be billed by TRU in order to collect payment from Allstate under applicable provisions of the Michigan No-Fault Act.

1182. Bazzi, Bakri, Vital, Select, Multicare, and Optim were responsible for the illegal solicitation and inducement of patients and improper referrals to the defendant clinics that resulted in orders and billing for unlawful and unnecessary patient transportation by TRU.

1183. Vital, Select, Multicare, Optim, Zukkoor, and Bitkowski were responsible for the disability certificates and prescriptions that allowed TRU to submit bills to Allstate for medically unnecessary transportation services.

1184. Vital, Select, Multicare, Optim, Zukkoor, Bitkowski ordered the unreasonable and unnecessary imaging that allowed TRU to bill for unnecessary and improper transportation services.

1185. Affiliated billed Allstate for the medically unnecessary imaging that allowed TRU to bill for unnecessary and improper transportation services.

1186. The Count XXIII defendants submitted, and caused to be submitted, false and fraudulent medical records, bills, and invoices that created the appearance

of injury and permitted TRU to continue billing for medically unnecessary transportation services, if performed at all.

1187. As a result of, and in reasonable reliance on, these misleading documents and representations, Allstate, by its agents and employees, issued payment drafts to TRU for the benefit of the Count XXIII defendants that would not otherwise have been paid.

1188. The Count XXIII defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

1189. By virtue of the Count XXIII defendants' violation of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted, caused to be submitted, or known to be submitted by them, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXIV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(TRU Enterprise)**
**Against Affiliated Diagnostic of Oakland, LLC, Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.**

1190. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1191. Defendants Affiliated, Vital, Select, Multicare, Optim, Bazzi, Bakri, Zukkoor, and Bitkowski ("Count XXIV defendants") conspired with each other to violate 18 U.S.C. § 1962(d) through the facilitation of the operation of TRU.

1192. The Count XXIV defendants each agreed to further, facilitate, support, and operate the Get Well enterprise.

1193. As such, the Count XXIV defendants conspired to violate 18 U.S.C. § 1962(c).

1194. The purpose of the conspiracy was to obtain insurance payments from Allstate on behalf of TRU even though TRU was not eligible to collect such payments by virtue of its unlawful conduct.

1195. The Count XXIV defendants were aware of this purpose and agreed to take steps to meet the conspiracy's objectives, including inter-referrals between themselves of solicited patients and the creation and submission to Allstate of insurance claim and medical record documents containing material misrepresentations.

1196. Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make insurance payments as a result of the Count XXIV defendants' unlawful conduct described herein.

1197. By virtue of this violation of 18 U.S.C. § 1962(d), the Count XXIV defendants are jointly and severally liable to Allstate and Allstate is entitled to recover from each three times the damages sustained by reason of the claims submitted by or on behalf of the Count XXIV defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

**COUNT XXV**
**COMMON LAW FRAUD**
**Against All Defendants**

1198. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1199. The scheme to defraud perpetrated by Affiliated, Clearpath, Vital, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count XXV defendants") was dependent upon a succession of material misrepresentations of fact that the defendants were entitled to collect benefits pursuant to applicable provisions of the Michigan No-Fault Act.

1200. The misrepresentations of fact made by the Count XXV defendants include, but are not limited to, those material misrepresentations discussed in section XI.A, *supra*.

1201. The Count XXV defendants' representations were false or required disclosure of additional facts to render the information furnished not misleading.

1202. The misrepresentations were intentionally made by the Count XXV defendants in furtherance of their scheme to defraud Allstate by submitting, causing to be submitted, or knowing that non-compensable claims for payment pursuant to applicable provisions of the Michigan No-Fault Act would be submitted to Allstate.

1203. The Count XXV defendants' misrepresentations were known to be false and were made for the purpose of inducing Allstate to make payments for claims that are not compensable under Michigan law.

1204. Allstate reasonably relied upon such material misrepresentations to its detriment in paying numerous non-meritorious bills for alleged medical expenses pursuant to insurance claims and in incurring expenses related to the adjustment and processing of claims submitted by the defendants.

1205. As a direct and proximate result of the defendants' fraudulent representations and acts, Allstate has been damaged in its business and property as previously described herein.

**COUNT XXVI**
**CIVIL CONSPIRACY**
**Against All Defendants**

1206. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1207. Defendants Affiliated, Clearpath, Vital, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count XXVI defendants") combined and acted in concert to accomplish the unlawful purpose of defrauding Allstate by submitting claims for payment pursuant to applicable provisions of the Michigan No-Fault Act to which they were not entitled because (1) the defendants did not actually render the treatment for which claims were submitted, (2) the defendants did not provide reasonably necessary medical treatment, (3) the defendants did not lawfully render treatment, and (4) the defendants engaged in fraudulent billing practices.

1208. The Count XXVI defendants worked together to achieve an unlawful purpose (namely, defrauding Allstate for personal gain).

1209. This purpose was known to all of the Count XXVI defendants and intentionally pursued.

1210. Indeed, as detailed above, the Count XXVI engaged in inter-referrals to each other of the patients they solicited so that each could submit improper bills to Allstate.

1211. Despite knowing that the defendants were not entitled to payment pursuant to applicable provisions of the Michigan No-Fault Act because they billed for services that were not actually provided, because they billed for services that were not reasonably necessary, because treatment was not lawfully rendered, and

because they engaged in fraudulent billing practices, the Count XXVI defendants nonetheless submitted, caused to be submitted, or knew that claims would be submitted (with accompanying false medical documentation) to Allstate seeking payment.

1212. In reasonable reliance on the false medical documentation submitted by the defendants, Allstate paid certain of the claims submitted.

1213. All of the Count XXVI defendants directly benefited from the payments made to Affiliated, Clearpath, Vital, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, and TRU.

1214. All of the Count XXVI defendants actively and intentionally partook in a scheme to defraud Allstate and also encouraged and aided other Count XXVI defendants in the commission of acts done for the benefit of all Count XXVI defendants and to the unjustified detriment of Allstate.

1215. Accordingly, all of the Count XXVI defendants are equally liable for the fraud perpetrated on Allstate pursuant to their conspiracy.

<u>**COUNT XXVII**</u>
**PAYMENT UNDER MISTAKE OF FACT**
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Select Specialists LLC, Multicare Health Center LLC, Optim Care Center LLC, VCC Services PLLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., and Transportation R Us LLC**

1216. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1217. Allstate paid the amounts described herein and itemized in Exhibits 14 through 25 under a misunderstanding, misapprehension, error, fault, or ignorance of material facts, namely, the scheme to defraud Allstate by misrepresenting the fact, lawfulness, and necessity of services purportedly provided and billed by Affiliated, Clearpath, Vital, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, and TRU ("Count XXVII defendants").

1218. Allstate sustained damages by paying under a mistake of fact the claims submitted by the Count XXVII defendants, which misrepresented the fact, reasonableness, necessity, and lawfulness of the medical services allegedly rendered and whether the patient's injury arose out of a motor vehicle accident.

1219. The Count XXVII defendants, individually and jointly, would be unjustly enriched if permitted to retain the payments made to them by Allstate under a mistake of fact.

1220. Allstate is entitled to restitution from each of the Count XXVII defendants, individually and jointly, for all monies paid to and/or received by them from Allstate.

1221. The Count XXVII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

**COUNT XXVIII**
**UNJUST ENRICHMENT**
**Against All Defendants**

1222. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1223. Defendants Affiliated, Clearpath, Vital, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count XXVIII defendants") submitted, caused to be submitted, or benefited from claims submitted to Allstate that caused Allstate to pay money, in reasonable belief that it was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations.

1224. Allstate's payments constitute a benefit which the Count XXVIII defendants aggressively sought and voluntarily accepted.

1225. The Count XXVIII defendants wrongfully obtained or benefited from payments from Allstate through the fraudulent scheme detailed in paragraphs 1 through 930 *supra*.

228

1226. The Count XXVIII defendants have been unjustly enriched by receipt of or benefit from these wrongfully obtained payments from Allstate.

1227. The Count XXVIII defendants' retention of these payments would violate fundamental principles of justice, equity, and good conscience.

## COUNT XXIX
## DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
### Against All Defendants

1228. Allstate re-alleges, re-pleads, and incorporates by reference paragraphs 1 through 930 set forth above as if fully set forth herein.

1229. Defendants Affiliated, Clearpath, Vital, Select, Multicare, Optim, VCC Services, Groesbeck Rx, Dynamic, United Lab, Get Well, TRU, Bazzi, Bakri, Zukkoor, Bitkowski, and Moussa ("Count XXIX defendants") routinely billed for unnecessary and unlawful services with respect to the patients at issue in this Complaint.

1230. The Count XXIX defendants also billed for services not rendered.

1231. The Count XXIX defendants also billed for services pursuant to a fraudulent scheme whereby patients were illegally solicited and referred to them for the purpose of generating claims to Allstate, and not for the purpose of providing reasonably necessary medical treatment, testing, or services.

1232. Pursuant to the Michigan No-Fault Act, an insurer is liable to pay benefits only for reasonable and necessary expenses for lawfully rendered treatment

arising out of a motor vehicle accident. Mich. Comp. Laws §§ 500.3105 and 500.3107.

1233. The lack of reasonableness and necessity are defenses to an insurer's obligation to pay No-Fault benefits arising out of a motor vehicle accident. Mich. Comp. Laws § 500.3107.

1234. The lack of lawfully-rendered treatment (such as treatment arising from illegal solicitation and unlicensed treatment) is also a defense to an insurer's obligation to pay No-Fault benefits. Mich. Comp. Laws §§ 500.3157(1).

1235. Where a provider is unable to show that an expense has been incurred for a reasonably necessary product or service arising out of a motor vehicle accident, there can be no finding of a breach of the insurer's duty to pay, and thus no finding of liability with regard to that expense.

1236. The Count XXIX defendants continue to submit claims under applicable provisions of the Michigan No-Fault Act for unnecessary and unlawfully rendered medical services to Allstate, and other claims remain pending with Allstate.

1237. The Count XXIX defendants will continue to submit claims under applicable provisions of the Michigan No-Fault Act absent a declaration by this Court that Allstate has no obligation to pay fraudulent pending and previously-denied insurance claims submitted by any of the Count XXIX defendants for any or all of the reasons set out in the within Complaint.

1238. Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIX defendants billed for unnecessary and unlawful treatment that is not compensable under applicable provisions of the Michigan No-Fault Act.

1239. Allstate also requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIX defendants were engaged in a fraudulent scheme whereby they billed for unnecessary and unlawful treatment and submitted unreasonable charges for the same to Allstate at all relevant times.

1240. As such, the Count XXIX defendants have no standing to submit, pursue, or receive benefits or any other payment from Allstate, and Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIX defendants cannot seek payment from Allstate for benefits under Michigan's No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq.*, any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint.

1241. Allstate further requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, declaring that the Count XXIX defendants cannot balance bill or otherwise seek payment from any person insured under an Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint.

231

## XIV.  **DEMAND FOR RELIEF**

WHEREFORE, plaintiffs Allstate Insurance Company, Allstate Property and Casualty Insurance Company, Allstate Fire and Casualty Insurance Company, Esurance Insurance Company, and Esurance Property and Casualty Insurance Company respectfully pray that judgment enter in their favor as follows:

**COUNT I**
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Affiliated Enterprise)**
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT II
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Affiliated Enterprise)
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT III
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Clearpath Enterprise)
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Get Well Medical Transport Co., Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

**COUNT IV**
**VIOLATION OF 18 U.S.C. § 1962(d)**
**(Clearpath Enterprise)**
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Get Well Medical Transport Co., Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT V
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Vital Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, VCC Services PLLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, and Hala Moussa**

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT VI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Vital Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, VCC Services PLLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

<u>**COUNT VII**</u>
**VIOLATION OF 18 U.S.C. § 1962(c)**
**(Select Enterprise)**
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Multicare Health Center LLC, Optim Care Center LLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT VIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Select Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Multicare Health Center LLC, Optim Care Center LLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT IX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Multicare Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Select Specialists LLC, Optim Care Center LLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT X
## VIOLATION OF 18 U.S.C. § 1962(d)
## (Multicare Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Select Specialists LLC, Optim Care Center LLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

(a)    AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)    AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Optim Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Select Specialists LLC, Multicare Health Center LLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Optim Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Select Specialists LLC, Multicare Health Center LLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIII
## VIOLATION OF 18 U.S.C. § 1962(c)
## (VCC Services Enterprise)
## Against Vital Community Care, P.C., Amale Bazzi, Youssef Bakri, and Namir Zukkoor M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XIV
## VIOLATION OF 18 U.S.C. § 1962(d)
## (VCC Services Enterprise)
## Against Vital Community Care, P.C., Amale Bazzi, Youssef Bakri, and Namir Zukkoor M.D.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XV
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Groesbeck Rx Enterprise)
### Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVI
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Groesbeck Rx Enterprise)
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XVII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (Dynamic Enterprise)
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT XVIII
### VIOLATION OF 18 U.S.C. § 1962(d)
### (Dynamic Enterprise)
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.**

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)      GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)      GRANT all other relief this Court deems just.

## COUNT XIX
### VIOLATION OF 18 U.S.C. § 1962(c)
### (United Lab Enterprise)
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.**

(a)      AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)      AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XX
### VIOLATION OF 18 U.S.C. § 1962(d)
### (United Lab Enterprise)
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XXI
### VIOLATION OF 18 U.S.C. § 1962(c)
### (Get Well Enterprise)
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Clearpath Diagnostics, LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

244

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XXII
## VIOLATION OF 18 U.S.C. § 1962(d)
### (Get Well Enterprise)
**Against Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Clearpath Diagnostics, LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XXIII
## VIOLATION OF 18 U.S.C. § 1962(c)
### (TRU Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)     GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)     GRANT all other relief this Court deems just.

## COUNT XXIV
## VIOLATION OF 18 U.S.C. § 1962(d)
### (TRU Enterprise)
**Against Affiliated Diagnostic of Oakland, LLC, Vital Community Care, P.C., Select Specialists, LLC, Multicare Health Center LLC, Optim Care Center LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., and Jason Bitkowski, D.O.**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, together with interest, costs, and attorney's fees;

(c)    GRANT Allstate injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the within Complaint; and

(d)    GRANT all other relief this Court deems just.

## COUNT XXV
## COMMON LAW FRAUD
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)  GRANT all other relief this Court deems just.

## COUNT XXVI
## CIVIL CONSPIRACY
### Against All Defendants

(a)    AWARD Allstate its actual and consequential damages against the defendants jointly and severally in an amount to be determined at trial;

(b)    AWARD Allstate its costs, including, but not limited to, investigative costs incurred in the detection of the defendants' illegal conduct; and

(c)    GRANT all other relief this Court deems just.

## COUNT XXVII
### PAYMENT UNDER MISTAKE OF FACT
**Against Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Select Specialists LLC, Multicare Health Center LLC, Optim Care Center LLC, VCC Services, PLLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., and Transportation R Us LLC**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XXVIII
### UNJUST ENRICHMENT
**Against All Defendants**

(a)     AWARD Allstate its actual and consequential damages in an amount to be determined at trial; and

(b)     GRANT all other relief this Court deems just.

## COUNT XXIX
### DECLARATORY RELIEF PURSUANT TO 28 U.S.C. § 2201
**Against All Defendants**

(a)     DECLARE that Allstate has no obligation to pay pending and previously-denied insurance claims submitted by Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Select Specialists LLC, Multicare Health Center LLC, Optim Care Center LLC, VCC Services PLLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri,

Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa, jointly and severally, for any or all of the reasons set out in the within Complaint;

(b)     DECLARE that Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Select Specialists LLC, Multicare Health Center LLC, Optim Care Center LLC, VCC Services PLLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa, jointly and severally, cannot seek payment from Allstate pursuant to the Michigan No-Fault Act, Mich. Comp. Laws § 500.3101, *et seq*., any policy of insurance, any assignment of benefits, any lien of any nature, or any other claim for payment related to the fraudulent conduct detailed in the within Complaint;

(c)     DECLARE that Affiliated Diagnostic of Oakland, LLC, Clearpath Diagnostics, LLC, Vital Community Care, P.C., Select Specialists LLC, Multicare Health Center LLC, Optim Care Center LLC, VCC Services PLLC, Groesbeck Rx LLC, Dynamic Medical Supply, LLC, United Lab Rx, LLC, Get Well Medical Transport Co., Transportation R Us LLC, Amale Bazzi, Youssef Bakri, Namir Zukkoor M.D., Jason Bitkowski, D.O., and Hala Moussa, jointly and severally, cannot balance bill or otherwise seek payment from any person insured under an

Allstate policy or for whom Allstate is the responsible payor related to the fraudulent conduct detailed in the within Complaint; and

(d)    GRANT such other relief as this Court deems just and appropriate under Michigan law and the principles of equity.

## XV.    <u>**DEMAND FOR JURY TRIAL**</u>

The plaintiffs hereby demand a trial by jury on all claims.

[SIGNATURE PAGE FOLLOWS]

Respectfully submitted,

SMITH & BRINK

*/s/ Jacquelyn A. McEttrick*

_____

Richard D. King, Jr.
rking@smithbrink.com
Nathan A. Tilden (P76969)
ntilden@smithbrink.com
Jacquelyn A. McEttrick
jmcettrick@smithbrink.com
Andrew H. DeNinno
adeninno@smithbrink.com
Brad A. Compston
bcompston@smithbrink.com
38777 Six Mile Road, Suite 314
Livonia, MI 48152
(734) 521-9000

350 Granite Street, Suite 2204
Braintree, MA 02184
(617) 770-2214

*Attorneys for Plaintiffs*
*Allstate Insurance Company,*
*Allstate Fire and Casualty Insurance*
*Company, Allstate Property and*
*Casualty Insurance Company,*
*Esurance Insurance Company, and*
*Esurance Property and Casualty*
*Insurance Company*

Dated: May 5, 2021